# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLON YARONI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PINTEC TECHNOLOGY HOLDINGS LIMITED, WEI WEI, STEVEN YUAN NING SIM, JUN DONG, JING ZHOU, XIAOMEI PENG, CHAO ZHOU, FENG HONG, JIACHENG LIU, GOLDMAN SACHS (ASIA) L.L.C., DEUTSCHE BANK SECURITIES INC., and CITIGROUP GLOBAL MARKETS INC.,<br><br>Defendants. | **Case No. 1:20-cv-08062-JMF**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Jesse M. Furman<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

SUMMARY OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 6

PARTIES ................................................................................................................................ 7

  A.  Plaintiff ....................................................................................................................... 7

  B.  Pintec........................................................................................................................... 7

  C.  The Individual Defendants.......................................................................................... 8

  D.  The Underwriter Defendants....................................................................................... 9

PINTEC'S BACKGROUND AND OPERATIONS PRIOR TO THE IPO ............................... 11

  A.  Pintec and its Business.............................................................................................. 11

  B.  Pintec Remains Closely Entangled with its Corporate Predecessor Despite Purported
      Separation .................................................................................................................. 15

  C.  Material Weaknesses in Internal Controls Result in Pintec Providing Millions of
      Dollars in Cash Loans to Jimu Without Proper Documentation........................................ 18

  D.  A Material Weakness in Internal Controls Results in Pintec Entering a Non-Routine
      Loan Financing Transaction with Plutux Labs, Leading to Significant Risk Exposure .... 20

  E.  Pintec Improperly Records Revenues Earned from Technical Service Fees on a Net,
      Rather than Gross Basis, Resulting in a Material Understatement of Cost of Revenues .. 21

PINTEC GOES PUBLIC VIA THE MATERIALLY FALSE AND MISLEADING
OFFERING MATERIALS ....................................................................................................... 22

  A.  Disclosure Obligations Under the Securities Act .............................................................. 22

  B.  Defendants Issue the False and Misleading Offering Materials ....................................... 26

    1.  False and Misleading Statements Regarding the Company's System of
        Internal Controls, Audit Committee, and Auditor ........................................................ 26

    2.  False and Misleading Statements Regarding the Company's Cash Loans to Jimu
        Made Outside of the Ordinary Course of Business ........................................................ 30

    3.  False and Misleading Statements About the Company's Revenue
        Recognition Practices.................................................................................................... 38

    4.  False and Misleading Line Items in the Company's Offering Materials' Financial
        Statements ..................................................................................................................... 43

PINTEC'S ADS PRICE DECLINES SUBSTANTIALLY FOLLOWING THE IPO
AS NEW MANAGEMENT IS FORCED TO UNTANGLE THE  COMPANY'S
BUSINESS FROM JIMU AND CORRECT ITS  INTERNAL CONTROL DEFICIENCIES
AND MISSTATEMENTS....................................................................................................... 52

CLASS ALLEGATIONS ....................................................................................................... 64

CAUSES OF ACTION ........................................................................................................... 65

COUNT I ............................................................................................................................ 65

COUNT II ........................................................................................................................... 67

PRAYER FOR RELIEF ....................................................................................................... 68

JURY TRIAL DEMANDED ................................................................................................. 69

Court-appointed Lead Plaintiff Eric Dahm ("Plaintiff") brings this action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") individually and on behalf of all persons or entities, other than Defendants and their affiliates, who purchased American Depositary Shares ("ADSs") registered by Pintec Technology Holdings Limited ("Pintec" or the "Company") pursuant or traceable to the Company's Initial Public Offering (the "IPO" or "Offering") that commenced on October 25, 2018.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of his undersigned Counsel, which included, among other things, review and analysis of: (i) Pintec's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Pintec's other public statements, including press releases; and (iii) news articles and other commentary and analysis concerning Pintec and the industry in which it operates. Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

For all claims stated herein, Plaintiff expressly disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

## SUMMARY OF THE ACTION

1.      Federal securities laws are built upon the fundamental tenet that a publicly traded company must avoid disseminating to the market any false or misleading statements in connection with its business or future prospects so as to provide the public a clear and accurate picture upon which to evaluate their investment. Never is that more important than in the context of an initial public offering, where an issuer is presenting itself to the market for the first time. In fact, the

registration statement by which a company carries out its initial public offering is so critical that liability under the Securities Act is nearly absolute for negligently prepared registration statements containing materially false and misleading information.

2.      This securities class action is brought on behalf of a proposed class of Pintec investors who, like Plaintiff, purchased Pintec ADSs pursuant and/or traceable to the negligently prepared Form F-1 Registration Statement filed with the SEC on July 16, 2018 (collectively with the subsequent amendments on Form F-1/A filed October 10, 19, and 22, the "Registration Statement") and Prospectus filed on Form 424B4 with the SEC on October 25, 2018 incorporated therein (the "Prospectus," and, together with the Registration Statement, the "Offering Materials") issued in connection with the Company's October 2018 IPO.

3.      The Defendants named herein were each negligent in failing to ensure that the Offering Materials were free from material defects and that the statements contained therein were not false or misleading.

4.      According to the Offering Materials, Pintec is a technology company uniquely positioned within the evolving Chinese financial services industry, operating several technology platforms designed to connect end user consumers with financial partners offering a variety of financial products, including small loans and wealth management services.

5.      Because Pintec purportedly operates only as an intermediary and facilitator, its relationships with these financial partners are of paramount importance to its success.

6.      The most important of Pintec's relationships at the time of the IPO was with Jimu Holdings Limited (collectively referred to herein, along with its affiliates and subsidiaries, as "Jimu" or the "Jimu Group"), a company with which Pintec shared a corporate past and overlapping board members. As set forth in the Offering Materials, Pintec historically relied on

Jimu for the vast majority of its funding, with Jimu Group's online peer-to-peer lending business acting as the "funding source for 99% of the outstanding loans facilitated through [Pintec's] platform as of December 31, 2016, 81% of the outstanding loans as of December 31, 2017, [and] 74% of the outstanding loans as of June 30, 2018."

7.     What was not disclosed in the Offering Materials, however, was that Pintec was making tens of millions of dollars in unsecured loans (later described by the Company as "cash advances") to Jimu outside of the normal course of business at the time of the IPO without any oversight from Pintec's Board of Directors (the "Board") or its Audit Committee. Even more troubling was that these non-routine loans were made without proper documentation as to even their most basic terms (including the associated interest rate or repayment period), meaning the Company was doing nothing to assess the collectability of such advances or the impact they had on Pintec's ongoing business operations, including the significant credit exposure to Jimu.

8.     Ultimately, and only after the IPO, Pintec would be forced to enter into several post-fact loan agreements with Jimu to account for these unapproved loans before eventually taking a significant provision for credit loss of RMB 856.0 million ($129.4 million USD)[1] on the balance due from Jimu in the year ended December 31, 2019. This amount was written off because collection or recovery had become remote, as Jimu was insolvent and announced its exit from the peer-to-peer ("P2P") lending business during the first quarter of 2020.

9.     The Company's internal control deficiencies at the time of the IPO were not limited to its related party transactions with Jimu, however, as in July 2018 the Company's failing system

---

[1] For the benefit of the Court, amounts presented in the Chinese currency Renminbi ("RMB") will be accompanied by an equivalent amount in U.S. dollars ("USD") using the relevant exchange rate or, in some cases, the exchange rate set forth in Pintec's Prospectus, RMB6.6171 to $1.00 USD. Amounts reported in USD will be rounded to the first decimal. Unless otherwise indicated, all emphasis used herein is added.

of internal checks resulted in Pintec making an unsecured loan of $20 million USD to a speculative cryptocurrency exchange company called Plutux Labs Limited ("Plutux"). Neither the existence of the loan, nor the manner in which this non-routine loan was provided, was described in the Offering Materials, as the Company failed to exercise even the most basic due diligence on Plutux before funding the loan *without any requirements for collateral or pledge from the borrower*.

10.     After providing this loan without first conducting proper diligence, and lacking the proper procedures to assess and review recoverability from this transaction, Pintec agreed to an early repayment from Plutux in May 2019, taking less than the amount owed and writing off interest to which it was otherwise entitled.

11.     Having failed to address these issues prior to the IPO, the Company was forced to file a notification of its inability to timely file its annual report for fiscal year 2018 in April 2019 – just months after the IPO, and for the first annual report Pintec was scheduled to file since becoming a public company – because doing so required "unreasonable effort or expense."

12.     When Pintec finally filed its annual report on July 30, 2019 (the "2018 Annual Report"), the Company disclosed that these material and previously undisclosed internal control weaknesses informed a significant adjustment from the unaudited financial results for 2018 released on March 20, 2019, including a significant decline in net income:

|  | Pre-adjustment | | Post-adjustment | |
|---|---|---|---|---|
|  | RMB | US$ | RMB | US$ |
|  | (in thousands) | | | |
| Share of loss from equity method investments | (2,967) | (432) | (2,652) | (386) |
| Other income, net | 14,317 | 2,082 | 8,822 | 1,283 |
| Income before income tax expenses | 13,059 | 1,899 | 7,880 | 1,146 |
| Net income | 7,350 | 1,068 | 2,171 | 315 |
| Total comprehensive income | 37,523 | 5,456 | 32,344 | 4,703 |
| Non-GAAP adjusted net income | 138,610 | 20,159 | 133,431 | 19,406 |

13.    But as the Company had negligently included financial results for the first six months of 2018 in the Prospectus that failed to account for these knowable internal control weaknesses and related adjustments as of the IPO, the figures presented to Plaintiff and the investing public in the Offering Materials were materially false and misleading.

14.    Furthermore, the belated 2018 Annual Report also provided context to the March 2019 announcement that Pintec had acquired the entire equity interest in Ganzhou Jimu Micro Finance Co., Ltd. ("Jimu Micro Finance"), a licensed micro loan company, from Jimu for RMB230 million ($33.5 million USD). The March 2019 announcement came at a time when Chinese regulators were cracking down on microfinance lenders and the industry was contracting, and appeared to violate a non-competition agreement between Pintec and Jimu. The 2018 Annual Report revealed that this asset transfer was netted against the undisclosed amounts Jimu owed to Pintec for the improper cash advances — amounts whose recovery was becoming less likely because of Jimu's worsening financial condition.

15.    Pintec's admission that the Company's internal controls were ineffective, and that the partial year financials presented in the Offering Materials for the first half of 2018 were

necessarily misstated, touched off a string of management, director, and auditor changeover at the Company, including the dismissal of PricewaterhouseCoopers Zhong Tian LLP ("PWC") – the auditor at the time of the IPO and for fiscal year 2017.

16.     Then on June 15, 2020, and for the second time in just two years as a public company, Pintec filed a Form NT 20-F with the SEC, again indicating an inability to file its annual report for the period ended December 31, 2019 on a timely basis without unreasonable effort or expense. However, this time the Company provided greater insight into why: Pintec's consolidated financial statements for December 31, 2017 (included in the Offering Materials) and December 31, 2018 (which included the interim results presented in the Offering Materials for the first half of 2018) contained material misstatements, necessitating a restatement by the Company.

17.     More specifically, the Company had improperly recognized revenues and costs of revenues on a net, rather than gross basis, resulting in a material understatement of the financial results presented in the Offering Materials. Additionally, line items in the Offering Materials' cash flow statements were improperly classified, misrepresenting the Company's cash position at the time of the IPO.

18.     Since the IPO, Pintec's ADSs have traded well below the initial Offering price of $11.88 per ADS, closing at $0.98 per ADS on September 29, 2020 – the date of the first-filed complaint in this action – representing a drop of $10.90 per ADS and ***constituting a loss of nearly 92% in value***. Thus, as detailed herein, the members of the Class have suffered significant damages as a result of the negligently prepared Offering Materials.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77(o).

20.     This Court has subject matter jurisdiction over this action under § 22 of the

Securities Act (15 U.S.C. §77v).

21. Venue is proper in this court as: (i) Pintec engaged The Bank of New York Mellon as its depositary bank for the ADSs issued in the Offering and The Bank of New York Mellon's depositary offices are located at 101 Barclay Street, New York, New York 10286 and its principal executive office is located at 225 Liberty Street, New York, New York 10286; (ii) several of the Underwriter Defendants maintain offices in this district; (iii) the Individual Defendants all signed the Registration Statement and caused it to be transmitted into this district; and (iv) the ADSs are listed on the Nasdaq Global Market ("Nasdaq"), a national stock exchange based in this district.

22. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A. Plaintiff

23. As set forth in his previously-filed Certification, incorporated by reference herein, Lead Plaintiff Eric Dahm purchased Pintec ADSs pursuant or traceable to the Registration Statement for the IPO and has been damaged thereby. *See* ECF No. 22-1; 22-2.

### B. Pintec

24. Defendant Pintec is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing, China. Pintec's ADSs trade on the NASDAQ under the symbol "PT."

25. As the issuer of the ADSs, Pintec has a responsibility to ensure that its Offering Materials were free from material defect. Instead, the Offering Materials were negligently prepared, resulting in the inclusion of several false and misleading statements of material fact, or

omitted to state material facts necessary to make the statements therein not misleading.

**C. The Individual Defendants**

26.     Defendant Wei Wei ("Wei") was, at all relevant times, the Chief Executive Officer and a director of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

27.     Defendant Steven Yuan Ning Sim ("Sim") was, at all relevant times, the Chief Financial Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

28.     Defendant Jun Dong ("Dong") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC. At the time of the IPO, Dong was also a director of Jimu.

29.     Defendant Jing Zhou was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

30.     Defendant Xiaomei Peng ("Peng") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC. At the time of the IPO, Dong was also a director of Jimu.

31.     Defendant Chao Zhou was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

32.     Defendant Feng Hong ("Hong") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC. At the time of the IPO, Dong was also a director of Jimu.

33.     Defendant Jiacheng Liu ("Liu") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

34.     Defendants Wei, Sim, Dong, Jing Zhou, Peng, Chao Zhou, Hong, and Liu are collectively referred to hereinafter as the "Individual Defendants."

35.     As members of management and the Board of Pintec and actual signatories of the Offering Materials containing the false and misleading statements alleged herein, the Individual Defendants had a duty to conduct appropriate due diligence to ensure that the Offering Materials were free from material defect. Instead, the Offering Materials were negligently prepared, resulting in the inclusion of several false and misleading statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading.

36.     Additionally, the Individual Defendants exercised control over the actions of Pintec as members of its executive management team and/or Board.  In this capacity, the Individual Defendants had the ability to prevent Pintec's issuance of the false and misleading Offering Materials, but failed to exercise their duty to do so.

**D.  The Underwriter Defendants**

37.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter for the Company's IPO.

38.     Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter for the Company's IPO.

39.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO.

40.     Defendants Goldman Sachs, Deutsche, and Citigroup are collectively referred to hereinafter as the "Underwriter Defendants."

41.     Per the Form of Underwriting Agreement filed as an exhibit to the Registration Statement, each Underwriter Defendant agreed, severally and not jointly, to purchase from the

Company the number of firm ADSs plus any optional shares upon the exercise of the Underwriter Defendants' option.

42.     Each of the Underwriter Defendants received commissions for their participation in the IPO, receiving $0.95 for each of the 3,725,000 Pintec ADSs underwritten, totaling approximately $3.5 million, plus any additional proceeds from the exercise of the over-allotment option.

43.     The Underwriter Defendants had an option to purchase up to 558,750 additional ADSs at the initial public offering price paid by investors less applicable underwriting discounts and commissions.  The Underwriter Defendants partially exercised this option, selling an additional 483,070 ADSs at the IPO price of $11.88 per ADS.

44.     In the run-up to the IPO, the Underwriter Defendants actually did, or had the ability to: (i) conduct due diligence on the Company, including, *inter alia*, access to confidential corporate information concerning Pintec's business operations unknown to the investing public; and (ii) consult with Company management regarding the content of the Offering Materials.

45.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially untrue and misleading statements in the Offering Materials. The Underwriter Defendants assisted Pintec and the Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable investigation into the business and operations of Pintec — a process known as a "due diligence" investigation. The Underwriter Defendants were required to conduct a due diligence investigation in order to participate in the IPO. During the course of their due diligence investigation, the Underwriter Defendants had continual access to confidential corporate information concerning Pintec's operations and financial prospects.

46.     In addition to availing themselves of virtually unlimited access to internal corporate

documents, agents of the Underwriter Defendants met with Pintec's lawyers, management, and top executives and made joint decisions regarding: (i) the terms of the IPO, including the price at which Pintec ADSs would be sold to the public; (ii) the strategy to best accomplish the IPO; (iii) the information to be included in the Offering Materials; and (iv) what responses would be made to the SEC in connection with its review of the Offering Materials. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Pintec's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Pintec's existing problems as detailed herein.

47.     As alleged herein, Pintec, the Individual Defendants, and the Underwriter Defendants negligently allowed the Offering Materials to contain materially untrue and misleading statements and/or omissions, and failed to act in a reasonable manner to prevent the Offering Materials from containing materially misleading statements and/or preventing the materially misleading Offering Materials from being disseminated.

## PINTEC'S BACKGROUND AND OPERATIONS PRIOR TO THE IPO

### A.  Pintec and its Business

48.     According to the Offering Materials, Pintec is a "technology company" that plays the role of intermediary to "help [its] financial partners adapt to the new digital economy by enabling them to access the online population that they could not otherwise reach efficiently or effectively":



49.     To do so, Pintec relies primarily on three technology platforms: the Dumiao platform for lending money to end users as point-of-sale installment loans, personal installment loans, or business installment loans; the Hongdian platform for offering wealth management services; and the Polaris platform for the construction of portfolios for users from mutual funds and other assets (collectively, Dumiao, Hongdian, and Polaris are referred to herein as the "Technology Platforms").



50.     *Dumiao*. The Dumiao platform links financial lenders and borrowers through its offering of three distinct consumer finance products: point-of-sale loans; personal installment loans; and business installment loans.

51.     For point-of-sale loans, Pintec's business partners (often online merchants and travel agencies) are able to offer installment payment options to customers at the point of sale,

providing an approved credit line for the end-consumer to purchase the product or service in question.

52.     For personal installment loans and business installment loans, Pintec's business partners can make unsecured personal or business credit available to their customers, with terms ranging from just a few months to several years.

53.     *Hongdian*. The Hongdian platform facilitates the provision of wealth management services to Pintec's business partners' consumers, allowing these entities to offer and distribute mutual fund products to their customers, either under the Hongdian brand or as a white label solution.

54.     Pintec directly charges end users subscription fees and shares a certain percentage of the subscription fees, redemption fees, conversion fees, sales service fees and customer maintenance fees charged to end users by Pintec's financial partners.

55.     *Polaris*. Described in the Offering Materials as a "robo-advisory" service, Polaris is a platform used to construct and offer portfolios with mutual funds and other assets provided by Pintec's financial partners.

56.     The Polaris platform is also used to evaluate end users' risk tolerance based on investor questionnaires, provides automated recommendations for initial asset allocation, and periodically rebalances end users' portfolios.

57.     Pintec's role as the technology middleman was critical to its business, as, at the time of the IPO, Pintec did not have the proper licensing from the Chinese regulatory authorities to operate as a direct peer-to-peer lender. Instead, and as stated in the Offering Materials, "[o]ur lending solutions platform, Dumiao Wallet, does not itself engage in any direct loan facilitation between peers, but merely facilitates loans funded by the financial partners. As such, we do not

consider Dumiao Wallet as a[n] 'online information intermediary institution' regulated under the Interim Measures [for Administration of the Business Activities of Online Lending Information Intermediator Institutions] [a wide-sweeping regulatory framework designed to curb the explosive gray market for online peer-to-peer lending in China promulgated in August 2016]."

58.     Dumiao itself was Pintec's essential business at the time of the IPO, as the primary driver of Company revenue.

59.     In connection with its role as technology intermediary, as of the IPO, Pintec collected revenue in three ways: (i) technical service fees; (ii) installment service fees; and (iii) wealth management service fees.

60.     *Technical Service Fees*. In connection with its provision of credit assessment services and "post-lending management services, such as cash processing services and collection services, for personal and business installment loans," Pintec collects a technical service fee from both its financial partners (*e.g.* the entities lending through Pintec's Dumiao platform) and the borrowers accessing that platform for a financial product. These "[l]oan facilitation services are provided to potential borrowers to facilitate their matching with the investors on [Pintec's] financial partners' platforms or commercial banks and other financial institutions," and Pintec can only charge such a fee when a successful match has been made between borrower and lender.

61.     Technical service fees (derived primarily from the Dumiao platform) comprised the largest portion of the Company's revenues at the time of the IPO, equaling nearly 75% of revenues for the year ended December 31, 2017 and 69% for the six months ended June 30, 2018:

| | For the Years Ended December 31, | | | | | For the Six Months Ended June 30, | | | | |
| | 2016 | | 2017 | | | 2017 | | 2018 | | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | | (In thousands, except percentages) | | | | | |
| **Revenues:** | | | | | | | | | | |
| Technical service fees | 34,171 | 62.3 | 425,311 | 64,275 | 74.8 | 138,261 | 79.4 | 399,703 | 60,405 | 69.2 |
| Installment service fees | 16,394 | 29.9 | 139,862 | 21,136 | 24.6 | 34,364 | 19.7 | 169,881 | 25,673 | 29.4 |
| Wealth management service fees | 4,309 | 7.8 | 3,547 | 536 | 0.6 | 1,422 | 0.9 | 8,080 | 1,221 | 1.4 |
| **Total revenues** | **54,874** | **100.0** | **568,720** | **85,947** | **100.0** | **174,047** | **100.0** | **577,664** | **87,299** | **100.0** |

14

62. *Installment Service Fees*. Installment service fee revenue is comprised of interest received from a borrower on a point-of-sale, business installment, or personal installment loan. This revenue also flowed from the Company's Dumiao platform and was the second largest portion of Pintec revenue immediately prior to and at the time of the IPO, constituting approximately 25% of revenue for the year ended December 31, 2017 and more than 29% for the six months ended June 30, 2018.

63. *Wealth Management Fees*. Through its Hongdian and Polaris platforms, the Company facilitates the sale of products from asset management and insurance companies, collecting a "wealth management fee" (i.e. a commission on financial products sold by these entities). These wealth management fees provided the smallest revenue stream for Pintec, equaling just 0.6% and 1.4% of revenue for fiscal year 2017 and the first half of 2018, respectively.

## B. Pintec Remains Closely Entangled with its Corporate Predecessor Despite Purported Separation

64. The Technology Platforms underlying Pintec's business at the time of the IPO were originally developed by entities affiliated with Pintec's former corporate parent, Jimu.

65. According to the Offering Materials, Jimu was incorporated in 2012 and commenced its peer-to-peer ("P2P") lending business in July 2012, as that company sought to enter the emerging Chinese consumer finance space.

66. Beginning in 2015, Jimu looked to diversify, launching the Dumiao platform to facilitate lending money to peer-borrowers in June 2015; the Hongdian platform for offering wealth management services in September 2015; and the Polaris platform for the construction of portfolios for users from mutual funds and other assets in June 2016.

67. In September 2016, Jimu purportedly separated its P2P business from its

Technology Platforms business, initiating a corporate restructuring and reorganization. The two business verticals (the P2P business and the Technology Platforms) would continue to operate as part of the Jimu Group as complementary parts, as the "Jimu Box" P2P business would take in funding from would-be lenders and then feed that cash into the Technology Platforms as funding for its various products and offerings.

68.    The Technology Platforms would continue to operate as a business unit of Jimu until March 31, 2018, when, following another group reorganization of Jimu, the Technology Platforms were transferred to Pintec as a standalone entity purportedly outside of the Jimu umbrella, all in advance of taking Pintec public via the IPO.

69.    Although Pintec's business units had been transferred to another legal entity and were operating under a new name, ownership still rested with Jimu's shareholders.

70.    According to the Prospectus: "Pursuant to the Reorganization, all of the shares of Pintec Technology Holdings Limited were issued to the shareholders of Jimu Group's holding company [Jimu Holdings Limited] such that Pintec Technology Holdings Limited has the same shareholders, in the same proportions and with the same rights, as Jimu Group's holding company does."

71.    As of the Offering, Pintec and Jimu also shared three board members: defendants Jun Dong, Xiaomei Peng, and Feng Hong.

72.    Further complicating this shared ownership and director overlap, Pintec's articles of association provided a carveout, allowing Pintec directors with an interest in Jimu to vote on transactions between Pintec and Jimu or Jimu's affiliates, even if other directors objected.

73.    Operationally, Pintec and Jimu had historically acted as a single entity, and Pintec continued to be heavily reliant upon Jimu as of the IPO.

74.     Jimu Box (Jimu's online peer-to-peer lending platform) was the funding source for 99% of the outstanding loans facilitated by Pintec's Dumiao platform as of December 31, 2016, 81% of outstanding loans as of December 31, 2017, and 74% of outstanding loans as of June 30, 2018, and the Offering Materials stated that Pintec expected Jimu Box to remain the largest single source of Dumiao funding for the foreseeable future.

75.     Pintec and Jimu also maintained extraordinary operating agreements, cooperation agreements, noncompete agreements, mutual indemnification agreements, and IP sharing agreements.

76.     For example, Pintec agreed to indemnify Jimu for any misstatements made in the Offering Materials, "except for misstatements or omissions relating to information that Jimu Group provided."

77.     Pintec and Jimu's Cooperation Framework Agreement stated that Jimu would fund the loans to borrowers referred and approved by Pintec up to an aggregate of no less than 50% of all of the loans matched on Jimu's P2P lending platform each month – an agreement that would not expire until the *later* of: "(i) the date that is 15 calendar days after the first quarter-end date that the common shareholding between Jimu Group's holding company and Pintec drops below 20%; and (ii) the 15th anniversary of the date of completion of this offering." Thus, in essence Pintec's fate was tied to Jimu for at least fifteen years following the IPO.

78.     The Company entered into a similarly long non-competition agreement with Jimu, which the Offering Materials described as an agreement "not to compete with Jimu Group during the non-competition period in any business that is of the same nature as the peer-to-peer lending business, excluding, for the avoidance of doubt, any part of the business that we currently conduct or contemplate to conduct."

79.     In the Prospectus, Pintec admitted that these agreements with Jimu "may be less favorable to us than similar agreements negotiated between unaffiliated third parties."

80.     However, what was not disclosed was that, at the time of the IPO, the intertwined relationship between Jimu and Pintec left Pintec vulnerable to internal control weaknesses and financial misstatements – issues that existed, but ultimately went unreported to Company investors in the Offering Materials.

## C.   Material Weaknesses in Internal Controls Result in Pintec Providing Millions of Dollars in Cash Loans to Jimu Without Proper Documentation

81.     Unbeknownst to Plaintiff and the public investors in Pintec, prior to and at the time of the IPO, Pintec regularly provided cash loans to Jimu outside of the normal course of business and without any effective oversight or controls.

82.     In the normal course of business, Pintec would disburse funds to borrowers for loans funded by Jimu and then collect payments on those loans from those borrowers on Jimu's behalf. Pintec would then remit those funds to Jimu, less the technical service fee to which it was entitled as the technological intermediary connecting borrower and lender.

83.     However, in addition to payments made to Jimu in this regular course of business, Pintec also made a series of unreported cash loans made outside of the Company's ordinary course of business (later dubbed "advances" by the Company) to Jimu in 2018 that were not documented contemporaneously by loan agreements.

84.     The reason these related and unreported transactions were able to slip through undetected was because Pintec lacked effective controls in several critical functions, including:

- the failure to set authorization levels for review and preapproval of the business rationale, nature, extent and terms of cash advances to Jimu by Pintec's board of directors;

- the failure to come to an agreement on and document the terms of the cash advances, including repayment terms and interest rate, prior to the provision or extension of the advances from Pintec to Jimu;

- the lack of any formal procedures to ensure authorization and approval of such advances by Pintec's Audit Committee prior to the provision or extension of the advances, as required under the charter of the Audit Committee;

- the absence of any review for appropriate authorization of the cash advance transaction in accordance with Pintec's authorization limits (including board of director and Audit Committee approvals) and whether amounts including cumulative amounts of these transactions were within the limits approved by the Board and Audit Committee prior to provision or extension of the advances; and

- the absence of any periodic assessment of the recoverability of these cash advances to Jimu to determine if an allowance for doubtful accounts was necessary.

85.     These cash advances totaled RMB441.5 million ($64.2 million USD) as of December 31, 2018, with such advances responsible for nearly the entirety of the amount due from Jimu as of that date, equaling nearly 93% of the $69.1 million USD owed by Jimu.

86.     Yet Pintec would continue to make these abnormal cash advances to Jimu in 2019, lending an additional $65.4 million USD before discontinuing the practice in May 2019.

87.      These unrecorded and unreported cash advances to Jimu resulted in Pintec having significant credit exposure to Jimu at the time of the IPO, exacerbated by the high degree of overlap between shareholders and management of the companies that left public investors like Plaintiff and members of the proposed Class subject to the secret lending whims of these conflicted parties.

88.     Further, these material weaknesses resulted in significant outstanding balances due from Jimu at the end of 2018 with unclear terms, presenting challenges for Pintec in assessing the recoverability of the outstanding balance for financial reporting purposes, meaning that the interim results presented in the Offering Materials were necessarily incorrect.

89.     Ultimately, and only after the IPO, Pintec would be forced to enter into several post-fact loan agreements with Jimu to account for these unapproved loans before taking a

significant provision for credit loss of RMB 856.0 million ($129.4 million USD) on the balance due from Jimu for the year ended December 31, 2019, as collection or recovery became remote due Jimu's insolvency and announced exit from the P2P business during the first quarter of 2020.

### D.  A Material Weakness in Internal Controls Results in Pintec Entering a Non-Routine Loan Financing Transaction with Plutux Labs, Leading to Significant Risk Exposure

90.    In addition to the abnormal cash advances to Jimu that went unchecked because of the Company's internal control failures, Pintec's lack of controls also resulted in the Company making an unsecured loan of $20 million USD to an entity called Plutux Labs Limited ("Plutux") in 2018.

91.    According to its own SEC filings, Plutux is a Cayman Islands-incorporated company with a mailing address in Hong Kong.

92.    Information about Plutux is sparse, however, an archived version of the company's website indicates that it sought to operate as a cryptocurrency exchange that was originally scheduled to open in late October 2018 before pushing to 2019, but which appears to have never actually commenced operations.

93.    The Company's annual report for 2018 corroborates this information, stating that Plutux "is a digital assets and securities exchange platform in Asia."

94.    However, Pintec later admitted it made no efforts to conduct any appropriate due diligence before extending a $20 million USD loan to Plutux on July 31, 2018 (well prior to the IPO) *without any requirements to Plutux Labs for collateral or pledge on this loan*, including failing to:

- exercise due diligence on Plutux prior to making the loan to determine and document the existence of, the ownership of, and the business nature of Plutux;

- assess the credit worthiness of Plutux before entering into the loan arrangement; and

- periodically assess the recoverability of the outstanding loan to Plutux to determine if an allowance for doubtful accounts was necessary.

95.     Despite being entitled to repayment of the entire principal of the $20 million USD loan from Plutux, along with $880,000 USD in interest as of December 31, 2018, the Company entered into an agreement with Plutux on May 5, 2019 whereby Pintec accepted a total payment of $20.12 million in satisfaction of the loan, writing off the $760,000 in interest to which it was otherwise entitled as of December 31, 2018, as well as foregoing the additional interest accrued between January 1, 2019 and the May 5, 2019 payment.

**E.  Pintec Improperly Records Revenues Earned from Technical Service Fees on a Net, Rather than Gross Basis, Resulting in a Material Understatement of Cost of Revenues**

96.     As set forth in the Offering Materials, revenues from technical service fees comprised the largest portion of Pintec's business prior to and at the time of the IPO, accounting for 75% of revenues for the year ended December 31, 2017 and 69% for the six-month period ended June 30, 2018.

97.     In purported compliance with FASB Accounting Standard Codification (ASC) Topic 605, at the time of the IPO, the Company recognized revenue when each of the following criteria were met: (1) persuasive evidence of an arrangement existed; (2) services had been rendered; (3) pricing was fixed or determinable; and (4) collectability was reasonably assured.

98.     However, despite acting as the principle for these technical service fees, Pintec recognized such revenue on a net, rather than gross basis. The end result was a material understatement of both revenues and cost of revenues that would only become public after the IPO and upon a restatement of 2017 and 2018 financial results by the Company, meaning the full year 2017 and interim 2018 financial results presented in the Offering Materials were materially false and misleading, as identified herein.

**PINTEC GOES PUBLIC VIA THE MATERIALLY FALSE AND MISLEADING OFFERING MATERIALS**

99.     After formally and finally separating the Technology Platforms from the Jimu umbrella of companies in March 2018, Pintec was finally positioned to go public through the IPO.

100.     Following several iterations of draft registration statements and correspondences with the SEC between December 2017 and June 2018, on July 16, 2018, Pintec filed the Registration Statement on Form F-1.

101.     The Registration Statement was subsequently amended on October 10, 2018, October 19, 2018, and October 22, 2018 before receiving a notice of effectiveness from the SEC as of October 24, 2018 at 5:00 p.m.

102.     On October 25, 2018, Pintec filed the Prospectus on Form 424(b)(4), commencing the Offering of 3,725,000 ADSs (each representing seven Pintec Class A ordinary shares) at an Offering Price of $11.88 per ADS.

103.     Additionally, the Underwriter Defendants maintained a 30-day option to purchase up to an additional 558,750 ADSs from Pintec at the Offering Price (the "Greenshoe Option").

104.     Ultimately, Defendants would sell 4,208,070 ADSs in the IPO (inclusive of a partial exercise of the Greenshoe Option) for gross proceeds of nearly $50 million and proceeds to Pintec of approximately $46 million, after deduction of underwriting commissions and expenses.

105.     However, in violation of the Securities Act, the Offering Materials pursuant to which Pintec conducted its IPO presented materially inaccurate, untrue, and/or incomplete statements regarding Pintec's business, performance, prospects, and financial statements, all while omitting crucial realities.

**A.  Disclosure Obligations Under the Securities Act**

106.     "The Securities Act of 1933 . . . was designed to provide investors with full

disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

107.    To effectuate this purpose, a company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983).  Failure to do so gives rise to private rights of action under the Securities Act.  *Id*. at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering"); *see also* 15 U.S.C. § 77k(a).

108.    Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC.  *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the

registration as being or about to become a director [;]" (4) "any person . . . who has with his consent

been named as having prepared or certified any part of the registration statement[;]" and (5) "every

underwriter with respect to such security."  15 U.S.C. § 77k(a)(1-5).

109.    Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose

"known trends or any known demands, commitments, events or uncertainties that will result in or

that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material

way." *Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release

No. 6835, 1989 WL 1092885, at *4 (May 18, 1989); *see also* 17 C.F.R. § 229.303(a)(3).

Disclosure of known trends or uncertainties that the registrant reasonably expects will have a

material impact on net sales, revenues, or income from continuing operations is also required.  *Id.*

110.    Pursuant to Item 303(a), a registrant thus has an affirmative duty to:

i.      Describe any *unusual or infrequent events or transactions* or any significant
        economic changes that materially affected the amount of reported income from
        continuing operations and, in each case, indicate the extent to which the income
        was so affected.

ii.     Describe *any known trends or uncertainties that have had or that the registrant
        reasonably expects will have a material favorable or unfavorable impact on net
        sales or revenues or income* from continuing operations. If the registrant knows of
        events that will cause a material change in the relationship between costs and
        revenues (such as known future increases in costs of labor or materials or price
        increases or inventory adjustments), the change in the relationship shall be
        disclosed. 2017 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also S.E.C.
        Release No. 6835*, 1989 WL 211092885, at *8 (May 18, 1989) ("Other non-
        recurring items should be discussed as unusual or infrequent events or transactions
        that materially affected the amount of reported income from continuing
        operations.") (citation and quotation omitted).

111.    Under these requirements, even a one-time event, if "reasonably expect[ed]" to

have a material impact on results, must be disclosed.  Examples of such *required* disclosures

include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share;

changes in insurance coverage; or the likely non-renewal of a material contract." *S.E.C. Release*

*No. 6835*, 1989 WL 1092885, at \*4 (May 18, 1989).

112.    Accordingly, as the SEC has emphasized, the "specific provisions of Item 303 [as set forth above] require disclosure of forward-looking information." *See* S.E.C. Release No. 6835, 1989 WL 1092885, at \*3.  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id*. at \*3, \*17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at \*11 (Dec. 19, 2003).

113.    Item 503 of Regulation S-K is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, S.E.C. Release No. 8501, 2004 WL 2610458, at \*86 (Nov. 3, 2004).  Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  17 CFR § 229.503(c).  The discussion of risk factors must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.  *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at \*14 (July 29, 1998).

114.    Thus, Item 503 provides that a registration statement must disclose all known

material risks that are "specific to the particular company and its operations."   17 CFR §
229.503(c).  Item 503(c) warns issuers: "Do not present risks that could apply to any issuer or any
offering."  *Id*.

115.    As detailed herein, by negligently allowing for the dissemination of the deficient
Offering Materials, Defendants wholly failed to meet their disclosure obligations.

**B.  Defendants Issue the False and Misleading Offering Materials**

116.    To the detriment of Plaintiff and all those who bought ADSs in or traceable to the
IPO and pursuant to the Offering Materials, the negligently prepared Offering Materials omitted
material information regarding Pintec's business practices, internal controls, and reported financial
statements. As such, the Offering Materials contained untrue statements of material fact or omitted
to state facts necessary to make the statements made therein not misleading, violating the rules and
regulations governing their preparation.

**1.  False and Misleading Statements Regarding the Company's System of
Internal Controls, Audit Committee, and Auditor**

117.    Most glaring in light of the Company's subsequent admissions and multiple
restatements of financials either specifically included in the Offering Materials or which
incorporated the stub period disclosed therein was the Offering Materials' discussion of the
Company's system of internal controls (or lack thereof).

118.    In discussing the Company's purported system of internal controls, the Offering
Materials negligently stated:

> ***If we fail to maintain an effective system of internal control over financial
> reporting, we may be unable to accurately report our financial results or prevent
> fraud.***
>
> Prior to this offering, we were a private company with limited accounting personnel
> and other resources with which to address our internal control and procedures. Our
> management has not completed an assessment of the effectiveness of our internal
> control over financial reporting and our independent registered public accounting

26

firm has not conducted an audit of our internal control over financial reporting. In the course of auditing our consolidated financial statements for the year ended December 31, 2017, we and our independent registered public accounting firm identified one material weakness in our internal control over financial reporting as of December 31, 2017, in accordance with the standards established by the Public Company Accounting Oversight Board of the United States.

The material weakness that has been identified relates to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements to properly address complex U.S. GAAP technical accounting issues and prepare and review financial statements and related disclosures in accordance with U.S. GAAP and reporting requirements set forth by the SEC. We have implemented and are continuing to implement a number of measures to address the material weakness that has been identified. For details, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Internal Control Over Financial Reporting." However, we cannot assure you that we will be able to continue implementing these measures in the future, or that we will not identify additional material weaknesses in the future.

* * *

**Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. We may also be required to restate our financial statements from prior periods.**

119.    In actuality, and as would only be disclosed well after the IPO, the Company's internal controls over financial reporting were wholly ineffective at the time of the Offering, as Defendants failed to identify and disclose the material weakness related to both the undocumented and non-routine cash loans made to Jimu and the improper unsecured loan to Plutux, each of which resulted in significant undisclosed risk to the Company not properly disclosed in the Offering Materials. As a result, the *potential* risk of ineffective internal controls over financial reporting and the *possible* restatement of prior financial statements had already materialized as of the IPO.

120.    Further, the Offering Materials' disclosures regarding *potential* risks related to Pintec's auditor were false and misleading, stating:

27

*The audit report included in this prospectus is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board and, as such, our investors are deprived of the benefits of such inspection.*

Our independent registered public accounting firm that issues the audit report included in our prospectus filed with the U.S. Securities and Exchange Commission, or the SEC, as auditors of companies that are traded publicly in the United States and a firm registered with the U.S. Public Company Accounting Oversight Board, or the PCAOB, is required by the laws of the United States to undergo regular inspections by the PCAOB to assess its compliance with the laws of the United States and professional standards. Because our auditors are located in the PRC, a jurisdiction where the PCAOB is currently unable to conduct inspections without the approval of the Chinese authorities, our auditors are not currently inspected by the PCAOB.

Inspections of other firms that the PCAOB has conducted outside China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. This lack of PCAOB inspections in China prevents the PCAOB from regularly evaluating our auditor's audits and its quality control procedures. **As a result, investors may be deprived of the benefits of PCAOB inspections.**

121.     As set forth herein, this disclosure was wholly insufficient as the risk of using a non-PCAOB inspected auditor had already materialized when PWC failed to identify and address the significant internal control deficiencies that resulted in both the undocumented cash advances to Jimu and the significant unsecured loan to Plutux made without even the most basic due diligence.

122.     Relatedly, the Offering Materials' discussion of the Company's Audit Committee was deficient, stating:

*Audit Committee.* Our audit committee consists of Jimin Zhuo, Chao Zhou and Jiacheng Liu, and is chaired by Mr. Zhuo. Mr. Zhuo, Mr. Zhou and Mr. Liu each satisfy the "independence" requirements of Rule 5605(c)(2) of the Listing Rules of the Nasdaq Stock Market and meet the independence standards under Rule 10A-3 under the Exchange Act. We have determined that Mr. Zhuo qualifies as an "audit committee financial expert." The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

- reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response;

- reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

- discussing the annual audited financial statements with management and the independent registered public accounting firm;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- meeting separately and periodically with management and the independent registered public accounting firm; and

- reporting regularly to the board.

123.    In actuality, the Company's Audit Committee was unable to carry out its tasks effectively, as evidenced by its failure to identify the internal control weaknesses related to the related party cash loans to Jimu, the improper provision of a loan to Plutux, and the improper revenue recognition practices that would ultimately necessitate several restatements.

124.    In presenting the Company for public investment, the Offering Materials also pointed to Pintec's ability to manage risk, stating:

***Ability to Manage Risk***

We offer risk management solutions to our partners, including both anti-fraud and risk-based pricing capabilities. If we are unable to prevent fraud or price risk properly, our partners may choose not to continue to use our solutions and we may find it difficult to attract new partners. Furthermore, while our business model is to connect business and financial partners and enable them to provide financial services to end users, we do bear credit risk under some of our funding arrangements. **If our risk management capabilities are not effective, we may suffer higher-than-expected losses. Therefore, we must continually improve our risk management and risk-based pricing capability.**

29

125.    The above identified statement was false and misleading because, at the time of the IPO, the Company's risk management capabilities were wholly insufficient, particularly with respect to its non-routine transactions, as the Company's lack of internal controls with respect to, *inter alia*, the undisclosed cash advances to Jimu and the large loan to Plutux made without even the most basic due diligence, left the Company vulnerable to higher-than-expected losses, as would result when the Company ultimately took a large write off related to amounts owed from Jimu and entered into a settlement agreement with Plutux wherein Pintec agreed to forfeit and write off interest it was otherwise owed.

126.    Each of these statements constitutes a violation of Defendants' disclosure obligations under the Securities Act.

127.    Furthermore, Pintec's failure to disclose the known adverse trends related to its internal control deficiencies prior to the IPO, particularly as related to the non-routine and unusual transactions with Jimu and Plutux, constitute a standalone violation of the Securities Act by virtue of the Company's required Item 303 disclosure obligations under Regulation S-K.

128.    To the extent that the above-identified statements constituted supposed risk warnings to investors, those statements were made in violation of Item 503, particularly where such risks had already materialized and went well-beyond any generic boilerplate language employed in the Offering Materials.  Like Item 303, a violation of Item 503 by Pintec constitutes a separate standalone violation of the Securities Act.

### 2. False and Misleading Statements Regarding the Company's Cash Loans to Jimu Made Outside of the Ordinary Course of Business

129.    The Offering Materials failed to properly disclose the rampant issues related to the Company's unchecked provision of undocumented cash advances to Jimu outside of the ordinary course of business.

130.    A review of the Offering Materials clearly shows that disclosures related to Pintec's relationship with Jimu were of paramount importance to potential investors such as Plaintiff and the Class. However, the section titled "Our Relationship with Jimu" was wholly deficient, stating in its entirety:

**Our Relationship with Jimu Group**

We and Jimu Group are under the control of our existing shareholders as of the date of this prospectus. Our predecessor, Jimu Holdings Limited, formerly known as Pintec Holdings Limited, was founded in 2013 and has grown to become a large financial services company focusing on providing peer-to-peer lending and financial solutions in China. Prior to the Reorganization and the establishment of Pintec Technology Holdings Limited, our business was carried out by various subsidiaries and variable interest entities of our predecessor. Since September 2016, our business and the Jimu business have been operating substantially independent of each other. Pursuant to the Reorganization, all of the shares of Pintec Technology Holdings Limited were issued to the shareholders of Jimu Group's holding company such that Pintec Technology Holdings Limited has the same shareholders, in the same proportions and with the same rights, as Jimu Group's holding company does. In addition, three of the directors on our board, namely, Jun Dong, Xiaomei Peng and Feng Hong, also sit on the board of Jimu Holdings Limited. We entered into various transaction agreements in connection with the Reorganization in December 2017. The Reorganization was completed in March 2018. The peer-to-peer lending business and provision of related services are now carried out by Jimu Group, while our business is carried out by our own subsidiaries and variable interest entities and their subsidiaries.

Jimu Box has been the single largest funding source for loans facilitated through our platform, and we expect it to remain so for the foreseeable future, even as we seek to reduce our reliance on it. Jimu Box was the funding source for 99% of the outstanding loans facilitated through our platform as of December 31, 2016, 81% of the outstanding loans as of December 31, 2017, and 74% of the outstanding loans as of June 30, 2018. See "Risk Factors—Risks Relating to Our Business— We have historically relied on Jimu Group for substantially all of our funding, and we will continue to rely on Jimu Group for a significant portion of our funding for some time in the future. We need adequate funding at reasonable cost to successfully operate our business, and access to adequate funding at reasonable cost cannot be assured." In addition, to facilitate our cooperation with our financial partners, we have historically depended on Jimu Group and recognition of its brand to have more accessible funding sources by way of relying on certain guarantee arrangement between a subsidiary of our predecessor, Lerong Duoyuan (Beijing) Technology Co., Ltd., and our financial partners. Jimu Group currently owns

31

Lerong Duoyuan (Beijing) Technology Co., Ltd. We intend to cease our reliance on Jimu Group for the provision of any guarantee services.

We have entered into a series of agreements with Jimu Group with respect to the Reorganization and post-reorganization relationship between us and Jimu Group, including a master transaction agreement, a cooperation framework agreement, a non-competition agreement and an intellectual property license agreement. The following are summaries of these agreements. For the complete text of these agreements, please see the copies included as exhibits to the registration statement filed with the SEC, of which this prospectus is a part.

*Master Transaction Agreement*

The master transaction agreement contains provisions relating to the Reorganization and our post-reorganization ongoing relationship with Jimu Group. Pursuant to this agreement, we are responsible for all financial liabilities associated with our business, whether current or historical, and operations that have been conducted by or transferred to us, and Jimu Group is responsible for financial liabilities associated with all of Jimu Group's other current and historical businesses and operations, in each case regardless of the time those liabilities arise. The master transaction agreement also contains indemnification provisions under which we and Jimu Group agree to indemnify each other with respect to breaches of the master transaction agreement or any related inter-company agreement.

In addition, we agree to indemnify Jimu Group against liabilities arising from misstatements or omissions in this prospectus or the registration statement of which it is a part, except for misstatements or omissions relating to information that Jimu Group provided to us specifically for inclusion in this prospectus or the registration statement of which it forms a part. Jimu Group agrees to indemnify us against liabilities arising from misstatements or omissions in its subsequent filings, if any, or with respect to information that Jimu Group provided to us specifically for inclusion in this prospectus, the registration statement of which this prospectus forms a part, or our annual reports or other SEC filings following the initial filing of the registration statement with the SEC of which this prospectus is a part, but only to the extent that the information pertains to Jimu Group or the Jimu business or to the extent we provide Jimu Group prior written notice that the information will be included in our annual reports or other SEC filings and the liability does not result from our action or inaction.

The master transaction agreement also contains a general release, under which the parties will release each other from any liabilities arising from events occurring on or before the initial filing date of the registration statement of which this prospectus forms a part, including in connection with the activities undertaken to implement this offering. The general release does not apply to liabilities allocated between the parties under the master transaction agreement or the other inter-company agreements.

The master transaction agreement will automatically terminate five years after the completion of this offering. This agreement can be terminated early or extended by mutual written consent of the parties. The termination of this agreement will not affect the validity and effectiveness of the cooperation framework agreement, the non-competition agreement and the intellectual property license agreement.

*Cooperation Framework Agreement*

**Under the cooperation framework agreement, Jimu Group agrees to fund the loans to borrowers referred and approved by us up to an aggregate of no less than 50% of all of the loans matched on Jimu Group's online peer-to-peer lending platform each month. We agree to provide Jimu Group with certain services and support, including borrower referral, repayment management and transaction and technology support.**

We and Jimu Group agree that the fee rate, if any, charged by one party to the other party in connection with any of the foregoing areas of cooperation will be negotiated on an arm's length basis. We will enter into separate specific agreements from time to time as necessary and appropriate for the purpose of the cooperation.

This agreement will be effective on the date of completion of this offering and expire on the later of (i) the date that is 15 calendar days after the first quarter-end date that the common shareholding between Jimu Group's holding company and Pintec drops below 20%; and (ii) the 15th anniversary of the date of completion of this offering.

*Non-competition Agreement*

Our non-competition agreement with Jimu Group provides for a non-competition period beginning upon the completion of this offering and ending on the later of (i) the date that is 15 calendar days after the first quarter-end date that the common shareholding between Jimu and Pintec drops below 20%; and (ii) the 15th anniversary of the date of completion of this offering.

We agree not to compete with Jimu Group during the non-competition period in any business that is of the same nature as the peer-to-peer lending business, excluding, for the avoidance of doubt, any part of the business that we currently conduct or contemplate to conduct. Jimu Group agrees not to compete with us during the non-competition period in the businesses conducted by us, other than any peer-to-peer lending business, excluding, for the avoidance of doubt, any part of the business that we currently conduct or contemplate to conduct.

The non-competition agreement also provides for a mutual non-solicitation obligation that neither Jimu Group nor we may, during the non-competition period, hire or solicit for hire any active employees of or individuals providing consulting

services to the other party, or any former employees of or individuals that provided consulting services to the other party within the previous six months, without the other party's consent, except for solicitation activities through generalized non-targeted advertisement not directed to such employees or individuals that do not result in a hiring within the non-competition period.

*Intellectual Property License Agreement*

Under the intellectual property license agreement, Jimu Group grants us and our subsidiaries and variable interest entities a worldwide, royalty-free, fully paid-up, sublicensable, non-transferable, unlimited, exclusive license of certain intellectual property owned by Jimu Group to use, reproduce, modify, prepare derivative works of, perform, display, transfer or otherwise exploit, until and unless, with respect to each intellectual property, such intellectual property is transferred to our company or any of our subsidiaries or consolidated variable interest entities.

This agreement has become effective and will expire on the date on which all relevant intellectual property have been transferred to Pintec.

131.   What this section failed to disclose, however, was Pintec's practice of lending tens of millions of dollars to Jimu as a supposed "cash advance" and doing nothing to record even the most basic terms of these loans (such as the length of the loan or associated interest rate), and instead was allowing these related party transactions to occur outside of the regular course of business and without any oversight from the Company's Board or Audit Committee. Therefore, the Offering Materials section identified in the preceding paragraph was materially false and misleading by omission.

132.   Additionally, the cash loans to Jimu were purportedly made pursuant to a December 31, 2017 "strategic cooperation agreement" between Pintec and Jimu. As these loans were non-routine and made outside of the ordinary course of business, the above-emphasized discussion of the "cooperation framework agreement" between Pintec and Jimu is false and misleading by virtue of their failure to disclose the presence of such an agreement.

133.   Further, in discussing potential conflicts of interest between Pintec and Jimu, the

Offering Materials stated:

> ***We may have conflicts of interest due to related party transactions with Jimu Group.***
>
> We and Jimu Group are under the control of the same shareholders. Immediately after the completion of the Reorganization, each of these shareholders will have the same shareholding interest in our company and in Jimu Group's holding company, Jimu Holdings Limited, but their interests in our company will be diluted by this offering, so they will generally have a higher proportion of shareholding in Jimu Group's holding company than in us. In addition, we and Jimu Group's holding company share three board members, and these members constitute a majority of each board. The overlap in shareholding and in directors between our company and Jimu Group's holding company could create, or appear to create, conflicts of interest when these persons are faced with decisions with potentially different implications for Jimu Group and us.
>
> Conflicts of interest may arise between Jimu Group and us in a number of areas relating to our ongoing relationships. Potential conflicts of interest that we have identified include the following:
>
> •       Employee recruiting and retention. Because both we and Jimu Group are engaged in businesses relating to consumer finance in China, we may compete with Jimu Group in the hiring of new employees, in particular with respect to risk management.
>
> •       Allocation of business opportunities. Under our non-compete agreement with Jimu Group, we agree not to compete with Jimu Group in any peer-to-peer lending business. In addition, other business opportunities may arise that both we and Jimu Group find attractive and which would complement our respective businesses.
>
> •       **Related party transactions. Jimu Group is expected to continue to be a major funding source for our platform under a cooperation framework agreement on terms and conditions similar to those we have with third party funding providers. However, if our arrangements with Jimu Group are perceived by our other financial partners to be not on commercially reasonable terms, our reputation may be damaged and our business and results of operations may be adversely affected.**

134.    This section of the Offering Materials was materially false and misleading by omission as it failed to disclose that there existed an unchecked flow of undocumented cash loans whereby Pintec provided tens of millions of dollars in unrecorded cash advances to Jimu without

any independent oversight from the Company's Board or its Audit Committee, representing a significant conflict of interest as Jimu was able to use Pintec as a piggy bank for cash advances on favorable, undefined terms.

135.    Additionally, Pintec's discussion of "Related Party Transactions" in the Offering Materials wholly omitted the Company's practice of extending open-ended cash loans to Jimu without any ability to properly track or assess the collectability of such advances, rendering the statements of related party transactions misleading:

### RELATED PARTY TRANSACTIONS

**Transactions and Agreements with Jimu Group**

*Reorganization Agreements*

We have entered into a series of agreements with Jimu Group with respect to the Reorganization and post-Reorganization relationship between us and Jimu Group. For a description of these contractual arrangements, see "Corporate History and Structure—Our Relationship with Jimu Group."

*Transactions with Jimu Group*

Previously, both we and Jimu Group carried out our businesses under our predecessor, Jimu Holdings Limited, formerly known as Pintec Holdings Limited. The variable interest entities and subsidiaries affiliated with Jimu Group provided us with funding and credit enhancement, and we paid service fees to Jimu Group for the peer-to-peer matching services for the funding debts. The table below sets forth our transactions with Jimu Group for the period indicated:

| Transactions | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2016 | 2017 | | 2018 | |
| | RMB | RMB | US$ | RMB | US$ |
| | | | (In thousands) | | |
| Cost and expenses allocated from Jimu Group | 140,894 | 102,263 | 15,454 | 28,668 | 4,332 |
| Service fee to Jimu Group for the peer-to-peer matching services for the funding debts | 1,120 | 1,235 | 187 | 1,009 | 152 |
| Allocated cost and expenses waived by Jimu Group | 74,367 | — | — | — | — |
| Service fees collected on behalf Jimu Group for which repayment is waived | 28,690 | — | — | — | — |
| Net cash advances from/ (repayment to) Jimu Group | 29,790 | 23,121 | 3,494 | (142,015) | (21,462) |
| Loan proceeds from Jimu Group | — | 29,270 | 4,423 | | |

As of December 31, 2016, we had RMB108.9 million due from Jimu Group and RMB162.8 million (US$24.6 million) due to Jimu Group and as of December 31, 2017, RMB228.5 million due from Jimu Group and RMB385 million (US$58.2 million) due to Jimu Group. As of June 30, 2018, we had RMB383 million (US$57.9 million) due from Jimu Group and RMB204 million (US$30.9 million) due to Jimu Group.

36

136.    Further, the Company's representations about its evaluation of its allowance for doubtful accounts was explicitly false and misleading, as the undocumented loans to Jimu during 2018 meant the Company was incapable of conducting any meaningful analysis for determining the recoverability of its outstanding loan balance, as Pintec ultimately admitted in its restated 2018 results issued in July 2019. As a result, the following statement in the Offering Materials was materially false and misleading:

> **Accounts receivables are stated at the historical carrying amount net of the allowance for doubtful accounts. The Group reviews the accounts receivable on a periodic basis and makes allowances when there is doubt as to the collectability of individual balances.** In evaluating the collectability of individual accounts receivable balances, the Group considers several factors, including the age of the balance, the customer's payment history, and current credit worthiness, and current economic trends. Accounts receivable balances are written off after collection efforts have been exhausted.

137.    Each of these statements constitutes a violation of Defendants' disclosure obligations under the Securities Act.

138.    Furthermore, Pintec's failure to disclose the known adverse trend related to its provision of these undocumented cash advances to Jimu and/or describe these clearly unusual transactions that had a significant impact on the Company's financials prior to and at the time of the IPO constitutes a standalone violation of the Company's required Item 303 disclosure obligations under Regulation S-K and a separate violation of the Securities Act.

139.    To the extent that the above-identified statements constituted supposed risk warnings to investors, those statements were made in violation of Item 503, particularly where such risks had already materialized and went well-beyond any generic boilerplate language employed in the Offering Materials.  Like Item 303, a violation of Item 503 by Pintec constitutes a separate standalone violation of the Securities Act.

### 3. False and Misleading Statements About the Company's Revenue Recognition Practices

140.     The Offering Materials also made materially false or misleading statements about Pintec's revenue recognition principles – statements confirmed to be false when the Company restated them after the Offering.

141.     Generally, the following statement about Pintec's conformity with U.S. Generally Accepted Accounting Principles ("GAAP") was materially false and misleading as the Company's revenue recognition practice deviated from generally accepted accounting principles, as evidenced by the ultimate restatement of such figures:

> We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experiences and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from our expectations as a result of changes in our estimates. Some of our accounting policies require a higher degree of judgment than others in their application and require us to make significant accounting estimates.

142.     Further, in specifically discussing the revenue recognition practices of the Company with respect to its technical service fees, the Offering Materials state:

> **Revenue recognition**
>
> Revenue is recognized when each of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) services have been rendered; (3) pricing is fixed or determinable; and (4) collectability is reasonably assured.
>
> *Technical service fees*. For these transactions, we earn technical service fees by providing online credit assessment services and post-lending management services, such as cash processing services and collection services. Online credit assessment services are provided to potential borrowers to facilitate their matching with the investors on the financial partners' platforms or commercial banks and other financial institutions.
>
> We have determined that the arrangement to provide technical service to borrowers contains the following multiple elements: online credit assessment services and

38

post-lending management services. We have determined that the borrowers and commercial banks and other financial institutions are our customers. We allocate the technical service fees among the deliverables at the inception of the arrangement on the basis of their relative selling prices according to the selling price hierarchy established by ASC 605-25-30. The hierarchy requires us to first use vendor-specific objective evidence of selling price, if it exists. If vendor-specific objective evidence of selling price does not exist, we are then required to use third-party evidence of selling price. If neither vendor-specific objective evidence of selling price nor third-party evidence of selling price exists, we use management's best estimate of selling price for the deliverables. We use management's best estimate of selling price for the deliverables of the technical service fees.

We can only charge the technical service fees to the borrowers upon the successful matching of the loans by a financial partner. The non-contingent portion of the selling price is collected upfront upon the loan matching, and the contingent portion of the selling price is collected over the term of the loans when the monthly repayment occurs. As the borrower are able to prepay the loan amounts before maturity date for a prepayment fee, the aggregate amount of the contingent portion of the fee that can ultimately collected by us for online credit assessment service and post-lending management service earned from a loan transaction is depend upon the actual term over which the borrowers made their loan repayments. In accordance with ASC 605-25-30-5, the amount allocated by us to the delivered credit assessment service is limited to that amount that is not contingent upon the delivery of additional units or meeting other specified performance conditions. The non-contingent portion of the credit assessment service fees are recognized revenue upon cash collection and execution of loan agreements between financial partners and borrowers. In situations where the upfront cash collected is less than the relative selling price of the credit assessment service, the revenue recognized is limited to the cash received upfront, the remaining contingent portion of the credit assessment fees together with the fees allocated to post-lending management services, are recognized each month when the service is provided over the period of the loan as the monthly repayment occurs.

Prepayment fee charged by us is recognized when the prepayment occurs and the payments are made by the borrowers.

We also charge fees for collection services related to defaulted payments. These fees are recognized when the contingent events occur and the payments are made by the borrowers as that is the point in time collectability is reasonably assured.

143.    The statements identified in the above two paragraphs were both affirmatively materially false and misleading, as well as misleading by omission. As would only come to light upon the Company's restatement of financial results in June 2020, the Company's revenue

recognition practices for its technical service fees (the largest of the Company's three streams of revenue) was improper as Pintec was recording these fees on a net, rather than gross basis, resulting in a material understatement of the Company's cost of revenues and meaning that the Company's practices were contrary to GAAP.

144.    More specifically, in discussing the Company's revenues, the Offering Materials state:

> **We generate technical service fee revenue by providing credit assessment services and post-lending management services, such as cash processing services and collection services, for personal and business installment loans. We also receive fees contingent on future events, such as penalty fees for loan prepayment and late payments as well as fees for collection services for late payments.**
>
> We generate installment service fee revenue through the point-of-sale installment loan services and personal and business installment loan services that we provide on our business partners' platforms. **Installment service fees are recognized on a gross basis, with the interest collected from the borrower recognized as revenue and the corresponding funding cost recognized as cost of revenues.** We pay the full amount of the order that a qualified customer makes on the partner's platform and collect the original order amount plus the installment service fee in installments from the customer. Installment service fee revenue is recognized ratably by applying the effective interest rate. We also receive fees contingent on future events, such as penalty fees for late payment. Contingent fee revenue is recognized when the event occurs and the payment is made by the customer.
>
> Wealth management service fees primarily consist of commission fees charged to third-party asset management companies for participating in our online wealth management platform. We earn transaction service commissions from the asset management companies based on a fixed percentage of subscription fees, redemption fees, conversion fees, sales service fees and customer maintenance fees charged to users by the asset management companies through our Hongdian platform.

145.    This statement was materially false and misleading by omission because it failed to disclose that the technical service fee revenues (which were far and away the largest portion of the Company's revenues) were being recorded on a net, rather than a gross basis – an error subsequently admitted by the Company and resulting in a restatement. Further, the failure to disclose the improper revenue recognition basis with respect to the technical service fees is further

magnified by the Company's subsequent disclosure that installment service fees *were* being properly recognized on a gross basis, leaving Pintec investors with the inaccurate impression that the Company was treating its technical service revenue in a similar manner.

146.    While the improper recognition of revenue on a net basis resulted in an understatement of total revenues, it also resulted in a material misstatement in the Company's cost of revenues.

147.    Similarly, the Offering Materials' discussion of the Cost of Revenues was wholly deficient and false and misleading by omission as it failed to include any discussion of the "Service cost charge by Jimu Group-related party" line item that would ultimately be included in the later restatement:

Cost of revenues

Cost of revenues increased significantly from RMB116.0 million in the six months ended June 30, 2017 to RMB341.5 million (US$51.6 million) in the six months ended June 30, 2018, with increases in all components of our cost of revenues.

*Funding cost*. Funding cost, consisting primarily of interest expenses, increased from RMB25.6 million in the six months ended June 30, 2017 to RMB93.5 million (US$14.1 million) in the six months ended June 30, 2018. This increase reflected the growth in the funding debts for on-balance sheet loans as a result of the significant growth in the volume of point-of-sale installment loans we facilitated, as well as those personal and business installment loans funded by trust and other structured finance products.

*Provision for credit loss*. Provision for credit loss increased from RMB26.1 million in the six months ended June 30, 2017 to RMB55.1 million (US$8.3 million) in the six months ended June 30, 2018. The increase in provision for credit loss was primarily attributable to the increase in the outstanding balance of point-of-sale installment loans as our business grew, plus our use of trust and other structured finance funding sources for certain personal installment loans beginning in late 2017.

*Origination and servicing cost.* Origination and servicing cost increased from RMB64.3 million in the six months ended June 30, 2017 to RMB192.9 million (US$29.2 million) in the six months ended June 30, 2018, primarily due to increases in user acquisition costs relating to revenue from lending solutions, cost incurred in

41

providing collection services, and costs paid for data used in credit assessments. These increases were driven primarily by the growth of our business.

148.     As a result, the costs of revenues presented for both Fiscal Year 2017 and the Six Months ended June 30, 2018 were materially false and misleading because they failed to include provisions later identified by the Company as "Service cost charged by Jimu Group-related party" in the amount of RMB566.707 million ($85.6 million USD) for 2017 and an undisclosed amount for the 2018 stub period, as derived from the RMB529.593 million ($80.0 million USD) amount ultimately included in the Company's restatement of Fiscal Year 2018 results.

149.     As would only be disclosed after the Company's 2020 restatement, the service costs charged by Jimu were made pursuant to a December 31, 2017 strategic cooperation agreement. On the basis of this agreement, Jimu was to provide a financial guarantee to borrowers and charge Pintec a relative service fee. This related party transaction was disclosed for the first time in the Company's June 29, 2020 annual report for fiscal year 2019, rendering the following discussion of Related Party Transactions in the Offering Materials (which was already deficient because of its failure to include the improper cash advances to the Jimu, as identified *supra*) additionally deficient and misleading by omission:

### RELATED PARTY TRANSACTIONS

**Transactions and Agreements with Jimu Group**

*Reorganization Agreements*
        We have entered into a series of agreements with Jimu Group with respect to the Reorganization and post-Reorganization relationship between us and Jimu Group. For a description of these contractual arrangements, see "Corporate History and Structure—Our Relationship with Jimu Group."

*Transactions with Jimu Group*
        Previously, both we and Jimu Group carried out our businesses under our predecessor, Jimu Holdings Limited, formerly known as Pintec Holdings Limited. The variable interest entities and subsidiaries affiliated with Jimu Group provided us with funding and credit enhancement, and we paid service fees to Jimu Group

42

for the peer-to-peer matching services for the funding debts. The table below sets forth our transactions with Jimu Group for the period indicated:

| Transactions | For the Years Ended December 31, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | | 2018 | |
| | RMB | RMB | US$ | RMB | US$ |
| | | | (In thousands) | | |
| Cost and expenses allocated from Jimu Group | 140,894 | 102,263 | 15,454 | 28,668 | 4,332 |
| Service fee to Jimu Group for the peer-to-peer matching services for the funding debts | 1,120 | 1,235 | 187 | 1,009 | 152 |
| Allocated cost and expenses waived by Jimu Group | 74,367 | — | — | — | — |
| Service fees collected on behalf Jimu Group for which repayment is waived | 28,690 | — | — | — | — |
| Net cash advances from/ (repayment to) Jimu Group | 29,790 | 23,121 | 3,494 | (142,015) | (21,462) |
| Loan proceeds from Jimu Group | — | 29,270 | 4,423 | — | — |

As of December 31, 2016, we had RMB108.9 million due from Jimu Group and RMB162.8 million (US$24.6 million) due to Jimu Group and as of December 31, 2017, RMB228.5 million due from Jimu Group and RMB385 million (US$58.2 million) due to Jimu Group. As of June 30, 2018, we had RMB383 million (US$57.9 million) due from Jimu Group and RMB204 million (US$30.9 million) due to Jimu Group.

### 4. False and Misleading Line Items in the Company's Offering Materials' Financial Statements

150.    As would only come to light after the IPO, several of the financials reported in the

Offering Materials for fiscal year 2017 and for the first half of 2018 were misstated and would

ultimately require two restatements to correct.

151.    As discussed above, the Company's revenues and cost of revenues for the

Company's technical service fees were improperly presented on a net, rather than gross basis,

rendering each mention of the line items materially incorrect:

| | For the Years Ended December 31, | | | | | For the Six Months Ended June 30, | | | | |
| | 2016 | | 2017 | | | 2017 | | 2018 | | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | (In thousands, except percentages) | | | | | | |
| **Selected Consolidated Statements of Comprehensive (Loss)/Income Data:** | | | | | | | | | | |
| **Revenues:** | | | | | | | | | | |
| Technical service fees | 34,171 | 62.3 | 425,311 | 64,275 | 74.8 | 138,261 | 79.4 | 399,703 | 60,405 | 69.2 |
| Installment service fees | 16,394 | 29.9 | 139,862 | 21,136 | 24.6 | 34,364 | 19.7 | 169,881 | 25,673 | 29.4 |
| Wealth management service fees | 4,309 | 7.8 | 3,547 | 536 | 0.6 | 1,422 | 0.9 | 8,080 | 1,221 | 1.4 |
| **Total revenues** | 54,874 | 100.0 | 568,720 | 85,947 | 100.0 | 174,047 | 100.0 | 577,664 | 87,299 | 100.0 |
| | | | | | | | | | | |
| **Cost of revenues:**[(1)] | | | | | | | | | | |
| Funding cost (including RMB1,120 thousand, RMB1,235 thousand, RMB568 thousand and RMB1,009 thousand to a related party, respectively) | (16,643) | (30.3) | (78,831) | (11,913) | (13.9) | (25,554) | (14.6) | (93,476) | (14,126) | (16.2) |
| Provision for credit loss | (16,124) | (29.4) | (115,920) | (17,518) | (20.4) | (26,070) | (15.0) | (55,136) | (8,332) | (9.5) |
| Origination and servicing cost (including RMB2,732 thousand, RMB2,720 thousand, RMB1,260 thousand and RMB413 thousand to a related party, respectively) | (27,087) | (49.4) | (177,662) | (26,849) | (31.2) | (64,349) | (37.0) | (192,908) | (29,154) | (33.4) |
| **Cost of revenues** | (59,854) | (109.1) | (372,413) | (56,280) | (65.5) | (115,973) | (66.6) | (341,520) | (51,612) | (59.1) |
| **Gross (loss)/profit** | (4,980) | (9.1) | 196,307 | 29,667 | 34.5 | 58,074 | 33.4 | 236,144 | 35,687 | 40.9 |
| | | | | | | | | | | |
| **Operating expenses:**[(1)] | | | | | | | | | | |
| Sales and marketing expenses (including RMB35,444 thousand, RMB18,215 thousand, RMB12,106 thousand and RMB3,026 thousand to a related party, respectively) | (72,010) | (131.2) | (72,076) | (10,892) | (12.7) | (30,577) | (17.6) | (51,264) | (7,747) | (8.9) |
| General and administrative expenses (including RMB60,623 thousand, RMB45,533 thousand, RMB24,594 thousand and RMB18,057 thousand to a related party, respectively) | (72,849) | (132.8) | (106,323) | (16,069) | (18.6) | (49,218) | (28.3) | (96,589) | (14,597) | (16.7) |
| Research and development expenses (including RMB40,975 thousand, RMB35,795 thousand, RMB24,942 thousand and RMB7,172 thousand to a related party, respectively) | (51,172) | (93.2) | (71,517) | (10,808) | (12.6) | (33,672) | (19.3) | (39,063) | (5,903) | (6.8) |
| **Total operating expenses** | (196,031) | (357.2) | (249,916) | (37,769) | (43.9) | (113,467) | (65.2) | (186,916) | (28,247) | (32.4) |

* * *

| | For the Years Ended December 31, | | | | | For the Six Months Ended June 30, | | | | |
| | 2016 | | 2017 | | | 2017 | | 2018 | | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | (In thousands, except percentages) | | | | | | |
| **Cost of revenues:** | | | | | | | | | | |
| Funding cost (including RMB1,120 thousand, RMB1,235 thousand, RMB568 thousand and RMB1,009 thousand to a related party, respectively) | (16,643) | (30.3) | (78,831) | (11,913) | (13.9) | (25,554) | (14.6) | (93,476) | (14,126) | (16.2) |
| Provision for credit loss | (16,124) | (29.4) | (115,920) | (17,518) | (20.4) | (26,070) | (15.0) | (55,136) | (8,332) | (9.5) |
| Origination and servicing cost (including RMB2,732 thousand, RMB2,720 thousand, RMB1,260 thousand and RMB413 thousand to a related party, respectively) | (27,087) | (49.4) | (177,662) | (26,849) | (31.2) | (64,349) | (37.0) | (192,908) | (29,154) | (33.4) |
| **Cost of revenues** | (59,854) | (109.1) | (372,413) | (56,280) | (65.5) | (115,973) | (66.6) | (341,520) | (51,612) | (59.1) |

* * *

44

|  | For the Years Ended December 31, | | | | | For the Six Months Ended June 30, | | | | |
|  | 2016 | | 2017 | | | 2017 | | | 2018 | | |
|  | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
|  | (In thousands, except percentages) | | | | | | | | | | |
| Total revenues | 54,874 | 100.0 | 568,720 | 85,947 | 100.0 | 174,047 | 100.0 | 577,664 | 87,299 | 100.0 |
| Cost of revenues | (59,854) | (109.1) | (372,413) | (56,280) | (65.5) | (115,973) | (66.6) | (341,520) | (51,612) | (59.1) |
| Gross profit | (4,980) | (9.1) | 196,307 | 29,667 | 34.5 | 58,074 | 33.4 | 236,144 | 35,687 | 40.9 |

152.    Total revenues and cost of revenues were in fact significantly higher, as disclosed for the first time in the 2020 restatement:

|  | For the Year Ended December 31, | | | | | |
|  | 2017 | | 2018 | | 2019 | |
|  | Restated | | Restated | | | |
|  | RMB | % | RMB | % | RMB | US$ | % |
|  | (in thousands, except percentages) | | | | | | |
| **Cost of revenues:** | | | | | | | |
| Funding cost | (78,831) | (10.3) | (161,384) | (10.1) | (51,759) | (7,435) | (4.0) |
| Provision for credit losses | (115,920) | (15.2) | (70,411) | (4.4) | (33,942) | (4,875) | (2.6) |
| Origination and servicing cost | (177,662) | (23.3) | (323,342) | (20.2) | (290,398) | (41,712) | (22.6) |
| Cost on guarantee | — | — | — | — | (193,426) | (27,784) | (15.0) |
| Service cost charged by Jimu Group | (194,294) | (25.5) | (529,593) | (33.0) | (200,163) | (28,752) | (15.6) |
| **Cost of revenues** | **(566,707)** | **(74.3)** | **(1,084,730)** | **(67.7)** | **(769,688)** | **(110,558)** | **(59.8)** |

* * *

|  | For the Year Ended December 31 | | | | | |
|  | 2017 | | 2018 | | 2019 | |
|  | Restated | | Restated | | | |
|  | RMB | % | RMB | % | RMB | US$ | % |
|  | (in thousands, except percentages) | | | | | | |
| **Total revenues** | 763,014 | 100.0 | 1,603,631 | 100.0 | 1,285,236 | 184,612 | 100.0 |
| **Cost of revenues** | (566,707) | (74.3) | (1,084,730) | (67.7) | (769,688) | (110,558) | (59.8) |
| **Gross profit** | 196,307 | 25.7 | 518,901 | 32.3 | 515,548 | 74,054 | 40.2 |

153.    Additionally, the Offering Materials' presentation of Pintec's cash positions were materially misstated, claiming: "Net cash provided by operating activities for the year ended December 31, 2017 was RMB197.4 million (US$29.8 million), as compared to net loss of RMB84.9 million (US$12.8 million)."

154.    In actuality, and as would be corrected when Pintec issued its restatement and reclassification of its 2017 financial results in 2020, the Company's net cash provided by operating activities was actually RMB32.586 million less, totaling just RMB164.852 million, meaning the figure presented in the Offering Materials was overstated by nearly 20%.

155.    Several misstated line items contributed to this overstatement, including a material understatement of short-term and long-term financing receivables, a material understatement of amounts due from related parties, a material understatement of short-term and long-term funding

debts, and a material overstatement of amounts due to related parties.

156.   Similarly, the Offering Materials' presentation of Pintec's net cash provided by financing activities was misstated, stating: "Net cash provided by financing activities for the year ended December 31, 2017 was RMB1,596.0 million (US$241.2 million), consisting primarily of proceeds from funding debts of RMB6,842.5 million (US$1,034.1 million), partially offset by principal payment on funding debts of RMB5,534.2 million (US$836.3 million)."

157.   In actuality, and as would be corrected when Pintec issued its restatement and reclassification of its 2017 financial results in 2020, the Company's net cash provided by financing activities was actually just RMB1,565 million.

158.   Additionally, the Offering Materials' cash flow statement for 2017 was false and misleading, presenting the following information:

46

| | For the years ended December 31, | | |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ Note (e) |
| **Cash flows from operating activities:** | | | |
| Net loss | (200,494) | (84,860) | (12,824) |
| Adjustments to reconcile net loss to net cash (used in)/provided by operating activities: | | | |
| Depreciation and amortization | 2,948 | 4,079 | 616 |
| Share-based compensation expense allocated from Jimu Parent | 25,665 | 31,018 | 4,688 |
| Gain on fair value change on previously held equity interest (Note 4) | (394) | — | — |
| Share of loss from equity-method investments | — | 2,455 | 371 |
| Impairment from long-term investments | — | 2,000 | 302 |
| Change in fair value of convertible loans | — | 7,042 | 1,064 |
| Provision for doubtful accounts and credit losses | 17,275 | 132,510 | 20,025 |
| Changes in operating assets and liabilities: | | | |
| Accrued interest receivable | (1,450) | (9,022) | (1,363) |
| Accounts receivable | (7,836) | (45,958) | (6,945) |
| Amount due from related parties | (3,778) | (42,119) | (6,365) |
| Prepayments and other current assets | (11,822) | (50,881) | (7,689) |
| Accounts payable | 784 | 36,139 | 5,461 |
| Accrued interest payable | 369 | 5,941 | 898 |
| Amount due to related parties | 42,611 | 92,431 | 13,969 |
| Tax payable | 1,731 | 20,442 | 3,089 |
| Accrued expenses and other liabilities | 11,325 | 96,221 | 14,541 |
| **Net cash (used in)/provided by operating activities** | (123,066) | 197,438 | 29,838 |
| **Cash flows from investing activities:** | | | |
| Purchase of property, equipment and software | (1,296) | (2,238) | (339) |
| Financing receivables originated | (1,918,955) | (7,109,958) | (1,074,482) |
| Principal collection on financing receivables | 1,811,763 | 5,671,423 | 857,086 |
| Placement of short-term investments | — | (2,000) | (302) |
| Purchase of long-term investments | — | (2,000) | (302) |
| Cash acquired due to acquisition of Shenzhen Minheng (Note 4) | 310 | — | — |
| **Net cash used in investing activities** | (108,178) | (1,444,773) | (218,339) |
| **Cash flows from financing activities:** | | | |
| Contribution from Jimu Parent and shareholders | 155,057 | 11 | 2 |
| Net cash advances from Jimu Parent | 29,790 | 23,121 | 3,494 |
| Loan proceeds from Jimu Parent | — | 29,270 | 4,423 |
| Proceeds from funding debts | 1,737,966 | 6,842,534 | 1,034,068 |
| Principal payments on funding debts | (1,666,113) | (5,534,199) | (836,348) |
| Proceeds from issuance of convertible loans | — | 235,231 | 35,549 |
| **Net cash provided by financing activities** | 256,700 | 1,595,968 | 241,188 |
| **Effect of exchange rate changes on cash, cash equivalents and restricted time deposits** | — | (34) | (5) |
| Net increase in cash, cash equivalents and restricted time deposits | 25,456 | 348,599 | 52,682 |
| Cash, cash equivalents and restricted time deposits at beginning of the year | 1,836 | 27,292 | 4,125 |
| Including: | | | |
| Cash and cash equivalents at beginning of the year | 1,836 | 27,292 | 4,125 |
| **Cash, cash equivalents and restricted time deposits at end of the year** | 27,292 | 375,891 | 56,807 |
| Including: | | | |
| Cash and cash equivalents at end of the year | 27,292 | 370,891 | 56,051 |
| Restricted time deposits at end of the year | — | 5,000 | 756 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid for interest | 14,473 | 69,328 | 10,477 |
| Cash paid for the acquisition of Shenzhen Minheng by Jimu Parent on behalf of the Company | 1,000 | — | — |

159.    The end result was a statement of cash flows for 2017 that was materially different from the actual results for that year, as evidenced by the restatement issued by the Company in 2020:

| | For the year ended December 31, 2017 | | |
| | As previously reported RMB | Restatement adjustments RMB | As Restated RMB |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net loss | (84,860) | — | (84,860) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Depreciation and amortization | 4,079 | — | 4,079 |
| Share-based compensation expenses | 31,018 | — | 31,018 |
| Provision for doubtful accounts and credit losses | 132,510 | (110) | 132,400 |
| Loss from equity-method investments | 2,455 | — | 2,455 |
| Change in fair value of convertible loans | 7,042 | — | 7,042 |
| Impairment from long-term investments | 2,000 | — | 2,000 |
| Changes in operating assets and liabilities: | | | |
| Short-term and long-term financing receivables | (9,022) | (37,379) | (46,401) |
| Accounts receivable | (45,958) | — | (45,958) |
| Amounts due from related parties | (42,119) | 77,358 | 35,239 |
| Prepayments and other current assets | (50,881) | 1,645 | (49,236) |
| Short-term and long-term funding debts | 5,941 | 6,926 | 12,867 |
| Accounts payable | 36,139 | — | 36,139 |
| Amounts due to related parties | 92,431 | (81,613) | 10,818 |
| Tax payable | 20,442 | — | 20,442 |
| Accrued expenses and other liabilities | 96,221 | 587 | 96,808 |
| **Net cash provided by operating activities** | **197,438** | **(32,586)** | **164,852** |
| **Cash flows from investing activities:** | | | |
| Purchase of property, equipment and software | (2,238) | (577) | (2,815) |
| Financing receivables facilitated | (7,109,958) | 171,753 | (6,938,205) |
| Collection of principal on financing receivables | 5,671,423 | (134,264) | 5,537,159 |
| Purchase of private-equity funds | (2,000) | — | (2,000) |
| Purchase of long-term investments | (2,000) | — | (2,000) |
| **Net cash used in investing activities** | **(1,444,773)** | **36,912** | **(1,407,861)** |
| **Cash flows from financing activities:** | | | |
| Proceeds from short-term and long-term borrowings | — | 40,000 | 40,000 |
| Repayment of short-term | — | (40,000) | (40,000) |
| Net cash advances from Jimu Group | 23,121 | (23,121) | — |
| Contribution from Jimu Group and shareholders | 11 | — | 11 |
| Loan proceeds from Jimu Group | 29,270 | — | 29,270 |
| Proceeds from funding debts | 6,842,534 | 51,372 | 6,893,906 |
| Principal repayments on funding debts | (5,534,199) | (58,298) | (5,592,497) |
| Proceeds from issuance of convertible loans | 235,231 | — | 235,231 |
| **Net cash provided by financing activities** | **1,595,968** | **(30,047)** | **1,565,921** |
| **Effect of exchange rate changes on cash, cash equivalents and restricted cash** | **(34)** | **—** | **(34)** |
| Net increase in cash, cash equivalents and restricted cash | 348,599 | (25,721) | 322,878 |
| Cash, cash equivalents and restricted cash at beginning of the year | 27,292 | 25,721 | 53,013 |

160.    Upon information and belief, the cash flow representations for the stub period of 2018 presented in the Offering Materials were similarly misstated, as the Company also restated the full year 2018 results in 2020. These false and misleading statements regarding the interim 2018 period in the Offering Materials included the representations that:

- "Net cash used in operating activities for the six months ended June 30, 2018 was RMB103.4 million (US$15.6 million), as compared to a net income of RMB12.4 million

48

(US$1.9 million). The difference between our net income and our net cash used in operating activities was primarily attributable to a decrease of RMB183.9 million (US$27.8 million) in amounts due to related parties, a decrease in accounts receivable of RMB57.9 million (US$8.8 million), a decrease in accrued expenses and other liabilities of RMB28.1 million (US$4.2 million) and a decrease in prepayments and other current assets of RMB40.8 million (US$6.2 million), partially offset by a decrease in provision for doubtful accounts and credit losses of RMB96.4 million (US$14.6 million) and an increase in accounts payable of RMB40.1 million (US$6.1 million). Our amounts due to related parties mainly arose from allocation of expenses between us and Jimu Group."

- "Net cash provided by investing activities for the six months ended June 30, 2018 was RMB304 million (US$45.9 million), consisting primarily of RMB3,248.2 million (US$490.9 million) in principal collection of financing receivables, partially offset by RMB2,923.0 million (US$441.7 million) of financing receivables originated. We record and collect significant volumes of financing receivables primarily in connection with the point-of-sale installment loans that we facilitate."

- "Net cash used in financing activities for the six months ended June 30, 2018 was RMB55.7 million (US$8.4 million), consisting primarily of proceeds from funding debts of RMB1,624.9 million (US$245.6 million) and proceeds from the issuance of preferred shares of RMB410.3 million (US$62.0 million), partially offset by principal payment on funding debts of RMB1,970.6 million (US$297.8 million). Funding debts primarily represent the proceeds from individual investors, the asset-backed securitized debts or the consolidated trusts that we use to fund our financing receivables."

161.    Further, the Offering Materials' cash flow statement misstated the stub period results for the first half of 2018, claiming:

| | For the six months ended June 30, | | |
|---|---|---|---|
| | 2017 | 2018 | 2018 |
| | RMB | RMB | US$ Note (e) |
| **Cash flows from operating activities:** | | | |
| Net (loss)/income | (56,471) | 12,386 | 1,872 |
| Adjustments to reconcile net (loss)/income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 1,656 | 2,314 | 350 |
| Share-based compensation expense allocated from Jimu Parent | 15,458 | 20,074 | 3,034 |
| Share of loss from equity-method investments | — | 792 | 120 |
| Change in fair value of convertible loans | — | 9,552 | 1,444 |
| Provision for doubtful accounts and credit losses | 29,936 | 96,425 | 14,572 |
| Changes in operating assets and liabilities: | | | |
| Accrued interest receivable | (1,215) | (142) | (21) |
| Accounts receivable | (16,755) | (57,931) | (8,755) |
| Amount due from related parties | (9,977) | (4,746) | (717) |
| Prepayments and other current assets | (29,384) | (40,799) | (6,168) |
| Accounts payable | 16,229 | 40,122 | 6,063 |
| Accrued interest payable | 888 | 7,191 | 1,087 |
| Amount due to related parties | 56,082 | (183,887) | (27,790) |
| Tax payable | (346) | 23,317 | 3,524 |
| Accrued expenses and other liabilities | 65,194 | (28,064) | (4,241) |
| **Net cash provided by/(used in) operating activities** | **71,295** | **(103,396)** | **(15,626)** |
| **Cash flows from investing activities:** | | | |
| Purchase of property, equipment and software | (838) | (1,958) | (296) |
| Financing receivables originated | (3,114,920) | (2,922,969) | (441,730) |
| Principal collection on financing receivables | 2,603,905 | 3,248,156 | 490,873 |
| Purchase of long-term investments | (2,000) | (19,259) | (2,910) |
| **Net cash (used in)/provided by investing activities** | **(513,853)** | **303,970** | **45,937** |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of preferred shares | — | 410,286 | 62,004 |
| Cash repayment to Jimu Parent | (51,559) | (142,015) | (21,462) |
| Proceeds from funding debts | 3,374,198 | 1,624,926 | 245,565 |
| Principal payments on funding debts | (2,876,372) | (1,970,589) | (297,803) |
| Proceeds from bank loans | 40,000 | — | — |
| Proceeds from issuance of convertible loans | — | 21,730 | 3,284 |
| **Net cash provided by/(used in) financing activities** | **486,267** | **(55,662)** | **(8,412)** |
| **Effect of exchange rate changes on cash, cash equivalents and restricted time deposits** | **(773)** | **(3,594)** | **(543)** |
| **Net increase in cash, cash equivalents and restricted time deposits** | 42,936 | 141,318 | 21,356 |
| **Cash, cash equivalents and restricted time deposits at beginning of the period** | 27,292 | 375,891 | 56,807 |
| Including: | | | |
| Cash and cash equivalents at beginning of the period | 27,292 | 370,891 | 56,051 |
| Restricted time deposits at beginning of the period | — | 5,000 | 756 |
| **Cash, cash equivalents and restricted time deposits at end of the period** | **70,228** | **517,209** | **78,163** |
| Including: | | | |
| Cash and cash equivalents at end of the period | 65,228 | 512,209 | 77,407 |
| Restricted time deposits at end of the period | 5,000 | 5,000 | 756 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid for interest | 23,984 | 58,343 | 8,817 |
| **Non-Cash investing and financing activities** | | | |
| Accretion to preferred shares redemption value | 23,032 | 33,177 | 5,014 |

162.    As the full year 2018 statement of cash flows would ultimately be significantly

restated in 2020, it is reasonable to infer that the interim results presented suffered from a similar

defect to that of 2017 given the ultimate magnitude of the various restated line items for the full

year:

| | For the year ended December 31, 2018 | | |
| --- | --- | --- | --- |
| | As previously reported RMB | Restatement adjustments RMB | As Restated RMB |
| **Cash flows from operating activities:** | | | |
| Net income | 2,171 | — | 2,171 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 4,701 | — | 4,701 |
| Share-based compensation expenses | 131,260 | — | 131,260 |
| Provision for doubtful accounts and credit losses | 178,438 | 129 | 178,567 |
| Release from financial guarantee liabilities | (21,397) | 21,397 | — |
| Loss from equity-method investments | 2,652 | — | 2,652 |
| Change in fair value of convertible loans | 9,552 | — | 9,552 |
| Change in fair value of short-term investments | 315 | — | 315 |
| Deferred income tax | — | (36,901) | (36,901) |
| **Changes in operating assets and liabilities:** | | | |
| Short-term and long-term financing receivables | (8,461) | (26,380) | (34,841) |
| Short-term and long-term financial guarantee assets | — | (20,610) | (20,610) |
| Accounts receivable | (119,123) | (129) | (119,252) |
| Amounts due from related parties | 36,036 | (2,684) | 33,352 |
| Prepayments and other current assets | (22,840) | 7,261 | (15,579) |
| Deferred tax assets | (36,901) | 36,901 | — |
| Short-term and long-term funding debts | 7,847 | 173,952 | 181,799 |
| Accounts payable | (4,193) | — | (4,193) |
| Amounts due to related parties | (94,812) | (24,076) | (118,888) |
| Tax payable | 34,695 | — | 34,695 |
| Financial guarantee liabilities | 36,934 | (21,397) | 15,537 |
| Accrued expenses and other liabilities | (28,565) | 16,136 | (12,429) |
| **Net cash provided by operating activities** | 108,309 | 123,599 | 231,908 |
| **Cash flows from investing activities:** | | | |
| Purchase of property, equipment and software | (4,071) | — | (4,071) |
| Financing receivables facilitated | (3,853,780) | (465,875) | (4,319,655) |
| Collection of principal on financing receivables | 4,712,223 | 492,550 | 5,204,478 |
| Loan provided to a third party | (137,264) | — | (137,264) |
| Net cash advances to Jimu Group | (441,491) | (3,828) | (445,319) |
| Loans provided to Jimu Group | (59,636) | 7,588 | (52,048) |
| Collection of loan from Jimu Group | 52,169 | (121) | 52,048 |
| Purchase of private-equity funds | 1,685 | — | 1,685 |
| Purchase of long-term investments | (19,259) | — | (19,259) |
| **Net cash provided by investing activities** | 250,576 | 30,019 | 280,595 |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of Pre-IPO Preferred Shares | 410,286 | — | 410,286 |
| Proceeds from initial public offering and followed offering, net of underwriting discount and commissions | 316,451 | — | 316,451 |
| Proceeds from short-term and long-term borrowings | 288,141 | — | 288,141 |

163.   Additionally, because of the open-ended nature of the non-routine loans to Jimu made during 2018, the Company admitted that it was unable to effectively assess the recoverability of these loans to determine if an allowance for doubtful accounts was necessary. As the Offering Materials presented the 2018 stub period's accounts receivable on a net basis at the historical carrying amount net of the allowance for doubtful accounts, each representation of the Company's accounts receivable figure and allowance for doubtful accounts for 2018 included in the Offering

Materials were materially false and misleading, including:

> Net cash used in operating activities for the six months ended June 30, 2018 was RMB103.4 million (US$15.6 million), as compared to a net income of RMB12.4 million (US$1.9 million). The difference between our net income and our net cash used in operating activities was primarily attributable to a decrease of RMB183.9 million (US$27.8 million) in amounts due to related parties**, a decrease in accounts receivable of RMB57.9 million (US$8.8 million)**, a decrease in accrued expenses and other liabilities of RMB28.1 million (US$4.2 million) and a decrease in prepayments and other current assets of RMB40.8 million (US$6.2 million), **partially offset by a decrease in provision for doubtful accounts and credit losses of RMB96.4 million (US$14.6 million)** and an increase in accounts payable of RMB40.1 million (US$6.1 million). Our amounts due to related parties mainly arose from allocation of expenses between us and Jimu Group. See "Related Party Transactions—Transactions and Agreements with Jimu Group."

* * *

**6. Accrued interest receivable, net**

Accrued interest receivable, net, as of December 31, 2017 and June 30, 2018, consists of the following:

| | As of December 31, 2017 RMB | As of June 30, 2018 RMB |
|---|---|---|
| Accrued interest receivable | 8,687 | 6,376 |
| Allowance for doubtful accounts | (1,050) | (677) |
| Accrued interest receivable, net | 7,637 | 5,699 |

**7. Accounts receivable, net**

Accounts receivable, net, as of December 31, 2017 and June 30, 2018, consists of the following:

| | As of December 31, 2017 RMB | As of June 30, 2018 RMB |
|---|---|---|
| Receivables for technical service fees from borrowers | 40,587 | 64,211 |
| Receivables for marketplace service fees from asset management companies | 1,236 | 1,450 |
| Others | 161 | 4,676 |
| Total accounts receivable | 41,984 | 70,337 |
| Allowance for doubtful accounts | (5,428) | (14,713) |
| Accounts receivable, net | 36,556 | 55,624 |

## PINTEC'S ADS PRICE DECLINES SUBSTANTIALLY FOLLOWING THE IPO AS NEW MANAGEMENT IS FORCED TO UNTANGLE THE COMPANY'S BUSINESS FROM JIMU AND CORRECT ITS INTERNAL CONTROL DEFICIENCIES AND MISSTATEMENTS

164.    Within months of going public, previously undisclosed issues at Pintec began to emerge, causing the Company's ADS price to drastically decline.

165.    On March 20, 2019, Pintec announced its unaudited financial results for the fourth

quarter and full year 2018.

166.    As the market would come to find out months later, these unaudited financial results were entirely unreliable, as the Company would be forced to make several adjustments to the reported financial results months later upon finally filing its annual report for the period.

167.    In the March 20, 2019 press release the Company announced its March 2019 agreement to acquire the entire equity interest in Jimu Micro Finance, a licensed micro loan company, from Jimu for RMB230 million ($33.5 million USD).  However, what was not disclosed until July 2019 was that Pintec's purchase of Jimu Micro Finance was not for cash, but instead the acquisition was simply netted against amounts due to Pintec from Jimu – the same amounts owed by Jimu to Pintec as repayment for the improper cash advances, recovery of which was becoming less and less likely because of Jimu's worsening financial condition.

168.    The netting of a cash receivable from Jimu in exchange for Jimu Micro Finance at a time when Chinese regulators were cracking down on microfinance lenders and the industry was clearly contracting, and when the Company was otherwise espousing a pivot towards a focus on the technological aspects of the consumer finance industry, did not appear to fit with Pintec's stated strategy and made little sense to the investing public.

169.    Further, the rationale for the questionable acquisition of Jimu Micro Finance stood contrary to the non-compete agreement between Pintec and Jimu discussed in the Offering Materials, as Jimu Micro Finance clearly operated in the same space as Jimu Box and was identified in the Offering Materials as being a "lending solutions partner" that "provide[d] a small amount of financing for personal installment loans" to Pintec.

170.    Market sentiment appeared to agree that something was amiss, as the Company's ADS price declined from a close of $12.05 per ADS on March 20, 2019 to just $6.30 per ADS on

April 29, 2019.

171.    Then, on April 30, 2019, Pintec filed a Form NT20-F with the SEC, announcing its inability to file its annual report on Form 20-F for the period ended December 31, 2018 "on a timely basis because the Company was unable, without unreasonable effort or expense, to complete the Form 20-F within the prescribed period." In making this filing, Pintec represented that its annual report would be filed within fifteen calendar days of that notification.

172.    However, Pintec was incapable of meeting this deadline and the Company's inability to file its first required annual report, just months after its IPO, was in fact a precursor to ongoing turmoil at the Company, as connected to its relationship with Jimu.

173.    On May 13, 2019, the Company informed Nasdaq that it would be unable to make the requisite annual report filing within the fifteen-day period. This letter was not publicly filed.

174.    Then, on May 16, 2019, Pintec issued a press release (filed with the SEC as an exhibit to a Form 6-K after the close of market that day) announcing its receipt of a May 14, 2019 notification letter from the Nasdaq Listing Qualifications stating that the Company was not in compliance with Nasdaq Listing Rule 5250(c) due to its failure to timely file its annual report for 2018 and that the Company had 60 calendar days (until July 13, 2019) to submit a plan to Nasdaq to regain its compliance with listing requirements.

175.    Despite announcing that it was in violation of the listing requirements and was in jeopardy of being delisted within months of going public, the Company remained tight-lipped about the basis for such a delay in filing its annual report.

176.    The market reacted strongly to the Company's lack of candor, sending Pintec's ADS price down from a closing price of $8.32 per ADS on May 16, 2019, down as low as $2.80 per ADS on June 20, 2019, and closing at $3.93 on July 30, 2019 – the date the Company finally

filed its annual report for 2018 on Form 20-F (the "2018 Annual Report") with the SEC after the close of trading.

177.   Along with that annual report on Form 20-F, Pintec issued a press release, announcing for the first time that "[c]ertain adjustments were made in the Company's consolidated financial statements for the fiscal year ended December 31, 2018, subsequent to the release of the full year 2018 unaudited annual results in March 2019."

178.   In this press release, the Company published only the adjustments from the previously published unaudited financial results for 2018 without any explanation, providing in chart form:

|  | Pre-adjustment | | Post-adjustment | |
| --- | --- | --- | --- | --- |
|  | RMB | US$ | RMB | US$ |
|  | | (in thousands) | | |
| Share of loss from equity method investments | (2,967) | (432) | (2,652) | (386) |
| Other income, net | 14,317 | 2,082 | 8,822 | 1,283 |
| Income before income tax expenses | 13,059 | 1,899 | 7,880 | 1,146 |
| Net income | 7,350 | 1,068 | 2,171 | 315 |
| Total comprehensive income | 37,523 | 5,456 | 32,344 | 4,703 |
| Non-GAAP adjusted net income | 138,610 | 20,159 | 133,431 | 19,406 |

179.   Despite the July 30, 2019 press release's terse treatment of the supposed adjustments, the filed Form 20-F disclosed for the first time the complete lack of internal controls existing at the Company at the time of the IPO that resulted in both unchecked cash advances to Jimu, as well as the making of the significant unsecured loan to Plutux, impacting the now-restated financials for 2018.

180.   The 2018 Annual Report admitted to significant credit exposure for Pintec with

respect to Jimu as of December 31, 2018, resulting from the Company's lack of effective internal controls, as well as the Company's efforts to remediate that exposure just days prior to the filing of the 2018 Annual Report by entering into new loan agreements:

> In addition to payments we made Jimu Group in the ordinary course of business, **we made a series of cash advances to Jimu Group in 2018, in both U.S. dollars and Renminbi, that were not documented contemporaneously by loan agreements. The cash advances totaled RMB441.5 million (US$64.2 million) as of December 31, 2018, and were responsible for the greater part of the amount due from Jimu Group, which amounted to RMB475.4 million (US$69.1 million) as of December 31, 2018. As a result of these cash advances, the amounts due from Jimu Group on our balance sheet became much larger than the amounts due to Jimu Group. As of December 31, 2018, we had RMB475.4 million (US$69.1 million) in amounts due from Jimu Group, as compared to RMB89.5 million (US$13.0 million) in amounts due to Jimu Group.** We made additional cash advances of this nature to Jimu Group in 2019 as well, totaling RMB449.9 million (US$65.4 million), until we decided to end this practice in May 2019.

> **We entered into two loan agreements with Jimu Group on July 19, 2019, to formally document the amounts due from Jimu Group that were attributable to the cash advances we made to Jimu Group outside of the ordinary course of business. The two loan agreements as supplemented, relate to cash that we advanced to Jimu Group in 2018 and early 2019. As of May 31, 2019, the principal amount due under the U.S. dollar-denominated loan agreement was US$21.4 million, and the principal amount due under the Renminbi-denominated loan agreement was RMB154.6 million (US$22.5 million).** The Renminbi-denominated loan bears interest at an annual simple (non-compounding) rate of 11%, and the U.S. dollar-denominated loan bears interest at an annual simple (non-compounding) rate of 3.5%. The U.S. dollar-denominated loan matures on January 31, 2020, and the Renminbi-denominated loan matures on January 31, 2022. See "Item 7. Major Shareholders and Related Party Transactions—Transactions and Agreements with Jimu Group—Cash Advances and Loan Agreements" for more details.

> On July 19, 2019, we also entered into an information service cooperation agreement with Jimu Group, **pursuant to which we must reimburse Jimu Group for part of the losses under loans that we facilitate using Jimu Group as a funding source. The guarantee only covers those loans that are not recorded on our balance sheet. We must also maintain a guarantee deposit with Jimu Group.** See "Item 7. Major Shareholders and Related Party Transactions—Transactions and Agreements with Jimu Group" for more details. **We were required to deposit RMB165.3 million (US$24.0 million) with Jimu Group under this agreement when the agreement was signed.** The amount of the initial

deposit represented 12% of the loans which we had facilitated and which Jimu Group had funded since January 1, 2019 and which remained outstanding on April 30, 2019, excluding amounts that were in default. **In lieu of paying the deposit in cash, we reduced the amount due to us from Jimu Group under the RMB-denominated loan agreement by the same amount.** If and when we make further periodic deposits under the information service cooperation agreement with Jimu Group, we will further reduce the remaining amounts due to us under the loan agreement, which are related to additional cash advances we made to Jimu Group in 2019, rather than pay cash, for as long as the loan agreement remains outstanding. **Although deposits under the information service cooperation agreement reduce the amount due to us from Jimu Group under the RMB-denominated loan agreement, they do not reduce our credit exposure to Jimu Group.**

**The amount of our credit exposure to Jimu Group is significant in relation to our total assets and our market capitalization. If we are unable to collect the amounts due to us from Jimu Group, our business, financial condition and results of operations would be materially and adversely affected.**

181.     With respect to these unauthorized, unrecorded, and non-routine loans to Jimu, the Company admitted in the 2018 Annual Report a material weakness in its internal control over financial reporting, stating that the material weakness included the lack of effective controls in the following areas:

- Failure to set authorization levels for review and preapproval of the business rationale, nature, extent and terms of cash advances to Jimu Group by Pintec's board of directors;

- Failure to reach agreement on and document of the terms of the cash advances, including repayment terms and interest rate prior to the provision or extension of the advances;

- Failure to establish and follow formal procedures to ensure authorization and approval of such advances by Pintec's Audit Committee prior to the provision or extension of the advances, as required under the charter of our Audit Committee;

- Failure to review for appropriate authorization of the transaction in accordance with Pintec's authorization limits (including board of director and Audit Committee approvals) and whether amounts including cumulative amounts of transactions are within the limits approved by the board and Audit Committee prior to provision or extension of the advances; and

- Failure to conduct any periodic assessment of the recoverability of the advances to determine if an allowance for doubtful accounts is necessary.

182.     According to the admission in the 2018 Annual Report, "[t]his material weakness

57

resulted in significant outstanding balances due from Jimu Group at the year end with unclear

terms, which presented significant challenges for the Company in assessing the recoverability of

the outstanding balance for period end financial reporting purposes."

183.    In response, the Company claimed it was instituting several measures, including:

- the setting of authorization levels for review and preapproval of the business rationale, nature, extent and terms of cash advances to Jimu Group by Pintec's management, Audit Committee and board of directors, and establishing procedures for Pintec's Audit Committee to review and classify transactions;

- establishing increased approval procedures for the agreement on and documentation of the terms of cash advances, including repayment terms and interest rates, to ensure that the transactions with Jimu Group are in compliance;

- establishing formal procedures to ensure that amounts exceeding the preapproved threshold for routine transactions with Jimu Group are properly reported and filed, and amounts for non-routine transactions with Jimu Group are submitted for appropriate level review;

- establishing proper procedures to ensure that matters are timely submitted for Audit Committee review and necessary approvals are obtained;

- designing and implementing procedures to identify any potential conflicts of interests or related party relationships; and

- establishing proper control procedures to assess and review the recoverability of the advances extended each reporting period end and to account for the measurement of the related financial statement line items at each reporting date with appropriate review.

184.    The Company also admitted in the 2018 Annual Report that its lack of effective

controls resulted in a non-routine loan financing transaction with Plutux.

185.    According to the 2018 Annual Report, "[o]n July 31, 2018, [Pintec] entered into a

loan agreement with an entity, namely Plutux Labs Limited ('Plutux Labs'), which is a digital

assets and securities exchange platform in Asia.  Pursuant to the loan agreement, it was agreed that

[Pintec] provided a loan, with principal amount of US$20 million and an annual interest rate of

10.5% to Plutux Labs, ***without any requirements to Plutux Labs for collateral or pledge on this***

***loan***. The outstanding loan principal [was] repayable to the Company on the termination date

which is defined in the agreement as '(i) one year upon receipt of the loan or (ii) any other date the borrower payoffs the loan to the Company'. . . As of December 31, 2018, the outstanding loan principal and accrued interests were RMB138,089."

186.    Yet the provision of this loan was marred by the Company's admitted inadequate internal control procedures in the following areas:

- Pintec's failure to exercise due diligence on Plutux prior to making the loan to determine and document the existence of, the ownership of, and the business nature of Plutux;

- Pintec's failure to assess the credit worthiness of Plutux before entering into the loan arrangement; and

- Pintec's failure to periodically assess the recoverability of the outstanding loan to determine if an allowance for doubtful accounts is necessary.

187.    In response, the Company claimed that it would be implementing several measures to address this weakness, including:

- establishing due diligence procedures for non-routine loan advance transactions to confirm, at a minimum, whether the borrower is duly organized, who its owners are, and what kind of business it operates;

- establishing pre-lending credit assessment procedures for non-routine loan advance transactions to ascertain, at a minimum, the financial position of the borrower, the availability of any guarantee of the loan, and the existence of any collateral with a reasonable amount of value; and

- establishing proper control procedures to assess and review the recoverability of the loans originated from non-routine transactions at each reporting period end and to account for the measurement of the related financial statement line items at each reporting date with appropriate review.

188.    Despite being entitled to repayment of the entire principal of the $20 million USD loan from Plutux, along with $880,000 USD in interest as of December 31, 2018, the Company entered into an agreement with Plutux on May 5, 2019 whereby Pintec accepted a total payment of $20.12 million in satisfaction of the loan, writing off the $760,000 in interest to which it was otherwise entitled as of December 31, 2018, as well as foregoing the additional interest accrued

between January 1, 2019 and the May 5, 2019 payment.

189.    The Company's admission of its lack of internal controls in the 2018 Annual Report only accelerated Pintec's declining ADS price, with Pintec's ADSs dropping more than 13% over the four trading days following the belated 2018 Annual Report's release, from $3.93 per ADS to $3.40 per ADS.

190.    Then, on August 14, 2019, just two weeks after the Company filed its 2018 Annual Report admitting to these material internal control weaknesses, Pintec announced the resignation of Defendant Feng Hong from the Company's board of directors, effective August 13, 2019, "due to personal reasons."

191.    Importantly, Defendant Feng Hong was one of the three Pintec board members who also sat on the board of Jimu.

192.    The market reacted to the abrupt director departure with a sell-off, with Pintec ADSs dropping more than 7% from a close of $4.16 per ADS on August 14, 2019 to $3.86 per ADS on August 15, 2019.

193.    The market continued to respond negatively to the director changeover when, after market close on August 19, 2019, Pintec announced the appointment of Yong Chen as Defendant Hong's replacement. Pintec's ADS price dropped an additional 7% on August 20, 2019 in response to this news, and $0.86 per ADS total (equaling nearly 24%) over the next five trading days, from $3.60 per ADS to $2.74.

194.    Then, prior to the commencement of trading on September 6, 2019, Pintec announced the appointment of Marcum Bernstein & Pinchuk LLP ("Marcum") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019. Marcum replaced PWC, which the Company dismissed on August 20, 2019.

195.    Also on September 6, 2019, Pintec announced that Defendant Wie would be taking a temporary medical leave of absence from the Company, resigning from his position as chairman of the Board.

196.    The dismissal of the independent auditor who served in that position for the Company at the time of the IPO, yet who only identified the material weaknesses in the Company's internal controls *after* the Offering, and the leave of absence for the Company's CEO who helped steer the Offering, led to a nearly 5% decline in the Company's ADS price at the close of trading on September 6, 2019 (from $3.16 per ADS to $3.02), with the ADS price continuing to drop to $2.68 over the next five trading days (a decline of more than 15%).

197.    On September 23, 2019, Pintec announced its unaudited financial results for the first half of 2019.  On the earnings call discussing these results, new Pintec CEO Defendant Dong, announced that the volume of loans Pintec facilitated in association with Jimu's P2P lending service decreased by 60%, further signaling the deteriorating relationship between Pintec and Jimu.

198.    Following the Company's earnings announcement and conference call, Pintec's ADS price dropped precipitously, closing down 28% to $1.63 per ADS on September 24, 2019.

199.    Then, on October 18, 2019, prior to the market opening, the Company announced the resignation of Pintec president Jing Zhou, effective immediately. According to the Offering Materials, Ms. Zhou had been a president of the Company since January 2018 and was previously the chief executive officer of the Dumiao business (the technology platform that most relied on Jimu's funding) from May 2016 to January 2018. The announcement resulted in a nearly 4% decline in the Company's ADS price.

200.    On February 4, 2020, Pintec announced the appointment of Hefei Xu as head of the

Company's risk management department, replacing Hai Tong, who previously held the role of Chief Risk Officer. The replacement was notable, as Hai Tong had been the Company's Chief Risk Officer as of the IPO at a time when the Company's inadequate internal controls left it particularly vulnerable to increased risk stemming from its relationship with Jimu.

201.    In February 2020, Jimu announced that its P2P lending business was insolvent and it would be exiting the online lending business.

202.    Then, on May 8, 2020, Pintec announced that Defendant Chao Zhou had tendered his resignation as an independent director, member of the Board's Audit Committee, and chairman of the Compensation committee. Defendant Chao Zhou was a member of the Board's Audit Committee at the time of the IPO when the numerous undisclosed material weaknesses in the Company's internal controls, including controls directly related to risk exposure stemming from the cash advances to Jimu, went undisclosed.

203.    On June 15, 2020, prior to the market opening, the Company announced its unaudited results for 2019. While the nearly 20% decline in total revenues year-over-year was alarming, the greater concern was the reported net loss of $130.2 million USD compared to a modest net income of RMB2.2 million ($0.3 million USD) in 2018.

204.    This outsized net loss was due to an RMB890.7 million ($134.6 million USD) provision for credit loss in amounts due from Jimu directly related to the undocumented cash advances – an amount now deemed unrecoverable due to Jimu's insolvency and exit from the online lending platform business with significant outstanding loan balances on its platform left unpaid.

205.    Also on June 15, 2020, and for the second time in just two years as a public company, Pintec filed a Form NT 20-F with the SEC, again indicating an inability to file its annual

report for the period ended December 31, 2019 on a timely basis without unreasonable effort or

expense. However, this time the Company provided greater insight into why: Pintec's consolidated

financial statements for December 31, 2017 (included in the Offering Materials) and December

31, 2018 (which included the interim results presented in the Offering Materials for the first half

of 2018) contained material misstatements, necessitating a restatement by the Company.

206.    The Company described the misstatements as:

(a) Gross vs net recognition on revenue

In the years ended December 31, 2017 and 2018, **the Company erroneously recorded revenue earned from certain technical service fee on a net basis, rather than on a gross basis as would have been correct since the Company was acting as principal.** The correction of this error resulted in an increase in both revenues and cost of revenues of RMB194 million for the year ended December 31, 2017 and RMB530 million for the year ended December 31, 2018.

(b) Reclassification of prior year presentation

Certain **fiscal year 2018 amounts have been reclassified** for consistency with the current period presentation. These reclassifications had no effect on the reported results of operations. In fiscal year 2019, the Company concluded that: **(a) it was appropriate to classify financial guarantee assets based on their short term and long term nature from prepayments and other current assets; (b) it was appropriate to present the release from guarantee obligation under the line item for technical service fee revenues; and (c) it was appropriate to present accrued interest receivable as part of financing receivable, and present accrued interest payable as part of funding debts.** These changes in classification do not materially affect previously reported consolidated statements of cash flows and had no effect on the previously reported consolidated statements of operations and comprehensive income for year 2018.

**The Company announced a net loss of RMB906.5 million in the full year of 2019 due to RMB890.7 million of provision for credit loss in amounts due from a related party, Jimu Group, and RMB200 million of impairment in prepayment for long-term investment.**

207.    The Company's poor financial condition, resulting from its failure to mitigate its

risk exposure to the now-insolvent Jimu, as well as its restatements and continued inability to

timely carry out its financial reporting obligations, resulted in a 4% decline in the ADS price on

June 15, 2019, and a more than 7% two-day drop, as Pintec's ADSs closed at $0.92 on June 16, 2020.

208.    By September 29, 2020, the date of the first-filed complaint in this securities action, Pintec's ADS price had fallen to a closing price of $0.98 per ADS – a drop of $10.90 per ADS from the Offering Price, ***constituting a loss of nearly 92% in value***.

## CLASS ALLEGATIONS

209.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of a class consisting of all persons and/or entities who purchased or otherwise acquired ADSs of Pintec pursuant and/or traceable to the Company's false and/or misleading Offering Materials issued in connection with the Company's IPO, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, there were more than 4.2 million ADSs issued in the Offering. Thus, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pintec, its depositary bank, or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

212.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

213.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.   whether Defendants violated the Securities Act;

        b.   whether statements made by Defendants to the investing public in the Offering Materials were false and/or misrepresented material facts about the business and operations of Pintec; and

        c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

214.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violations of § 11 of the Securities Act
### Against All Defendants

215.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

216.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S. C. § 77k, on behalf of the Class, against Pintec, the Individual Defendants, and the Underwriter

Defendants.

217.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

218.    The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

219.    The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.  As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

220.    The Underwriter Defendants each served as underwriters in connection with the IPO. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate,

unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

221.    By reason of the conduct herein alleged, each Defendant named herein violated, §11 of the Securities Act.

222.    Plaintiff acquired Pintec ADSs pursuant or traceable to the Registration Statement used for the IPO without knowledge of the material omissions or misrepresentations alleged herein.

223.    Plaintiff and the Class have sustained damages, as the value of Pintec ADSs has declined substantially subsequent to and due to these Defendants' violations.

224.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**Violations of §15 of the Securities Act**
**Against the Individual Defendants**

225.    Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

226.    This Cause of Action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants.

227.    The Individual Defendants each were control persons of Pintec by virtue of their positions as directors and/or senior officers of Pintec.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Pintec.

228.    The Individual Defendants were each critical components affecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting to execute the IPO and by having otherwise directed through their authority the processes leading to the execution of the IPO.

229.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's ADSs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Declaring this action to be a class action and certifying Plaintiff as a representative of the Class and his counsel as Class Counsel;

B. Awarding Plaintiff and the members of the Class damages, including interest;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a jury trial.

Dated:  February 15, 2021

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/Sebastiano Tornatore*
Shannon L. Hopkins (SH-1887)
Sebastiano Tornatore (ST-0304)
1111 Summer Street, Ste. 403
Stamford, Connecticut 06905
Tel.  203.992.4523
Fax. 212.363.7500
Email:  shopkins@zlk.com
Email: stornatore@zlk.com

*Attorneys for Lead Plaintiff Eric Dahm*

69

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2021, a copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served via the Court's ECF system to all counsel of record as identified on the Notice of Electronic Filings (NEF), and otherwise served on this indicated as non-registered participants.

Dated: February 15, 2021

*/s/Sebastiano Tornatore*
Sebastiano Tornatore