UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| ALLON YARONI, Individually and On Behalf of All Others Similarly Situated, | : | 20-cv-8062 (JMF) |
| | : | |
| | : | **ECF Case** |
| Plaintiff, | : | **Electronically Filed** |
| v. | : | |
| | : | **ORAL ARGUMENT** |
| PINTEC TECHNOLOGY HOLDINGS LIMITED, | : | **REQUESTED** |
| WEI WEI, STEVEN YUAN NING SIM, JUN | : | |
| DONG, JING ZHOU, XIAOMEI PENG, CHAO | : | |
| ZHOU, FENG HONG, JIACHENG LIU, | : | |
| GOLDMAN SACHS (ASIA) L.L.C., DEUTSCHE | : | |
| BANK SECURITIES INC., and CITIGROUP | : | |
| GLOBAL MARKETS INC., | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| SKADDEN, ARPS, SLATE,<br>    MEAGHER & FLOM LLP | GOODWIN PROCTER LLP |
| | Douglas H. Flaum |
| Scott D. Musoff | Molly L. Leiwant |
| Robert A. Fumerton | 620 Eighth Avenue |
| Michael C. Griffin | New York, New York 10018 |
| One Manhattan West | Telephone: (212) 813-8800 |
| New York, New York 10001 | |
| Telephone: (212) 735-3000 | *Attorneys for Defendants Goldman* |
| | *Sachs (Asia) L.L.C., Deutsche Bank* |
| *Attorneys for Defendant Pintec Technology* | *Securities Inc. and Citigroup Global* |
| *Holdings Limited* | *Markets Inc.* |

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

I.      BACKGROUND ...................................................................................................... 4

        A.      Pintec's Business Model ............................................................................... 4

        B.      Pintec's Relationship with Jimu ................................................................... 4

II.     PINTEC'S IPO AND OFFERING DOCUMENTS ................................................. 5

        A.      Pintec Disclosed All Required Financial Information ................................... 5

        B.      Pintec Disclosed Risks Associated with Its Relationship with Jimu ........... 6

        C.      Pintec Disclosed Heightened Internal Controls Risks .................................. 7

III.    PINTEC'S SUBSEQUENT DISCLOSURES .......................................................... 8

        A.      Prior to Any Purported "Corrective Disclosure," Pintec's ADS Price Falls
                Nearly 70% from the IPO Price ..................................................................... 8

        B.      Pintec Releases Its 2018 Annual Report in July 2019 .................................. 9

        C.      Pintec's ADS Price Drops 70% For Reasons Unrelated to this Action ........ 12

        D.      In June 2020, Pintec's ADS Price *Increases*  After It Releases Its 2019
                Annual Report ................................................................................................. 12

IV.     THIS ACTION .......................................................................................................... 13

ARGUMENT ........................................................................................................................ 14

I.      VIRTUALLY ALL OF PLAINTIFF'S CLAIMS ARE TIME-BARRED .............. 14

II.     PLAINTIFF FAILS TO ALLEGE A MATERIAL MISREPRESENTATION ....... 16

III.    NEGATIVE CAUSATION IS APPARENT FROM THE FACE OF  THE
        COMPLAINT ............................................................................................................ 24

CONCLUSION ..................................................................................................................... 25

# **TABLE OF AUTHORITIES**

Page(s)

## **CASES**

*Altayyar v. Etsy, Inc.*,
    242 F. Supp. 3d 161 (E.D.N.Y. 2017) .........................................................................17, 18

*Amorosa v. AOL Time Warner Inc.*,
    409 F. App'x 412 (2d Cir. 2011) ......................................................................................14

*In re AmTrust Financial Services, Inc. Securities Litigation*,
    No. 17-cv-1545 (LAK), 2020 WL 2787117 (S.D.N.Y. Apr. 20, 2020) .....................22, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................................24

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................................4

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
    No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. 2010) .............................................23, 25

*In re Britannia Bulk Holdings Inc. Securities Litigation*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009)..............................................................................25

*Delfonce v. Eltman Law, P.C.*,
    No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017) ...................4

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).........................................................................................................24

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................................20, 21

*F.D.I.C. v. Countrywide Financial Corp.*,
    No. 12-CV-4354 (MRP), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ........................15

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020).........................................................................14, 15

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)..............................................................................23

*Hutchison v. Deutsche Bank Securities Inc.*,
    647 F.3d 479 (2d Cir. 2011)....................................................................................20, 21, 25

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) .......................................................16, 20

*Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012)..................................................................23

*In re Magnum Hunter Resources Corp. Securities Litigation*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014)...................................................................14

*In re Magnum Hunter Resources Corp. Securities Litigation*,
    616 F. App'x 442 (2d Cir. 2015) ..................................................................14, 15

*In re Morgan Stanley Information Fund Securities Litigation*,
    592 F.3d 347 (2d Cir. 2010)......................................................................16, 23

*NECA-IBEW Pension Trust Fund v. Lewis*,
    607 F. App'x 79 (2d Cir. 2015) .........................................................................15

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................17, 18

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
    No. 17-CV-6130-LTS-SN, 2021 WL 1226865 (LTS).......................................15

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015).............................................................................................22

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008).................................................................18

*Schuler v. NIVS Intellimedia Technology Group, Inc.*,
    No. 11 Civ. 2484(KMW)(FM), 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013) .................25

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011).................................................................24

*In re Time Warner Inc. Securities Litigation*,
    9 F.3d 259 (2d Cir. 1993)....................................................................................20

*Xu v.Gridsum Holding Inc.*,
    No. 18 Civ. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)........................22, 24

**STATUTES**

15 U.S.C. § 77...........................................................................................1, 14, 24

**REGULATIONS**

17 C.F.R. § 210.3-12...........................................................................................................3, 5, 20

Defendants[1] respectfully submit this memorandum of law in support of their joint motion to dismiss the Amended Class Action Complaint (ECF No. 31) ("Complaint" or "AC")[2] pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff brings this putative securities class action in a veiled and untimely attempt to recover for stock market losses that, by his own admission, occurred long before any purported "corrective disclosures" in this case.  In early April 2019, six months after Pintec's October 2018 initial public offering ("IPO"), Pintec's American Depositary Share ("ADS") price began to tumble for reasons that have nothing to do with Plaintiff's allegations here.  Indeed, by July 29, 2019—the day *before* Pintec filed its 2018 Annual Report, which Plaintiff claims first revealed the alleged misrepresentations in Pintec's IPO Registration Statement and Prospectus (together, the "Offering Documents")—Pintec's ADS price had already dropped nearly 70% from its IPO price.  In light of that, it is unsurprising that at the time neither Plaintiff nor any other shareholder claimed the 2018 Annual Report revealed any prior violation of the securities laws.  Indeed, the one-year statute of limitations for any such claim expired in July 2020 without any shareholder bringing such a claim.

Nonetheless, in September 2020, a shareholder belatedly filed this Action for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o,

---

[1]  "Defendants" as used herein refers collectively to Pintec Technology Holdings Limited ("Pintec" or the "Company"); Goldman Sachs (Asia) L.L.C., Deutsche Bank Securities Inc., and Citigroup Global Markets Inc., (together, the "Underwriter Defendants").  To Defendants' knowledge, the individual defendants (certain Pintec officers and/or directors) have not been served.

[2]  All exhibits are attached to the accompanying Declaration of Robert A. Fumerton, dated April 16, 2021, and are cited herein as "Ex. __."  Pin cites for all exhibits reference the original pagination at the bottom of the page.  All citations and internal quotation marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

alleging that the 2018 Annual Report revealed two issues that were supposedly not disclosed in the Offering Documents: (i) certain cash advances Pintec made to its corporate predecessor, Jimu Holding Limited ("Jimu"); and (ii) a short-term loan Pintec made to an unrelated party, Plutux Labs Limited ("Plutux"). But the Company did disclose the cash advances to Jimu and it had no obligation, as a matter of law, to disclose the Plutux loan—which was ultimately repaid in full in any event. Separately, Plaintiff also tacks on a claim regarding Pintec's 2019 Annual Report, which was issued *after Plaintiff sold all of his shares* and which disclosed an adjustment to the Company's revenue recognition practices and restated certain historical financial results. But these accounting adjustments had no material impact on Pintec's previously reported bottom line, and did not trigger any decrease in Pintec's ADS price. In any event, the Offering Documents (issued two years earlier) warned that Pintec had internal control weaknesses regarding its accounting and that these might require adjustments in the future.

As demonstrated below, Plaintiff's Complaint should be dismissed with prejudice in its entirety for multiple independent reasons.

First, all of Plaintiff's claims based on the 2018 Annual Report are time-barred. Claims under Section 11 and 15 of the Securities Act, must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Here, Plaintiff admits that the matters at the heart of his Complaint—Pintec's internal controls deficiencies, cash advances to Jimu, loan to Plutux, and other forms of risk management—were revealed to the public in Pintec's 2018 Annual Report on July 30, 2019, over a year before this Action was filed. Thus, these claims are time-barred and should be dismissed with prejudice on this basis alone.

Second, all of Plaintiff's claims fail because none allege any material misstatement or omission in the Offering Documents. Pintec clearly warned prospective IPO investors of the limitations in its internal controls and the attendant risks. Investors were on notice that the Company might identify further material weaknesses relating to its prior financial statements. The Offering Documents also expressly disclosed the cash advances Pintec made to Jimu and warned of the risks relating to its continued cooperation with Jimu. Although the Offering Documents did not discuss the short-term loan Pintec made to Plutux, Pintec had no duty to disclose that information because the Plutux transaction occurred less than 135 days before Pintec's IPO. *See* SEC Regulation S-X, 17 C.F.R. § 210.3-12(a), (g). Moreover, Plaintiff does not plausibly allege facts showing the Plutux loan was material to investors. Finally, Pintec's reclassification of certain previously reported financial results to be consistent with its updated judgment regarding revenue recognition does not mean the original reporting was false or misleading. Indeed, Plaintiff fails to allege any facts that show Pintec's original numbers were objectively incorrect and not merely the product of subjective accounting standards.

Third, all of Plaintiff's claims also fail as a matter of law because it is apparent from the face of the Complaint that the alleged misrepresentations did not and could not have caused Plaintiff's alleged loss. Pintec's ADS price fell far below the IPO price long before any purported "corrective disclosures" were made, and fell further—by another 70%—between the release of the 2018 and 2019 Annual Reports for unrelated reasons. Indeed, there is no conceivable argument that Plaintiff's alleged loss was caused by the revelations in the 2019 Annual Report because plaintiff sold all of his shares before that report was issued. In any event, Pintec's ADS price *increased* when the 2019 Annual Report was issued.

### STATEMENT OF FACTS[3]

## I.      BACKGROUND

### A.      Pintec's Business Model

At the time of its IPO, Pintec was a leading technology company in China that matched lenders (such as banks and investment funds) with borrowers (such as e-commerce and telecommunications companies).  (Ex. A at 1–2, 90; AC ¶ 48.)  Pintec generates most of its revenues from "technical service fees" for successfully matching a borrower with a lender through the various loan products it offers on its online platform.  (Ex. A at 90; AC ¶¶ 49, 61.)  These technical service fees comprised nearly 75% of Pintec's revenue in 2017 and 69% of revenue for the first half of 2018.  (AC ¶ 61.)

### B.      Pintec's Relationship with Jimu

Pintec began operations in June 2015 as a business unit of its predecessor, Jimu.  (Ex. A at 80.)  In 2016, Jimu underwent a reorganization that carved out the peer-to-peer ("P2P") lending business from its non-P2P lending and wealth management businesses.  (*Id.*; AC ¶ 67.)  After the reorganization, Jimu continued to run the P2P business, while Pintec independently ran the non-P2P and wealth management businesses under its own name.  (Ex. A at 80; AC ¶ 67.)

In connection with the reorganization, Pintec entered into various agreements with Jimu relating to, among other things, the transfer of assets, change in employment relationships, and the restructuring and reorganization of their respective subsidiaries and variable interest entities.  (Ex.

---

[3]     The facts set forth herein are drawn from the well-pled allegations in the Complaint and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint."  *Delfonce v. Eltman Law, P.C.*, No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

A at 82.)  For example, the Master Transaction Agreement allocates financial liabilities between Pintec and Jimu and includes indemnification provisions on a variety of matters.  (*Id.* at 82–83.)

Pintec and Jimu also memorialized their plans for continued business cooperation after the reorganization.  (*Id.* at 82–84.)  For example, their Cooperation Framework Agreement provides that Jimu will continue to fund loans on Pintec's platform.  (*Id.* at 82-83.)  Indeed, from 2016 to 2019, Pintec continued to rely on Jimu as its principal source of funding "to meet user demand for loans on our platform" in the ordinary course of business.  (*Id.* at 24; Ex. C at 6.)  For its part, Pintec agreed to provide Jimu "with certain services and support, including borrower referral, repayment management and transaction and technology support."  (Ex. A at 83.)

In connection with the reorganization and the two entities' continued business cooperation, Pintec and Jimu needed to settle amounts due to or from each other from time to time. Accordingly, depending on who owed money to whom on net, Pintec and Jimu made a series of cash advances to each other between 2016 and 2019.  (Ex. A at 183; Ex. G at 116–17.)  These cash advances were accurately recorded in the Company's financial documents, including in the consolidated financial statements found in the Offering Documents.  (Ex. A at 183.)

## II.    PINTEC'S IPO AND OFFERING DOCUMENTS

### A.    Pintec Disclosed All Required Financial Information

On October 25, 2018, Pintec launched its IPO, issuing 3,725,000 ADSs at $11.88 per share. (AC ¶ 102.)  In compliance with Pintec's reporting obligations, the Offering Documents included the Company's financial statements through June 30, 2018.  (Ex. A at F-59–62.)  *See* 17 C.F.R. § 210.3-12(a), (g)(ii) (requiring issuers to include statements 135 days old as of the effective date of the filing).[4]  These financial statements included Pintec's revenues, broken down into technical

---

[4]    135 days from the date of Pintec's October 25, 2018 IPO is June 12, 2018.

service fees, installment fees, and wealth management service fees.  (Ex. A at F-60.)  Pintec also described its revenue recognition practices, including a lengthy discussion of its revenue recognition practices with respect to technical service fees.  (*Id.* at 105–06.)

Contrary to Plaintiff's assertions that Pintec's cash advances to Jimu were "undocumented" and "unreported," (AC ¶¶ 83–84, 87, 134, 181), the Offering Documents clearly disclosed these cash advances under related party transactions as "[n]et cash advances" received from and made to Jimu.  (Ex. A at 183.)  Pintec reported that as of June 30, 2018, it had paid net cash advances to Jimu totaling RMB142,015,000.[5]  (*Id.*)  The amounts due to and from Jimu "mainly arose from allocation of expenses between [Pintec] and Jimu Group."  (*Id.* at 122, 183.)

## B.    Pintec Disclosed Risks Associated with Its Relationship with Jimu

In addition, the Offering Documents accurately and fully disclosed Pintec's relationship with Jimu, warning that "[t]he overlap in shareholding and in directors between our company and [Jimu] may create conflicts of interest, especially given the continued cooperation expected between our company and [Jimu] after this offering."  (Ex. A at 11.)  Pintec described certain key agreements entered into with Jimu, including the Master Transaction Agreement, the Cooperation Framework Agreement, and a Non-Competition Agreement, whereby Pintec and Jimu agreed not to compete in any business of the same nature as the other, excluding "any part of the business that we currently conduct or contemplate to conduct."  (*Id*. at 83–84.)

Pintec also disclosed the risks associated with its relationship and continued cooperation with Jimu.  Pintec warned that because Jimu was a related party, the terms of agreements entered

---

[5]    For 2016 and 2017, the cash advances Jimu paid to Pintec exceeded cash advances Pintec paid to Jimu.  (Ex. A at 183.)  Hence, the "[n]et cash advances" line item showed that Jimu made cash advances to Pintec in amounts of RMB29,790,000 and RMB23,121,000, respectively.  (*Id.*)  By June 30, 2018, however, the cash advances that Pintec paid to Jimu exceeded the cash advances that Jimu paid to Pintec, such that the "[n]et cash advances" line item reflected that Pintec made cash advances to Jimu in the amount of RMB142,015,000.  (*Id.*)

into by both parties "may be less favorable to us than similar agreements negotiated between unaffiliated third parties," and "may affect our ability to diversify our revenue and funding sources and may materially and adversely impact our business and prospects."  (*Id.* at 34–35.)  The Company noted that it "may have conflicts of interest due to related party transactions with Jimu Group."  (*Id.* at 35.)  Pintec also disclosed risks associated with its continued reliance on Jimu's P2P business as a principal source of funding for loans facilitated on its platform.  (*Id.* at 24.)  Recognizing that its own financial and operational performance may be impacted by Jimu's, Pintec disclosed recent regulatory developments affecting the Chinese P2P lending industry in which Jimu operates and the potential spillover effects on Pintec's business.  (*Id.* at 5, 9–10, 22–23, 27.)

### C.      Pintec Disclosed Heightened Internal Controls Risks

The Offering Documents also discussed at length the risks and shortcomings associated with the Company's internal controls at the time.  As an "emerging growth company," Pintec was exempt from certain requirements applicable to other public companies, such as an independent audit of the Company's internal controls. (Ex. A at 11–12.)  These exemptions, as well as Pintec's relatively new corporate status and limited resources, elevated Pintec's internal controls risks compared to other companies.  Pintec disclosed these heightened internal controls risks as follows:

> ***If we fail to maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud.***  Prior to this offering, we were a private company with limited accounting personnel and other resources with which to address our internal control and procedures.  ***Our management has not completed an assessment of the effectiveness of our internal control over financial reporting and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting.***  (*Id.* at 42.)

Pintec also disclosed that, although its assessment of internal controls was not complete, "we and our independent registered public accounting firm" had already "identified one material weakness in our internal control over financial reporting as of December 31, 2017."  (*Id.*)  Investors

were warned that this weakness might adversely affect its compliance with SEC reporting requirements and made it more likely that additional weaknesses would be identified that would require a restatement of Pintec's prior financials:

> ***The material weakness that has been identified relates to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements to properly address complex U.S. GAAP technical accounting issues and prepare and review financial statements and related disclosures*** in accordance with U.S. GAAP and reporting requirements set forth by the SEC.  We have implemented and are continuing to implement a number of measures to address the material weakness that has been identified . . . However, we cannot assure you that we will be able to continue implementing these measures in the future, ***or that we will not identify additional material weaknesses in the future . . .*** If we fail to achieve and maintain an effective internal control environment, ***we could suffer material misstatements in our financial statements and fail to meet our reporting obligations***, which would likely cause investors to lose confidence in our reported financial information . . . limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our ADSs . . . . ***We may also be required to restate our financial statements from prior periods.***  (*Id.* at 42–43.)

## III.    PINTEC'S SUBSEQUENT DISCLOSURES

### A.    Prior to Any Purported "Corrective Disclosure," Pintec's ADS Price Falls Nearly 70% from the IPO Price

As Plaintiff admits, the significant drop in Pintec's ADS price occurred long before any of the purported "corrective disclosures" alleged here.  (AC ¶ 170.)  By April 29, 2019—the day before Pintec filed its Form NT 20-F announcing its 2018 Annual Report would be delayed—the Company's ADS price had dropped nearly 47% to $6.30 from the IPO price of $11.88.  (*Id.*)  Following the delay announcement, the stock dropped a further 2.38% to $6.15.  (Ex. B at 3; AC ¶ 171.)  On May 16, 2019, after Pintec announced its receipt of a notification letter from Nasdaq due to its failure to timely file its Form 20-F, Pintec's ADS price increased from the prior day.  (Ex. B at 4; AC ¶ 174.)  By July 29, 2019, the day before it filed its 2018 Annual Report on Form 20-F, Pintec's ADS price had plummeted nearly 70% to $3.70 from its IPO price.  (Ex. B at 5.)

**B.      Pintec Releases Its 2018 Annual Report in July 2019**

On July 30, 2019, after the close of trading, Pintec released its 2018 Annual Report.  (Ex. C at 1; AC ¶ 12.)  As it did in its Offering Documents, Pintec reported "[n]et cash advances from/(to) Jimu Group," which showed Pintec's net cash advances to Jimu had increased to RMB441,491,000 ($64.2 million), as of December 31, 2018.  (Ex. C at 8, 116.)  Pintec also disclosed that it provided a short-term loan to a third party, Plutux, on July 31, 2018, with a principal amount of $20 million and an annual interest rate of 10.5%.  (*Id.* at F-41.)  As of December 31, 2018, the outstanding amount Plutux owed Pintec was RMB138,089,000 ($20.1 million), as reported under "prepayments and other current assets."  (*Id.*)  However, by the time the 2018 Annual Report was filed in July 2019, Pintec had ***fully collected*** the loan principal and part of the interest from Plutux.  (*Id.*)

As the Offering Documents warned might happen (*see* Ex. A at 42–43), Pintec's ongoing assessment of its internal controls that continued after the IPO identified two additional material weaknesses that necessitated adjustments to its prior financial statements.  (Ex. C at 24.)  <u>First</u>, Pintec identified a new material weakness related to the "lack of effective controls over the provision of cash advances" to Jimu.  (*Id.*)  These cash advances were separate from the payments it collected from borrowers for loans funded by Jimu, which Pintec remitted to Jimu "in the normal course of business."  (*Id.* at 115.)  In contrast, these other cash advances "mainly arose from allocation of expenses between us and Jimu Group" in relation to the reorganization, (Ex. A at 122), and thus were considered "outside the normal course of business," (Ex. C at 24).  While Pintec did have preexisting compliance policies and procedures relevant to these risk areas, the 2018 Annual Report candidly acknowledged the need to review, improve, and formalize these controls measures, including:

- setting of authorization levels for review and preapproval of the business rationale, nature, extent and terms of cash advances to Jimu Group by our board of directors;
- agreement on and documentation of the terms of the cash advances including repayment terms and interest rate prior to the provision or extension of the advances;
- formal procedures to ensure authorization and approval of such advances by our audit committee prior to the provision or extension of the advances, *as required under the charter of our audit committee*;
- review for appropriate authorization of the transaction *in accordance with our authorization limits* (including board of director and audit committee approvals) and whether amounts including cumulative amounts of transactions are within the limits approved by the board and audit committee prior to provision or extension of the advances; and
- periodic assessment of the recoverability of the advances to determine if an allowance for doubtful accounts is necessary.  (Ex. C at 24.)

Pintec disclosed that "[t]his material weakness resulted in significant outstanding balances due from Jimu Group at the year end with unclear terms, which presented significant challenges for the Company in assessing the recoverability of the outstanding balance for period end financial reporting purposes."  (*Id.*)  As remediation, Pintec entered into two loan agreements with Jimu on July 19, 2019, to formally document the amounts due in RMB and USD.  (*Id.* at 115.)  These amounts were partially offset in supplemental agreements by certain fees Pintec owed to Jimu, and by the amount due to Jimu from Pintec's March 2019 purchase of Ganzhou Jimu Micro Finance Co., Ltd. ("Jimu Micro Finance") for RMB230 million.  (*Id.*)  Pintec viewed this acquisition favorably because Pintec could take advantage of Jimu Micro Finance's license to operate a small loan business "to develop and operate pilot programs for new service offerings" and "provide our partners and customers with more robust financial solutions going forward."  (*Id.* at 116.)  The purchase price was "supported by a fairness opinion issued by a third-party valuer."  (*Id.*)

By the time the 2018 Annual Report was filed, the majority of cash advance amounts due from Jimu as of December 31, 2018 had been settled.  (*Id.* at 115, F-60.)  But to ensure that the outstanding balances, including cash advances that Pintec made in 2019 *after the IPO* were compliant with the Company's newly implemented internal controls, Pintec and Jimu

supplemented their Consulting Service Agreement and Strategic Cooperation Agreement to allow Pintec to withhold fees due to Jimu in the event that Jimu failed to fully and timely repay Pintec. (*Id.* at 115.)

Second, Pintec identified an additional material weakness that "relates to our lack of effective controls over a non-routine loan financing transaction with a third-party entity, Plutux Labs." (*Id.* at 24.)  Noting that it had ***fully collected*** the principal amount of the loan from Plutux, which agreed to early repayment in May 2019, Pintec nonetheless disclosed that it lacked effective controls in the following areas:

- exercising due diligence on the third party entity prior to making the loan to determine and document the existence of, the ownership of, and the business nature of the entity;
- assessing the credit worthiness of the third party entity before entering into the loan arrangement; and
- periodically assessing the recoverability of the outstanding loan to determine if an allowance for doubtful accounts is necessary.  (*Id.*)

The Company disclosed that these two material weaknesses, along with the material weakness in internal controls previously identified in its Offering Documents, had "resulted in a significant number of adjustments and amendments to consolidated financial statements and related disclosures under U.S. GAAP." (*Id.*)  It also disclosed numerous measures it implemented to address these issues, but warned that such measures "may not fully address these deficiencies in our internal control over financial reporting, and we cannot conclude that they have been fully remedied." (*Id.* at 24, 132.)  In addition, "[o]ur failure to correct these control deficiencies or our failure to discover and address any other control deficiencies could result in inaccuracies in our financial statements and impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis." (*Id.* at 24, 132.)

Later that day, Pintec issued a press release identifying the adjustments made to its financial statements.  (Ex. D at 1.)  The next day, the Company's ADS price decreased by 2% from $3.93 on July 30, 2019 to $3.85 on July 31, 2019.  (Ex. B at 5.)

### C.      Pintec's ADS Price Drops 70% For Reasons Unrelated to this Action

As the Complaint acknowledges, between August and October 2019, Pintec's ADS price dropped further—by approximately another 70% from $4.16 to $1.25—for reasons unrelated to the alleged misrepresentations in this action.  (Ex. B at 5–6.)  For example, Plaintiff points to price drops that occurred after the Company announced the departure of three different directors over three different months, all of which occurred "due to personal" or medical reasons.  (Ex. E at 4; AC ¶¶ 190, 195, 199.)  Similarly, Plaintiff notes Pintec's announcement of the appointment of a new auditor, but does not allege that this decision had anything to do with any of the alleged misrepresentations.  (AC ¶ 194.)  Finally, he alleges Pintec's ADS price fell by 28% after the release of its unaudited financial results on September 23, 2019, which did not reveal any information relevant to any of the alleged misrepresentations in this case.  (*Id.* ¶ 197.)

### D.      In June 2020, Pintec's ADS Price *Increases* After It Releases Its 2019 Annual Report

On June 15, 2020, prior to market open, Pintec filed a notification of late filing of its 2019 Form 20-F, announcing a correction of the revenue basis of its technical service fee:

> In the years ended December 31, 2017 and 2018, the Company erroneously recorded revenue earned from certain technical service fee on a net basis, rather than on a gross basis as would have been correct since the Company was acting as principal.  ***The correction of this error resulted in an increase in both revenues and cost of revenues of RMB194 million for the year ended December 31, 2017 and RMB530 million for the year ended December 31, 2018.***  (Ex. F at 2.)

The concomitant increases in revenues and cost of revenues meant that Pintec's profits for 2017—*i.e.*, the difference between revenue and cost of revenue—remained ***the same***.  (Ex. G at F-72–73.)  Pintec also announced that it had reclassified certain 2018 financial figures for the sake

of consistency, but "[t]hese reclassifications had no effect on the reported results of operations" and "do not materially affect previously reported consolidated statements of cash flows and had no effect on the previously reported consolidated statements of operations and comprehensive income." (Ex. F at 3.)  In the same filing, Pintec disclosed "a net loss of RMB906.5 million in the full year of 2019 due to RMB890.7 million of provision for credit loss in amounts due from a related party, Jimu Group, and RMB200 million of impairment in prepayment for long-term investment." (*Id.* at 3.)  After this disclosure, Pintec's ADS price opened at $1.04 on June 15, 2020, a 5% ***increase*** from the prior day's closing price, before closing at $0.95. (Ex. B at 10.)

On June 29, 2020, prior to market open, Pintec filed its 2019 Annual Report on Form 20-F, providing further details on the impact of the above changes on its 2017 and 2018 financials. (Ex. G at F-3–81.)  Pintec also disclosed that the provision for credit loss in amounts due from Jimu was attributable to Jimu's insolvency and exit from the online lending platform business "pursuant to relevant regulations," as announced by Jimu in February 2020. (*Id.* at 80.)  With respect to cash advances made to Jimu, Pintec disclosed a "[s]ignificant provision for credit loss of RMB856.0 million on balance due from Jimu Group . . . in the year ended December 31, 2019 as collection or recovery was remote." (*Id.* at 23.)  Notably, no provisions were made for cash advances made in 2018. (*Id.*)  Hence, the provisions did not impact the net cash advances previously disclosed in the Offering Documents.  That day, Pintec's ADS price ***increased*** from $1.20 on June 26, 2020 (the last day markets were open) to $1.21. (Ex. B at 10.)

## IV.   THIS ACTION

Plaintiff filed this action on September 29, 2020.  Plaintiff asserts that Pintec's failure to disclose the Jimu and Plutux transactions made the Offering Documents' descriptions of Pintec's internal controls, risk management, audit process, and relationship with Jimu each false or misleading. (AC ¶¶ 7–10.)  Plaintiff also alleges Pintec erroneously recorded revenue earned from

technical service fees on a net basis, rather than a gross basis, and that Pintec misrepresented certain line items for its 2017 and 2018 financials.  (AC ¶ 17.)  As explained below, Plaintiff fails to state a claim under the federal securities laws, and the Complaint should be dismissed.

## ARGUMENT

## I.    VIRTUALLY ALL OF PLAINTIFF'S CLAIMS ARE TIME-BARRED

As a threshold matter, Plaintiff's claims concerning Pintec's internal controls, risk management, auditor, audit committee, relationship with Jimu, and Plutux loan agreement are all time-barred.[6]  Section 11 claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The limitations period begins when a company issues a corrective disclosure divulging the "very falsity that [p]laintiffs . . . allege in their complaint."  *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 201 (S.D.N.Y. 2020); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) ("The corrective disclosure date is the same as the constructive notice date for purposes of limitations.").  The corrective disclosure does not need to "touch on every specific allegation that a plaintiff chooses to put in his complaint."  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015).  Rather, the claim accrues when a company discloses a "sufficient constellation of facts" for the plaintiff to assert his claims.  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 301 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).  "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be

---

[6]    Though Plaintiff's claims concerning Pintec's 2020 financial restatement and revenue recognition practices are timely, (AC ¶¶ 140–63) those claims should also be dismissed for multiple independent reasons, (*see infra* §§ 2–3).

decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *NECA-IBEW Pension Trust Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015).

Here, by Plaintiff's own allegations, the information that he claims Pintec omitted or misrepresented in the Offering Documents was disclosed, at the latest, by **July 30, 2019**. Specifically, while Plaintiff alleges that the Offering Documents failed to disclose certain weaknesses in internal controls and transactions with Jimu and Plutux, his own Complaint admits that these issues were revealed when Pintec issued its 2018 Annual Report. (*See, e.g.*, AC ¶¶ 119–39, 180–85.)  Yet, the Complaint was not filed until more than a year later—on **September 29, 2020**.  Because "more than one year elapsed between the publication of the information" Plaintiff relies on and his initial complaint, these claims are time-barred.[7]  *Nurlybayev v. ZTO Express (Cayman) Inc.*, No. 17-CV-6130 (LTS) (SN), 2021 WL 1226865, at *4 (S.D.N.Y. Mar. 31, 2021); *NECA-IBEW Pension Tr. Fund*, 607 F. App'x at 81 ("Plaintiffs' amended claims are time-barred because [their] own allegations demonstrate that a reasonably diligent plaintiff would have had sufficient information to plead the asserted Securities Act violations . . . more than one year prior to the filing of Plaintiffs' initial complaint.").[8]

---

[7]  The alleged events to which Plaintiff points that postdate the 2018 Annual Report cannot toll the limitations period because a claim accrues when there is sufficient information to plead it in a complaint, not when all of a plaintiff's allegations are ultimately revealed. *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x at 447.  It is thus irrelevant that Jimu defaulted on its loan obligations in 2020, (AC ¶ 203), because this did not reveal any misrepresentation, and Plaintiff's purported "injury accrued at the time [the] alleged misrepresentations came to light, not at the time the risk actually materialized." *F.D.I.C. v. Countrywide Fin. Corp.*, No. 12-CV-4354 (MRP), 2012 WL 5900973, at *7 (C.D. Cal. Nov. 21, 2012).  The resignations of Pintec directors also cannot toll Plaintiff's claims (AC ¶¶ 190–200), as those resignations did not reveal any misrepresentation. *See Francisco*, 481 F. Supp. 3d at 192, 201–02 (dismissing claims as time-barred where CEO resigned after the limitations period began).  Finally, Plaintiff tacks on unrelated allegations concerning certain service fees charged by Jimu pursuant to the Strategic Cooperation Agreement, which he contends "would only be disclosed after the Company's 2020 restatement." (AC ¶ 149.)  In fact, the terms of that Agreement were disclosed in the 2018 Annual Report. (Ex. C at 115.)

[8]  In the event the Court holds that any of Plaintiff's claims are not time-barred in full, they should be dismissed to the extent that they rely on information that was disclosed before September 29, 2019. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x at 447 (stating that the Second Circuit has "never permitted the statute of *(cont'd)*

## II.      PLAINTIFF FAILS TO ALLEGE A MATERIAL MISREPRESENTATION

The Complaint should also be dismissed for the separate and independent reason that Plaintiff fails to allege that Pintec made a materially false or misleading "statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010).

### 1.      Pintec Disclosed The Relevant Internal Controls Risks

Although Plaintiff attempts to cast this action as one involving numerous misstatements, his claims, at bottom, all relate to the Offering Documents' disclosures about Pintec's internal controls and their risks and shortcomings.   Specifically, Plaintiff alleges that the Offering Documents were materially misleading in that they failed to disclose material weaknesses relating to (i) cash advances paid to Jimu; (ii) the loan made to Plutux; and (iii) Pintec's revenue recognition practices and other financials.  (AC ¶¶ 7, 9, 17.)  However, Pintec's explicit and extensive risk disclosures regarding its internal controls weaknesses—including that it might ***"identify additional material weaknesses in the future"*** or ***"be required to restate our financial statements from prior periods"***—foreclose all of Plaintiff's claims.  (*Id.* ¶ 118.)

"Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003).  Here, Pintec specifically disclosed internal control risks, including that although it "ha[d] not completed an assessment of the effectiveness of our internal control," its preliminary assessment had already uncovered a material weakness relating to its "lack of sufficient financial reporting and accounting personnel with appropriate knowledge

---

limitations to be tolled until a company's disclosures touch on every specific allegation that a plaintiff chooses to put in his complaint").

of U.S. GAAP and SEC reporting requirements to properly address complex U.S. GAAP technical accounting issues and prepare and review financial statements and related disclosures."  (AC ¶ 118.)  In light of Pintec's specific disclosure of the very risks at issue, no reasonable investor could have been surprised when Pintec later did identify, as it said it might, additional material weaknesses, or when it restated financials to account for them.  *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (dismissing securities complaint where "defendants openly acknowledged that [they] faced compliance challenges" and "warned investors of the significant risk"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).  Nor would an investor, viewing the Offering Documents in their full context, have been misled by Pintec's accurate descriptions of its auditor, audit committee or ability to manage risk.  (AC ¶¶ 120–125.)  *See Altayyar*, 242 F. Supp. 3d at 176 (viewed "in the context of the Prospectus as a whole . . .  the challenged statements are not misleading, and it is only by ignoring the Prospectus's clear limiting language that the plaintiffs can say that they are").

Unable to deny that Pintec warned of these risks, Plaintiff contends that such disclosures were nonetheless insufficient because "the potential risk of ineffective internal controls over financial reporting and the possible restatement of prior financial statements had already materialized as of the IPO."  (AC ¶ 119.)  But Plaintiff alleges no facts whatsoever that even remotely suggest that Pintec knew at the time of the IPO about the additional material weaknesses that it later discovered and promptly disclosed, or that its reported financials would necessitate a later restatement.  Nor does Plaintiff plausibly allege that Pintec should have known of these material weaknesses prior to engaging qualified personnel familiar with U.S. GAAP and SEC reporting requirements and these professionals' completion of their assessment.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are

only responsible for revealing those material facts reasonably available to them.")  In other words,
"Plaintiff asks the Court to assume that Defendants must have known because something did in
fact occur later; this is simply inadequate pleading."  *Panther Partners, Inc. v. Ikanos Commc'ns,
Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).

### 2.      Pintec Disclosed Its Cash Advances to Jimu

Plaintiff also cannot state a claim on the basis of Pintec's disclosures regarding Jimu,
because, once again, Pintec "cannot be held liable for failing to disclose something that [it]
disclosed."  *Altayyar*, 242 F. Supp. 3d at 180.  Pintec clearly reported the cash advances it made
to Jimu as "[n]et cash advances from/(repayment to) Jimu Group."  (Ex. A at 183; AC ¶ 135.)
Thus, investors were on notice that Jimu owed Pintec money and how much.

Despite these disclosures, Plaintiff claims that such cash advances were  "unrecorded and
unreported" and "were able to slip through undetected" "without any oversight from the
Company's Board or Audit Committee."  (AC ¶¶ 84, 87, 131.)  These claims are both incorrect
and self-contradictory.  Indeed, the fact that such cash advances were disclosed in the Offering
Documents demonstrates that they were recorded, reported, and subject to Board and Audit
Committee oversight, since, as Plaintiff acknowledges, the Audit Committee was responsible for
"reviewing and approving all proposed related party transactions," including those disclosed in the
Offering Documents.  (*Id.* ¶¶ 122, 135.)   While the Offering Documents disclosed the
imperfections in the Company's internal controls and the attendant risks, imperfection is not the
same as nonexistence. Even the purported "corrective disclosure" Plaintiff relies on acknowledges
that there were ***existing procedures*** before the IPO—albeit ones that needed enhancement—

including those "as required under the charter of our audit committee" and relating to the "authorization of . . . transaction[s] in accordance with our authorization limits."[9]  (Ex. C at 132.)

When the Complaint is stripped of Plaintiff's mischaracterizations, all that remains is the claim that Pintec failed to disclose as-yet-unidentified **additional** weaknesses in internal controls relating to the cash advances to Jimu.  (*See* AC ¶¶ 131, 134–39.)  As explained above, (*supra* § II.1), this claim fails because Pintec explicitly disclosed that it had not yet fully assessed the efficacy of its internal controls and that such further assessment might lead to the identification of additional weaknesses.  (Ex. A at 42.)  Viewed in the context of these disclosures—which were anything but "generic" or "boilerplate" (AC ¶ 139)—the Offering Documents' discussion of Pintec's relationship with Jimu was not misleading (*id.* ¶¶ 129–39).

Moreover, the Offering Documents warned about specific additional risks relating to Pintec's relationship with Jimu, including that (i) as of June 30, 2018, Pintec had advanced RMB142,015,000 to Jimu; (ii) "[w]e may have conflicts of interest due to related party transactions with Jimu Group," including the cash advances disclosed under related party transactions; and (iii) agreements entered into with Jimu "may be less favorable to us than similar agreements negotiated between unaffiliated third parties."  (Ex. A at 33–35, 183.)  Thus, Pintec expressly informed investors that it was exposed to significant credit risk in light of the cash advances paid to Jimu and that conflicts of interest and other internal control issues could arise from these transactions.[10]

---

[9]   The description of such cash advances as being "outside of the ordinary course of business" also adds nothing (AC ¶¶ 131–32), since, as Pintec's disclosures make clear, that description distinguishes these cash advances from funds provided by Jimu to support loans disbursed on Pintec's platform "in the normal course of business."  (Ex. C at 115.)  It does not indicate that the cash advances were made outside of Pintec's ordinary approval process.

[10]  Plaintiff's allegations relating to Jimu Micro Finance are irrelevant, as this **post-IPO** acquisition could not have rendered the Offering Documents misleading.  (AC ¶¶ 167–70.)  Nor does he adduce any facts to show why or how the acquisition allegedly violated Jimu and Pintec's Non-Competition Agreement, which specifically exempted "any part of the business that we . . . contemplate to conduct." (Ex. A at 83–84.)  Plaintiff also alleges that Pintec failed to disclose a Strategic Cooperation Agreement with Jimu, (AC ¶ 132), but he does not allege
*(cont'd)*

### 3.    Pintec Was Under No Duty to Disclose The Plutux Transaction in the Offering Documents

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Here, Plaintiff contends that the Offering Documents were misleading because Pintec failed to disclose a $20 million loan it made to Plutux Labs on July 31, 2018.  (AC ¶ 9.)  This claim fails because Plaintiff cannot establish that Pintec owed any duty to disclose this information at the time of the IPO.

The Offering Documents did not disclose the July 31, 2018 loan Pintec made to Plutux for one simple reason:  Pintec was under no obligation to disclose financial information more recent than 135 days from its IPO, *i.e.*, June 12, 2018.  *See* SEC Regulation S-X, 17 C.F.R. § 210.3-12(a), (g).  In accordance with its obligations, Pintec duly reported consolidated financial information through June 30, 2018 (Ex. A at F-59–62)—and had no obligation to disclose its loan agreement with Plutux that was not entered into until July 31, 2018.  (Ex. C at F-41.)[11]

Even if disclosure was required (it was not), the omission of such information was not material to investors.  Even at the pleading stage, dismissal on the grounds of materiality is warranted if the alleged omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint*

---

why disclosure was required.  *Keyspan*, 383 F. Supp. 2d at 378 (defendant "cannot be held liable for withholding information it had no duty to disclose").  His claim that cash advances were made pursuant to this agreement is incorrect.  (AC ¶ 132.)  Rather, **after the IPO**, this agreement was amended to enable Pintec to withhold certain fees in the event Jimu was unable to repay the Company for the cash advances it made to Jimu.  (Ex. C at 115.) *Keyspan*, 383 F. Supp. 2d at 377 ("naked assertion . . . contradicted by published documents" is insufficient to state a claim).

[11]    Nor does Plaintiff claim that Pintec had any reason to doubt the recoverability of the loan at the time of the IPO. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 489 (2d Cir. 2011) (dismissing securities complaint that "fails to allege how much of the Triton Loans was impaired at the time of the IPO").

*Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  Here, the terms of the Plutux agreement were favorable to Pintec and did not negatively impact Pintec's financials.  *See id.* at 197–98.  As Plaintiff concedes, Pintec collected the full amount of the principal, plus $880,000 in interest.  (AC ¶ 95.)  Plutux is not alleged to have been a related party, and the loan did not affect a critical component of Pintec's business.  *Hutchison*, 647 F.3d at 488 (loan was not material as it did not "constitute a component of [defendant's] business that is of distinct interest to investors").  Although Plaintiff claims that Pintec wrote off "$760,000 in interest to which it was otherwise entitled," Pintec agreed to do so in exchange for early repayment in full. (AC ¶¶ 10, 95.)

### 4.  Plaintiff Fails to Establish That The Offering Documents' Statements on Revenue Recognition Practices Were Misleading

Plaintiff contends that the technical service fee revenue reported in the Offering Documents was materially misleading because Pintec later restated its financials after changing the accounting treatment for certain of those fees.  (AC ¶ 150.)  Once again, Plaintiff fails to state a claim.

First, this claim, like all of Plaintiff's claims, is foreclosed by the Offering Documents' explicit warning that the Company lacked "sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements to properly address complex U.S. GAAP technical accounting issues," and that this material weakness could result in the Company having "to ***restate our financial statements from prior periods***."  (Ex. A at 42–43.) This disclosure clearly put investors on notice of the precise risk that later materialized, namely, the identification of an accounting issue that could necessitate a restatement of prior financials.

Second, Plaintiff fails to allege any facts demonstrating how the change in accounting treatment rendered Pintec's Offering Documents misleading.  Often, determining what "accounting principle applies and how it applies call[s] for subjective judgment by the issuer or its

auditor." *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv -1545 (LAK), 2020 WL 2787117, at *1 (S.D.N.Y. Apr. 20, 2020).  Therefore, to adequately plead that a company's financial results "were statements of facts, rather than opinions . . . plaintiff[] would [need] to allege plausibly that a given accounting standard objectively was the only correct standard to apply to the topic at issue and that it applied in an objective and singular way." *Id.*  Here, Plaintiff does not even try to meet his high burden.  Plaintiff does not point to any accounting principle that "was the only permissible standard"; nor does he allege facts to show that the prior accounting treatment, which was signed off on by Pintec's external independent auditor, was false or incorrect.  *See id.* at *2.  Absent that, Plaintiff's claim amounts to nothing more than a disagreement with Pintec's subjective accounting judgments and fails as a matter of law.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015) (Section 11 "does not allow investors to second-guess inherently subjective and uncertain assessments.")

Third, Plaintiff fails to allege why these changes were material.  As Pintec disclosed, the change in accounting caused Pintec's revenues to *increase*.  (Ex. G at F-73.)  Critically, because both revenue and costs of revenue increased by the same amounts, the change did not cause any change to gross profit (revenue minus costs of revenue), and thus had no impact on Pintec's bottom line.[12]  (*Id.*)  *See also Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (noting that for purposes of materiality, a restatement's impact is

---

[12]    For example, FY2017 revenue from technical service fees was restated at RMB619,605,000 compared to RMB425,311,000 as disclosed in the Offering Documents, an increase of RMB194,294,000 after the restatement adjustments. (Ex. G at F-73.)  Costs of revenue increased by the same amount—RMB194,294,000. (*Id.*)  Hence, Pintec's 2017 "Gross profit" remained the same at RMB196,307,000.  Similarly, FY2018 revenue from technical service fees was restated at RMB1,297,758,000 compared to RMB746,768,000, as reported in Pintec's 2018 Annual Report, indicating an increase of revenue of RMB550,990,000. (Ex. G at F-72.)  The cost of revenue was increased by RMB529,593,000. (*Id.*)  This means the "bottom line" item—"Gross profit"—was slightly higher than the previously reported amount. (*Id.*)

*(cont'd)*

measured by its effect on "total operations," not "the change in the line item alone"). Because Plaintiff fails to plead any reason why an investor would consider these changes material, he fails to state a claim. *Id.*; *Morgan Stanley,* 592 F.3d at 360.[13]

### 5. Plaintiff Fails to Plead that Pintec's Disclosures on Certain Line Items Were False or Misleading

Plaintiff also fails to allege a misrepresentation with respect to the other financial figures restated in Pintec's 2019 Annual Report. As explained above, Pintec's forthright disclosures regarding its internal controls foreclose any claim arising solely from its financial restatement. (*See supra* § II.1–4.) Moreover, it is axiomatic that a plaintiff cannot survive a motion to dismiss by setting forth mere "labels and conclusions." *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *7 (S.D.N.Y. 2010). Instead, a plaintiff must allege "factual content that allows the court to draw the reasonable inference that [the defendant] is liable for the misconduct alleged." *Id.* at 8. Accordingly, to adequately state a claim, a plaintiff cannot merely assert that financial figures were misstated; he must also allege "specific facts" that show what the correct figures actually were. *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), *aff'd*, 347 Fed. App'x 665 (2d Cir. 2009); *see also Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012) ("To state that [d]efendants falsely reported [their] holdings is merely to state a legal conclusion."), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015). Here, Plaintiff simply concludes that the Offering Documents' description of Pintec's financial results for the first half of 2018 must have contained several inaccurate line items

---

[13]   Plaintiff also claims that the change of revenue recognition basis also affected other line items, such as accounts receivable and allowance for doubtful accounts. (AC ¶ 163.) These allegations also fail, because they are "products of subjective accounting standards." *AmTrust*, 2020 WL 2787117, at *2. Moreover, Plaintiff fails to explain how these line items would have been material to investors. *Morgan Stanley*, 592 F.3d at 360.

because Pintec later restated its 2018 financial results.  (AC ¶¶ 160–62.)  Yet Plaintiff fails to allege how much those line items were misstated by or what the supposedly accurate figures actually were.  (AC ¶¶ 160–62.)  Such "naked assertion[s] devoid of further factual enhancement" are plainly insufficient to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original).[14]

## III.  NEGATIVE CAUSATION IS APPARENT FROM THE FACE OF THE COMPLAINT

Dismissal is also warranted because Plaintiff's loss is not attributable to the purported "corrective disclosures" on which he relies.  The securities laws do not "provide investors with broad insurance against market losses"; rather, they "protect [investors] against those economic losses that misrepresentations actually cause."  *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  The Securities Act provides an affirmative defense that bars recovery for losses not attributable to the alleged misrepresentation.  *See* 15 U.S.C. § 77k(e).  Even at the pleading stage, dismissal is warranted if "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue."  *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).

As Plaintiff concedes, by July 29, 2019—before any alleged misrepresentation was revealed to the market—Pintec's ADS price had already dropped $8.18—nearly 70%—to $3.70 from its IPO price of $11.88.  (AC ¶¶ 170–76.)  Between the July 2019 and June 2020 disclosures, Pintec's ADS price fell another $2.65—an additional 70%—for reasons unrelated to the misrepresentations at issue here.  (Ex. B at 5–11.)  Under Section 11, "a price decline before

---

[14]    In addition, Plaintiff fails to provide "any reason why these changed line items would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Peifa Xu*, 2020 WL 1508748, at *9

disclosure may not be charged to defendants." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009).   Worse still, Pintec's ADS price actually ***increased*** following its second restatement of financials in June 2020.  *Blackmoss*, 2010 WL 148617, at *11 (no causation where disclosures did not result in a price drop).   Thus, it is apparent on the face of the Complaint that the alleged misrepresentations did not cause any loss.

Plaintiff's claims concerning Pintec's June 2020 financial restatement also fail for lack of causation because he sold his shares six months before the restatement.  (ECF. No. 22-1 at 3.) Here, Plaintiff sold his shares in December 2019.  (ECF. No. 22-1 at 3.).  Plaintiff concedes that it was not until June 2020 that the public learned of the inaccurate line items in the Offering Documents' financial statements and of Pintec's revenue recognition practices at the time of the IPO.   (AC ¶¶ 143, 152–62.)   Because the market was unaware of Pintec's purported misrepresentations until six months *after* Plaintiff sold his shares, it is impossible for those misrepresentations to have caused his loss and Plaintiff cannot state a Section 11 claim related to this corrective disclosure.  *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11 CIV. 2484 (KMW) (FM) 2013 WL 944777, at *10 (S.D.N.Y. Mar. 12, 2013) (Plaintiffs who "sold [their] shares before the misrepresentation was disclosed . . . would not even conceivably be able to prove loss causation.")  Thus, Plaintiff's claims should be dismissed for lack of causation.[15]

## CONCLUSION

For the foregoing separate and independent reasons, Defendants respectfully request that the Amended Class Action Complaint be dismissed in its entirety with prejudice.

---

[15]   Because Plaintiff fails to allege a primary violation under Section 11 of the Securities Act, his claims for control person liability under Section 15 necessarily fail.  *Hutchison*, 647 F.3d at 490.

Dated: New York, New York
       April 16, 2021

Respectfully submitted,

/s/ Robert A. Fumerton
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Attorneys for Defendant Pintec
Technology Holdings Limited*

/s/ Douglas H. Flaum (with consent)
Douglas H. Flaum
(dflaum@goodwinlaw.com)
Molly L. Leiwant
(mleiwant@goodwinlaw.com)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
dflaum@goodwinlaw.com
mleiwant@goodwinlaw.com

*Attorneys for Defendants Goldman
Sachs (Asia) L.L.C., Deutsche Bank
Securities Inc. and Citigroup Global
Markets Inc.*