UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
ALLON YARONI  et al.,                                       :
                                                            :
                              Plaintiff,                    :
                                                            :            20-CV-8062 (JMF)
             -v-                                            :
                                                            :            OPINION AND ORDER
PINTEC TECHNOLOGY HOLDINGS LIMITED et al.,  :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        In this putative class action, Lead Plaintiff Eric Dahm brings securities fraud claims

against Pintec Technology Holdings Limited ("Pintec" or the "Company"), several of Pintec's

employees and board members, and the banks that acted as underwriters for its October 25, 2018

initial public offering (the "IPO").  In particular, Plaintiff alleges that the Registration Statement

and Prospectus that Pintec filed with the Securities and Exchange Commission (the "SEC") in

advance of the IPO contained false and misleading statements and omitted material facts in

violation of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Certain

Defendants now move, pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss Plaintiff's claims.[1]  For the reasons that follow, the motion is GRANTED.

## BACKGROUND

        In considering a Rule 12(b)(6) motion, courts are limited to the facts alleged in the

complaint and are required to accept those facts as true.  *See, e.g.*, *Burch v. Pioneer Credit*

---

[1]     The moving Defendants are Pintec, Goldman Sachs (Asia) L.L.C., Deutsche Bank
Securities Inc., and Citigroup Global Markets Inc.  The individual Defendants have apparently
not yet been served.  *See* ECF No. 33 ("Defs.' Mem"), at 1 n.1; *see also* ECF No. 17.

*Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A court may also consider "documents incorporated into the complaint by reference," including "legally required public disclosures documents filed with the SEC."  *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013).  Accordingly, the following facts are taken from the Amended Complaint, ("Complaint"), ECF No. 31 ("Compl."), and the documents incorporated by reference therein.[2]

## A.  Pintec's Registration Statement and the IPO

Pintec, which is based in China and registered in the Cayman Islands, is a technology company that operates platforms designed to connect consumers with financial partners offering a variety of financial products, including small loans and wealth management services.  Compl. ¶¶ 4, 24.  Pintec began operations in June 2015 as a business unit of Jimu Holdings Limited. Reg. Stmt. 80.  In 2016, Jimu reorganized and carved out its peer-to-peer ("P2P") lending business, which Jimu continued to run, from its non-P2P lending and wealth management business, which were allocated to Pintec.  Compl. ¶ 67.  In connection with its anticipated IPO in the United States, Pintec filed a registration statement with the SEC on July 16, 2018, and, on October 25, 2018, filed its final Prospectus and Registration Statement (the "Registration Statement" or the "Offering Materials").  *Id*. ¶ 2.  Plaintiff's claims relate to four categories of representations or alleged omissions in these Offering Materials.  The Court will summarize the contents of the Offering Materials as they relate to each of Plaintiff's claims in turn.

---

[2]     Documents incorporated by reference or of which the Court takes judicial notice include Pintec's Registration Statement and Prospectus filed in connection with its IPO, ECF No. 34-1 ("Reg. Stmt."); Pintec's 2018 Annual Report, ECF No. 34-3 ("2018 Report"); Pintec's 2019 Annual Report, ECF No. 34-7 ( "2019 Report"); and documents that Pintec filed with the SEC on July 31, 2019, ECF No. 34-4; October 18, 2019, ECF No. 34-5; and June 15, 2020, ECF No. 34-6.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

1. **Statements About Internal Controls, Auditors, and the Audit Committee**

Plaintiff's first set of claims relate to statements in the Offering Materials concerning

Pintec's internal controls, auditors, and the audit committee.  To the extent relevant, the Offering

Materials warned would-be investors as follows:

> If we fail to maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud.  Prior to this offering, we were a private company with limited accounting personnel and other resources with which to address our internal control and procedures.  Our management has not completed an assessment of the effectiveness of our internal control over financial reporting and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting.  In the course of auditing our consolidated financial statements for the year ended December 31, 2017, we and our independent registered public accounting firm identified one material weakness in our internal control over financial reporting as of December 31, 2017, in accordance with the standards established by the Public Company Accounting Oversight Board of the United States.
>
> The material weakness that has been identified relates to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements to properly address complex U.S. GAAP technical accounting issues and prepare and review financial statements and related disclosures in accordance with U.S. GAAP and reporting requirements set forth by the SEC.  We have implemented and are continuing to implement a number of measures to address the material weakness that has been identified. For details, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Internal Control Over Financial Reporting." However, we cannot assure you that we will be able to continue implementing these measures in the future, or that we will not identify additional material weaknesses in the future. . . .
>
> Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions.  We may also be required to restate our financial statements from prior periods.

Compl. ¶ 118.  Elsewhere in the Registration Statement, Pintec noted that it had not undertaken

"a comprehensive assessment of [its] internal controls under the Sarbanes-Oxley Act for the

purposes of identifying and reporting any weaknesses in our internal control over financial

reporting" and that, if it had, "additional control deficiencies may have been identified."  Reg.
Stmt. 113.  On a similar note, Pintec also warned prospective investors that because the Public
Company Accounting Oversight Board (the "PCAOB") is "unable to conduct inspections" in
China "without the approval of the Chinese authorities," the audit report included in the Offering
Materials was "prepared by an auditor who is not inspected by the [PCAOB]."  Compl. ¶ 120.
Specifically, Pintec noted that, when the PCAOB had inspected other audit firms, it had
"identified deficiencies in those firms' audit procedures and quality control procedures" and that,
because the PCAOB could not inspect companies based in China, "investors may be deprived of
the benefits of PCAOB inspection."  *Id.*  Additionally, Pintec stated that this "makes it more
difficult to evaluate the effectiveness of our auditor's audit procedures or quality control
procedures" and, consequentially, "[i]nvestors may lose confidence in our reported financial
information and procedures and the quality of our financial statements."  Reg. Stmt. 59.  In
connection with its "ability to manage risk," Pintec warned that "we do bear credit risk under
some of our funding arrangements.  If our risk management capabilities are not effective, we
may suffer higher-than-expected losses."  Compl. ¶ 124.

### 2.  Statements About Related Transactions with Jimu

Next, the Offering Materials described Pintec's relationship with Jimu, its former parent
company.  Pintec stated that it had "historically relied on Jimu Group for substantially all of [its]
funding, and [it would] continue to rely on Jimu Group for a significant portion of [its] funding
for some time in the future."  *Id.* ¶ 130.  The Offering Materials described the "series of
agreements" that Pintec and Jimu had entered into "with respect to the Reorganization and post-
reorganization relationship" and attached full copies of each agreement.  *Id.*  Most relevant here
is the "Cooperation Framework Agreement," by which Pintec agreed "to provide Jimu Group

with certain services and support, including borrower referral, repayment management and transaction and technology support." *Id*. The "fee rate, if any, charged by one party to the other party in connection with any of the foregoing areas of cooperation" was to be "negotiated on an arm's length basis." *Id*. The parties were to "enter into separate specific agreements from time to time as necessary and appropriate for the purpose of the cooperation." *Id*. Elsewhere, Pintec made clear that it "may have conflicts of interest due to related party transactions with Jimu Group" and identified a number of these potential conflicts of interest, including "[e]mployee recruiting and retention," "[a]llocation of business opportunities," and "[r]elated party transactions." *Id*. ¶ 133. More specifically, the Registration Statement noted that the terms of Pintec's "agreements with Jimu Group may be less favorable to [it] than similar agreements negotiated between unaffiliated third parties." Reg. Stmt. 34. And finally, in a section titled "Transactions with Jimu Group," Pintec reported a line item for "[n]et cash advances from/ (repayment to) Jimu Group." Compl. ¶ 135.

### 3. Statements About Revenue Recognition

In its Offering Materials, Pintec stated that it prepared its financial statements in conformity with U.S. Generally Accepted Accounting Principles ("GAAP") but noted that GAAP "requires [the company] to make judgments, estimates and assumptions" and that it "continually evaluate[d] these estimates and assumptions based on the most recently available information, [its] own historical experiences and various other assumptions that [it] believe[d] to be reasonable under the circumstances." *Id*. ¶ 141. As stated above, the Offering Materials also warned would-be investors that Pintec had identified a "material weakness" that "relate[d] to [its] lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP . . . to properly address complex U.S. GAAP technical accounting issues and

prepare and review financial statements . . . in accordance with U.S. GAAP." *Id.* ¶ 118.  This material weakness, the Offering Materials warned, could result in Pintec having to "restate [its] financial statements from prior periods."  *Id.*

As relevant to Plaintiff's claims, the Offering Materials also discussed how Pintec generated and would subsequently recognize various streams of revenue.  *Id.* ¶¶ 142, 144.  Pintec reported that the company "generate[s] technical service fee revenue by providing credit assessment services and post-lending management services, such as cash processing services and collection services, for personal and business installment loans."  *Id.* ¶ 144.  These technical service fees made up roughly three-quarters of Pintec's total revenue.  *Id.* ¶ 96.  The Registration Statement does not specify whether the company would recognize revenue from the technical service or wealth management fees on a net or gross basis.  *See id.* ¶¶ 142, 144.  By contrast, Pintec disclosed that the "installment service fee revenue," which was "generate[d] . . . through the point-of-sale installment loan services and personal and business installment loan services that [it] provide[d] on [its] business partners' platforms," was "recognized on a gross basis, with the interest collected from the borrower recognized as revenue and the corresponding funding cost recognized as cost of revenues."  *Id.* ¶ 144.

### 4.  Statements About Cash Flow Statement Line Items

Finally, to the extent relevant here, the Offering Materials also included "selected consolidated statements of operations and comprehensive loss data for the years ended December 31, 2016 and 2017 and selected consolidated balance sheet data as of December 31, 2016 and 2017," which were "derived from [Pintec's] audited consolidated financial statements," as well as "selected consolidated statements of operations data for the six months ended June 30, 2017

and 2018 and selected consolidated balance sheets data as of June 30, 2018," which were "derived from [Pintec's] unaudited consolidated financial statements."  Reg. Stmt. 87.

## B.  The IPO and Subsequent Developments

On October 25, 2018, Pintec held its IPO, which involved the sale of American Depositary Shares ("ADSs") at $11.88 per share.  Compl. ¶ 102.  In total, 4,208,070 ADSs were sold to investors as part of the IPO, netting the company approximately $46 million.  *Id*. ¶ 104.  Within months of the IPO, the price of the Company's ADSs declined sharply.  *Id.* ¶ 164.  On March 20, 2019, Pintec's shares closed at a price of $12.05 per ADS; by April 29, 2019, each ADS was worth only $6.30.  *Id*. ¶ 170; *see also* ECF No. 34-2 (showing Pintec's ADS closing price for each day between the IPO and filing of the Complaint).  Plaintiff alleges that the decline occurred because "[m]arket sentiment . . . agree[d] that something was amiss," Compl. ¶ 170, but, significantly, this initial decline occurred before the first of the disclosures that Plaintiff claims revealed Defendants' alleged misrepresentations, *see* Defs.' Mem. 1 ("[B]y July 29, 2019 — the day *before* Pintec filed its 2018 Annual Report . . . — Pintec's ADS price had already dropped nearly 70% from its IPO price.").

On April 30, 2019, Pintec filed a notice with the SEC announcing that it would be unable to file its 2018 annual report on time but representing that the report would be filed within fifteen days.  Compl. ¶ 171.  On May 13, 2019, Pintec informed Nasdaq that it would not meet even that deadline.  *Id*. ¶ 173.  The next day, Nasdaq responded privately, informing Pintec that it was not in compliance with Nasdaq's listing rules due to its failure to file the annual report.  *Id*. ¶ 174.  Pintec issued a press release and made a filing with the SEC announcing receipt of the Nasdaq letter on May 16, 2019.  *Id*.  Upon this news, Pintec's share price fell from $8.32 per ADS on

May 16, 2019, to as low as $2.80 per ADS on June 20, 2019, closing at $3.93 on July 30, 2019,

the date Pintec finally filed its 2018 Annual Report on Form 20-F. *Id.* ¶ 176.

That same day, Pintec issued a press release stating that "[c]ertain adjustments were made

in the Company's consolidated financial statements for the fiscal year ended December 31, 2018,

subsequent to the release of the full year unaudited annual results in March 2019." *Id.* ¶ 177.

According to Plaintiff, the 2018 Annual Report "disclosed for the first time the complete lack of

internal controls existing at the Company at the time of the IPO" and "admitted to significant

credit exposure for Pintec with respect to Jimu as of December 31, 2018, resulting from the

Company's lack of effective internal controls." *Id.* ¶¶ 179-80.  Pintec also "admitted . . . a

material weakness in its internal control over financial reporting" that "resulted in significant

outstanding balances due from Jimu Group at the year end with unclear terms, which presented

significant challenges for the Company," and "admitted . . . that its lack of effective controls

resulted in a non-routine loan financing transaction with" a company called Plutux Labs Limited

("Plutux"). *Id.* ¶¶ 180-84.  Pintec stated that it would be implementing several measures to

address its inadequate internal control procedures, including "establishing due diligence

procedures[,] . . . pre-lending credit assessment procedures[, and] . . . proper control procedures

to assess and review the recoverability of the loans originated from non-routine transactions."

*Id.* ¶ 187.  Pintec's ADSs "dropp[ed] more than 13% over the four trading days following the

belated 2018 Annual Report, from $3.93 per ADS to $3.40 per ADS." *Id.* ¶ 189.

On June 15, 2020, Pintec announced its unaudited results for 2019, including a "nearly

20% decline in total revenue year-over-year" and a "reported net loss of $130.2 million USD

compared to a modest net income of . . . $0.3 million . . . in 2018." *Id.* ¶ 203.  On the same day,

Pintec filed a notice with the SEC announcing that it would be unable to file its 2019 annual

report on time. *Id*. ¶ 205. The Company also disclosed that its consolidated financial statements

for December 31, 2017 (which were included in the Offering Materials) and December 31, 2018,

contained two misstatements and would need to be restated. *Id*. ¶¶ 205-06. The first

misstatement was that Pintec had "erroneously recorded revenue earned from certain technical

service fee[s] on a net basis rather than on a gross basis as would have been correct since the

Company was acting as principal." *Id*. ¶ 206. Correcting this error resulted in "an increase in

both revenues and cost of revenues" for each year. *Id*. Second, Pintec reclassified "certain fiscal

year 2018 amounts . . . for consistency with the current period presentation." *Id*. These line-item

changes, such as "classify[ing] financial guarantee assets based on their short term and long term

nature from prepayments and other current assets," "had no effect on the reported results of

operations." *Id*. These disclosures led to a 4% decline in the ADS price on June 15, 2020,[3] and

a 7% two-day drop. *Id*. ¶ 207.

## C. This Action

Allon Yaroni filed this action on September 29, 2020. ECF No. 1. On November 30,

2020, both Allon Yaroni and Eric Dahm moved for appointment as lead plaintiff and for their

respective counsel to be appointed as lead counsel for the class. *See* ECF Nos. 18, 19. Then, on

December 14, 2020, Yaroni filed a notice informing that Court that he would not oppose Dahm's

appointment as lead plaintiff, as Dahm had "larger financial interests" in the case. ECF No. 24.

Accordingly, the Court granted Dahm's motion for appointment as unopposed. ECF No. 26. On

February 15, 2021, Dahm filed the operative complaint.

---

[3]     The Complaint alleges that this drop occurred on "June 15, *2019*," Compl. ¶ 207
(emphasis added), but it is plain from context, not to mention the rest of the sentence (which lists
June 16, 2020, as the end of the "two-day drop"), that that is a typographical error, *id.*

## APPLICABLE LEGAL STANDARDS

In reviewing a Rule 12(b)(6) motion, "the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). The Court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim for relief that is facially plausible, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Here, Plaintiffs' principal claims are brought under Sections 11 and 15 of the Securities Act. 15 U.S.C. §§ 77k, 77o. Section 11(a) provides that any signatory to a registration statement, director of the issuer, or underwriter may be held liable to purchasers of registered securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). "Section 15, in turn, creates liability for individuals or entities that control any person liable under section 11." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (cleaned up). "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[] 11." *Id.*

Significantly, a plaintiff bringing claims under these provisions need not plead scienter, reliance, or causation. *See, e.g.*, *Tongue*, 816 F.3d at 209; *Rombach v. Chang*, 355 F.3d 164, 169 n.4, 171 (2d Cir. 2004). Where, as here, the claims do not sound in fraud, a plaintiff also need not meet "the heightened pleading standard of Rule 9(b)." *Rombach*, 355 F.3d at 171; *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("Neither scienter, reliance, nor loss causation is an element of § 11 . . . claims which — unless they are premised on allegations of fraud — need not satisfy the heightened particularity requirements of Rule 9(b)."). Instead, "[s]o long as a plaintiff establishes one of the three bases of liability under these provision — (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading," an issuer will generally be liable. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011); *see also In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-CV-6882 (RJS) et al., 2015 WL 1600464, at *23 (S.D.N.Y. Mar. 31, 2015).

A misstatement or omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Litwin*, 634 F.3d at 717 (internal quotation marks omitted). "It is not sufficient to allege that the investor *might* have considered the misrepresentation or omission important." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (emphasis added). Generally, materiality is a "mixed question of law and fact" best left to the finder of fact to determine. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). But the question of materiality can be decided as a matter of law on a motion to dismiss if the alleged misstatement or omission is "so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of [its] importance." *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996).  Moreover, "when a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law.  *ProShares Tr.*, 728 F.3d at 102 (cleaned up).

Finally, Section 11 claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  Although "the statute of limitations is ordinarily an affirmative defense that must be raised in an answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015) (summary order).  And "[w]hile a statute of limitations defense in a securities case sometimes turns on disputed facts, the facts on the face of the complaint and related documents are sufficiently conclusive in a vast number of cases to permit resolution on a motion to dismiss."  *Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 723 (S.D.N.Y. 2016) (internal quotation marks omitted).  Where, as here, the company issues a disclosure that a plaintiff relies on to demonstrate that the registration statement contained misstatements or omissions, "[t]he corrective disclosure date is the same as the constructive notice date for purposes of limitations."  *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (summary order).

## DISCUSSION

Plaintiff claims that Defendants made material misstatements or omissions in Pintec's Offering Materials with respect to five subjects: (1) Pintec's internal controls, the audit committee, and auditor; (2) cash loans made to Jimu outside the ordinary course of business; (3) a loan made to Plutux; (4) the company's revenue recognition practices; and (5) certain line

items in the company's financial statements.  Applying the standards set forth above, the Court concludes that each claim fails as a matter of the law.

## A.  Statements About Pintec's Internal Controls, Audit Committee, and Auditor

As noted, Plaintiff first alleges that the Offering Materials contained misrepresentations and omissions with respect to Pintec's internal controls, audit committee, and auditor.  In particular, he alleges that the warnings in the Offering Materials describing "the *potential* risk of ineffective internal controls over financial reporting and the *possible* restatement of prior financial statements" were improper because these harms "had already materialized as of the IPO."  Compl. ¶ 119.  With respect to the auditor, Plaintiff alleges similarly that the risks described in the Offering Materials were "wholly insufficient as the risk of using a non-PCAOB inspected auditor had already materialized."  *Id.* ¶ 121.  And finally, Plaintiff alleges that the section of the Registration Statement describing the responsibilities of the audit committee was "deficient" because the committee "was unable to carry out its tasks effectively."  *Id.* ¶¶ 122-23; *see also* ECF No. 38 ("Pl.'s Opp'n"), at 2.

These allegations fail to state a claim.  As a general matter, "[w]hen a registration statement warns of the exact risk that later materialized, a [s]ection 11 claim will not lie as a matter of law."  *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013); *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim."), *aff'd*, 347 F. App'x 617, 620 (2d Cir. 2009) (summary order); *Elite Aviation LLC v. Credit Suisse*, 588 F. App'x 37, 38 (2d Cir. 2014) (summary order) (affirming dismissal where the offering materials "clearly disclosed in numerous, repeated, sometimes boldfaced warnings," the risks that ultimately materialized).

That is the case here.  As detailed above, the warnings in Pintec's Offering Materials about the company's internal controls were extensive and "reasonably specific as opposed to generic or boilerplate so as to constitute a real warning to investors."  *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006).  Pintec explicitly stated that, at the time of the IPO, it had "limited accounting personnel" and warned that "management ha[d] not completed an assessment of the effectiveness of [its] internal control over financial reporting"; nor had its auditor "conducted an audit" of these controls."  Compl. ¶ 118.  And the limited audit that had been completed, Pintec disclosed, had already identified a material weakness, namely that the company lacked "sufficient financial reporting and accounting personnel with appropriate knowledge of" GAAP and SEC reporting requirements.  *Id.*  Further, Pintec warned that it might "identify additional material weaknesses in the future" as the review continued and that it might "be required to restate [its] financial statements from prior periods."  *Id*. (emphasis omitted).

It is true, as Plaintiff points out, that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *Rombach*, 355 F.3d at 173.  "In other words, a warning framed in hypothetical terms does not appraise a reasonable investor of actual misconduct."  *Horowitz v. Sunlands Tech. Grp.*, No. 19-CV-3744 (FB) (SMG), 2021 WL 1224517, at *3 (E.D.N.Y. Mar. 31, 2021).  But critically, to the extent the Complaint alleges that the warned-of risks had materialized, it does not allege that Pintec knew or should have known of that fact at the time of the IPO.  Instead, Plaintiff argues in his opposition that because the allegedly improper loans had occurred, "there is no doubt the material weaknesses were knowable."  Pl.'s Opp'n 16.  But the "relevant inquiry under the Securities Act is . . . whether the facts alleged in the Complaint evince that the Company knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the statement was untrue."

*Coronel v. Quanta Cap. Hldgs. Ltd.*, No. 09-CV-1405 (RPP), 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009); *see also Panther Partners*, 347 F. App'x at 620 ("Without an allegation in the amended complaint that [the defendant] knew of the abnormally high defect rate . . . before publishing their registration statement, the amended complaint failed to meet the plausibility requirements of *Twombly*."); *In re Flag Telecom Holdings, Ltd.*, 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration became effective."); *Johnson v. Sequans Commc'ns S.A.*, No. 11-CV-6341 (PAC), 2013 WL 214297, at *8 (S.D.N.Y. Jan. 17, 2013) (same).

    *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), a case cited by Plaintiff, is instructive.  In *Jinkosolar*, the Second Circuit held that the district court had erred in dismissing a complaint that alleged that the company had failed to disclose environmental compliance problems in its offering materials despite having "submitted a report to Chinese regulators about 'existing problems'" with environmental regulations.  *Id.* at 251.  The report, the Court held, "allow[ed] a trier of fact, absent contrary evidence, to draw an inference that the problems 'existing' as of June 8, 2010, were both present and material at the time of the May 13, 2010, offering."  *Id.*  A general risk statement that "non-compliance with the environmental regulations may be very costly," the Court found, was insufficient because the company's failure to disclose the "then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk."  *Id*; s*ee also In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ("Plaintiffs plausibly allege that [defendant company] knew or should have known that it would use the proceeds to fund Dabai Auto at the time of the IPO and, therefore, that they plausibly state claims [under Section 11].").   Here, by contrast, Plaintiff alleges no facts suggesting that Pintec knew or

should have known about the internal control weaknesses at the time of the IPO.  In fact, Plaintiff specifically alleges that, because of Pintec's poor internal controls, the loans at issue were made "without any oversight from the Company's Board or Audit Committee" and that they were not recorded.  Compl. ¶ 131; *see also* Pl.'s Opp'n 13-14.  It is not until Plaintiff's memorandum of law filed in opposition to the motion to dismiss that he argues that "Defendants' knowledge of these loans is beyond question," Pl.'s Opp'n 16 n.12, but the Complaint contains no well-pleaded allegations supporting that conclusion.  *See, e.g.*, *Panther Partners,* 538 F. Supp. 2d at 671 ("Plaintiff does not allege any facts which indicate that [defendant company] knew, or should have known, that its quality assurance program was defective at the time of the IPO."); *In re Lone Pine Res., Inc.*, No. 12-CV-4839 (GBD), 2014 WL 1259653, at *5 (S.D.N.Y. Mar. 27, 2014) ("Plaintiff does not allege that [defendant company] knew whether or how the pipeline disruption might affect its quarterly results at the time of its . . . IPO.").

The cases cited by Plaintiff do not suggest otherwise.  In *Meyer v. Concordia International Corp.*, 2017 WL 4083603 (S.D.N.Y. July 28, 2017), the court found that general cautionary statements about one of the company's products and "potential problems with third parties" did not excuse the company's failure to disclose the termination of approximately eighty members of its 175-person salesforce.  *Id*. at *5.  Unlike here, however, there was no question in that case that the company had been aware of the undisclosed material fact and the supposedly cautionary statements were generic, not specific.  *Id*.  In *Horowitz*, 2021 WL 1224517, the complaint at issue included "findings of the Chinese media and government, corroborat[ed] . . . with accounts of confidential witnesses inside" the company that showed that "deceptive and illegal marketing was pervasive" in the company at the time of the IPO.  *Id.* at *1.  Here, by contrast, the Complaint relies entirely on Pintec's own public disclosures and provides no more

than speculation that the Company knew or should have known of the at-issue loans at the time

of the IPO.  And finally, the court in *In re Scottish Re Group Securities Litigation*, 524 F. Supp.

2d 370 (S.D.N.Y. 2007), did indeed find "§ 10(b) liability for failure to disclose internal control

weaknesses," Pl.'s Opp'n 14, but there, officers had "repeatedly issued sworn Sarbanes-Oxley

certifications attesting to the adequacy of the Company's internal controls," *In re Scottish Re*

*Grp. Sec. Litig.*, 524 F. Supp. 2d at 378.  Here, Pintec never promised would-be investors that its

internal controls were adequate.  To the contrary, it repeatedly warned that "management ha[d]

not completed an assessment of the effectiveness of [its] internal control[s]."  Compl. ¶ 118.

In short, Plaintiff's claims with respect to Pintec's statements about its internal controls

fail as a matter of law because Pintec disclosed the risk at issue.  Plaintiff's claims regarding

Pintec's auditor and audit committee fall short for similar reasons.  Pintec's Offering Materials

include explicit and frank warnings about the risks of using a non-PCAOB inspected auditor, *see*

*id.* ¶ 122, and Plaintiff does not plausibly allege that, at the time of the IPO, Pintec knew that

those risks had materialized.  And a description of the responsibilities of the audit committee, *see*

*id.*, is not materially deficient simply because the committee is later alleged to have been "unable

to carry out its tasks effectively," *id.* ¶ 123.

## B.  Statements About Cash Advances to Jimu and the Loan to Plutux

Plaintiff's next two claims — relating to "cash advances made to Jimu outside of the

ordinary course of business," Compl. ¶ 129, and the Plutux loan, *see id.* ¶ 90 — fail for the same

reason: They are time barred.  In general, the statute of limitations is an affirmative defense.

Nevertheless, it is well established that "a statute of limitations defense may be decided on a

Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Ellul v. Congregation*

*of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).  Here, that turns on whether the one-

year statute of limitations for Section 11 claims was triggered by Pintec's 2018 Annual Report, which was released July 30, 2019.[4]  To trigger the statute of limitations, "disclosures do not have to perfectly match the allegations that a plaintiff chooses to include in its complaint."  *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 640-41 (S.D.N.Y. 2017) (internal quotation marks omitted).  Instead, they must "relate . . . directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008); *see Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (finding claims were time barred where "corrective disclosures provided precisely the information [the defendant] should have disclosed earlier such that [the plaintiffs] should have *discovered* their alleged claims on the dates of those disclosures" (internal quotation marks omitted)); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014) ("Even if plaintiffs were correct that the 2012 disclosures did not include every problem that the company ultimately disclosed, the statute of limitations for Securities Act claims is not somehow tolled until the appearance of disclosures that perfectly match the allegations that a plaintiff chooses to include in its complaint."), *aff'd,* 616 F. App'x 442 (2d Cir. 2015); *Amorosa*, 409 F. App'x at 416 ("The corrective disclosure date is the same as the constructive notice date for purposes of limitations.").

---

[4]      The Second Circuit has not yet decided whether an "inquiry notice" or "discovery rule" applies to Section 11 claims.  *See In re Magnum Hunter*, 616 F. App'x 442, 447 (2d Cir. 2015) (summary order); *see also Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 640 (S.D.N.Y. 2017).  The Court need not resolve that question here because "even if we were to resolve it in plaintiff['s] favor," the Company's "public disclosures . . . would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim."  *In re Magnum*, 616 F. App'x at 447; *see also Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138-39 (2d Cir. 2013).

That is the case here.  Plaintiff asserts that the 2018 Annual Report "downplayed the
materiality of the effect of the advances" to Jimu and therefore did not trigger the statute of
limitations.  Pl.'s Opp'n 11-12.[5]  But that assertion is belied by Plaintiff's own pleadings.  *See
Chen v. X Fin.*, No. 19-CV-6908 (KAM) (SJB), 2022 WL 765417, at *9 (E.D.N.Y. Mar. 13,
2022).  In Plaintiff's own words, "[t]he 2018 Annual Report admitted to *significant* credit
exposure for Pintec with respect to Jimu, . . . resulting from the Company's lack of effective
internal controls."  Compl. ¶ 180 (emphasis added).  In addition, the Complaint alleges that "the
Company admitted in the 2018 Annual Report a *material weakness* in its internal control over
financial reporting" and "that the material weaknesses included the lack of effective controls"
over "cash advances to Jimu Group."  *Id*. ¶ 181 (emphasis added).  Plaintiff also alleges that,
"[a]ccording to an admission in the 2018 Annual Report, this material weakness resulted in
*significant* outstanding balances due from Jimu Group at the year end with unclear terms, which
presented *significant* challenges for the Company."  *Id.* ¶ 182 (internal quotation marks omitted)
(emphases added).  As these allegations make plain, Plaintiff's claims relating to the Jimu loans
are "based upon disclosures" made in the 2018 Annual Report and, "to the extent that there is not
total overlap between the disclosures and a complete and truthful disclosure, . . . [the] statements
were sufficient to give reasonably diligent plaintiffs the facts necessary to plead a section 11
claim."  *Chen v. X Fin.*, No. 19-CV-6908 (KAM) (SJB), 2021 WL 7449851, at *7 (E.D.N.Y.
Dec. 9, 2021), *report and recommendation adopted,* 2022 WL 765417 (E.D.N.Y. Mar. 13,

---

[5]      In his Opposition, Plaintiff also argues that "[i]f, as Defendants argue, the [2018 Annual
Report] contained disclosures sufficient to trigger the [statute of limitations], one would also
expect an impactful market reaction.  Instead, Pintec' ADSs *rose* on its filing (from $3.70 on
July 29, to $3.93 July 30), on flat volume."  Pl.'s Opp'n 12.  In the Complaint, however, Plaintiff
parses the data differently and alleges that, because of the "admission of its lack of internal
controls," Pintec's ADSs "dropp[ed] more than 13% over the four trading days following the
belated 2018 Annual Report's release, from $3.93 per ADS to $3.40 per ADS."  Compl. ¶ 189.

2022); *see also Magnum Hunter*, 26 F. Supp. 3d at 301-02 (finding that plaintiffs had sufficient information to assert claims regarding material weaknesses in internal controls where the company had disclosed information similar to that disclosed in Pintec's 2018 Annual Report).  It follows that the claims, filed on September 29, 2020, are barred by the statute of limitations.

The same is true for Plaintiff's claims with respect to the Plutux loan.  In its 2018 Annual Report, Pintec admitted that it had identified a "material weakness . . . relat[ing] to [its] lack of effective controls over a non-routine loan financing transaction with a third-party entity, Plutux Labs."  2018 Report 24.  As Plaintiff alleges, the filing further "admitted [that Pintec] made no efforts to conduct any appropriate due diligence before extending" the loan, which was made "without any requirements to Plutux Labs for collateral or pledge."  Compl. ¶ 94 (emphasis omitted); *see id.* ¶ 184 ("The Company also admitted in the 2018 Annual Report that its lack of effective controls resulted in a non-routine loan financing transaction with Plutux."); *see also id.* ¶¶ 185-89.  It is beyond dispute, therefore, that the "facts comprising the core" of Plaintiff's claims relating to the Plutux loan were "contained within [the earlier] financial disclosures that are cited in the [complaint]," *NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir. 2015) (summary order), and that the claims are time barred.  Notably, Plaintiff does not even argue otherwise in his Opposition, responding only to Defendants' argument about the materiality of the Plutux-loan statements and saying nothing about their timeliness argument. *Compare* Defs.' Mem. 15, 20-21, *with* Pl.'s Opp'n 14 n.8; *see also, e.g.*, *Fieldcamp v. City of New York*, 242 F. Supp. 2d 388, 391 (S.D.N.Y. 2003) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue.").  Thus, the claims must be and are dismissed.

## C.  Revenue Recognition Practices

Next, Plaintiff argues that the "revenue recognition" section of the Registration Statement was "materially false and misleading by omission because it failed to disclose that the technical service fee revenues . . . were being recorded on a net, rather than a gross basis." Compl. ¶ 145.  In addition, he alleges that the statement that the company "prepare[s its] financial statements in conformity with U.S. GAAP" was false and misleading because these revenue recognition practices "deviated from generally accepted accounting principles."  *Id*. ¶ 141.  And finally, he alleges that the cost-of-revenue section was false and misleading because "it failed to include any discussion of the 'Service cost charge by Jimu Group-related party' line item."  *Id*. ¶ 147.  In response, Defendants point to warnings in the Registration Statement that the company lacked sufficient personnel with appropriate knowledge of GAAP and SEC reporting requirements and that the Company might therefore be forced to restate its financial statements from prior periods.  Defs.' Mem. 21.  Defendants also argue that Plaintiff fails to allege that any misstatement was a "statement of fact," positing instead that it was the result of an "subjective accounting judgments" and, thus, a matter of opinion.  *Id*. at 22.  Finally, Defendants contend that Plaintiff does not plausibly allege that the change from net to gross basis was material because it "had no impact on Pintec's bottom line."  *Id*.

Once again, Defendants have the better of the argument.  At the pleading stage, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Litwin*, 634 F.3d at 717 (cleaned up).  The Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation," *id.*, and has directed courts to consider both

quantitative and qualitative factors, including "the significance of the misstatement in relation to the company's operations," *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197-98 (2d Cir. 2009). Ultimately, the Court must determine whether the alleged misstatements "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (internal quotation marks omitted).

Judged against this standard, Plaintiff's allegations fall short. First, his argument that the Registration Statement was materially false and misleading because it indicated that "Pintec recorded technical service fee revenues in compliance with GAAP on a gross basis," Pl.'s Opp'n 18, is simply inaccurate. A review of the Complaint and the Registration Statement reveals no such claim, and Plaintiff "cannot base a Section 11 claim on implicit promises read into" the offering materials. *In re Coty Inc. Sec. Litig.*, No. 14-CV-919 (RJS), 2016 WL 1271065, at *9 (S.D.N.Y. Mar. 26, 2016); *see also* Compl. ¶ 145 (arguing that disclosing "that installment service fees were being . . . recognized on a gross basis, le[ft] Pintec investors with the inaccurate impression that the Company was treating its technical service revenue in a similar manner"). Plaintiff's claim that the Offering Materials were false and misleading by omission for failing to state whether revenue was recognized on a gross or net basis does not fare any better. Although it is true that the technical service fee made up a large percentage of Pintec's revenue, Plaintiff offers no plausible allegation that the change from gross-basis to net-basis recognition of revenue would have been material to an investor. Indeed, Plaintiff acknowledges that "gross profit remained the same" before and after the restatement because the correction resulted in an *equal increase* in both revenue and costs of revenue. Pl.'s Opp'n 20. Plaintiff's conclusory statement that "the changes in financial results were material to investors" is not

sufficient. *Iqbal*, 556 U.S. at 678; *see also Peifa Xu v. Gridsum Holding Inc.*, No. 18-CV-3655 (ER), 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (finding a misstatement immaterial where the "plaintiffs have not provided the Court with any reason why these changed line items . . . altered the total mix of information available" (internal quotation marks omitted)).

Plaintiff's next claim, that the Offering Materials were misleading because they "omit that Pintec was subject to a substantial 'Service cost' charge by Jimu that was not included in the costs of revenue," Pl.'s Opp'n 18; *see also* Compl. ¶¶ 147-48, can be disposed of quickly. First, Plaintiff alleges that the Registration Statement section on "Related Party Transactions" was misleading by omission because it did not include discussion of the service cost charges. Compl. ¶ 149. But the language quoted in the Complaint appears to disclose these very costs. In the sub-section titled "Transactions with Jimu Group," Pintec notes that "we paid service fees to Jimu Group for the peer-to-peer matching services for the funding debts." *Id*. And in the table reproduced in the Complaint, there is a corresponding line item for "Service fee to Jimu Group for the peer-to-peer matching services for the funding debts." *Id.* Next, Plaintiff argues that the service costs should have been included in the "Cost of Revenues" section of the offering documents. *Id*. ¶ 147. But "it is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material," *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd sub nom. In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010), and Plaintiff cites no authority for a duty to disclose any service cost charge. And finally, even assuming that there did exist a duty to disclose, Plaintiff does not allege that the omission of the service cost charge was material.

## D. Financial Statements

Finally, Plaintiff notes that Pintec restated certain financial results and asserts that because Pintec "admit[ted] to 'erroneously' recording certain financial results requiring a restatement, there is no dispute that Pintec's financial statements were false and misleading when made." Pl.'s Opp'n 21. In response to Defendants' protests that this section of the Complaint fails to provide "specific facts" about the line items that were allegedly misstated, *see* Defs.' Mem. 23, Plaintiff includes a bullet-point list in his Opposition identifying the specific misstatements that he is alleging, Pl.'s Opp'n 21-22. The Court addresses them in kind:

- The first alleged misstatement, that Pintec's revenues and costs of revenues for its technical service fees were improperly presented on a net, rather than gross, basis, fails for the reasons already discussed above.

- The second alleged misstatement, that Pintec restated its cash position for the year ended December 31, 2017, from ¥197.4 million to ¥164.852 million, is, as noted by Defendants, *see* ECF No. 39 ("Defs.' Reply"), at 9-10, factually incorrect. Pintec's cash position, reported as "[c]ash, cash equivalents and restricted cash at end of year" remained the same, at ¥375.891 million, before and after the restatement. 2019 Report F-77. The numbers that Plaintiff reports in the second bullet point actually represent "net cash provided by operating activities" and are repeated in the fourth bullet point, discussed below. *Id*. at F-76.

- The alleged misstatements in the third and fifth bullet points, net cash from financing activities and net cash used in investing activities for 2017, are presumptively immaterial because the restatements were 1.9% and 2.5% lower, respectively, then the originally stated financials. *See e.g.*, *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-CV-1954 (PAC), 2018 WL 2943746, at *4 (S.D.N.Y. June 12, 2018) ("[R]estatements of financial performance are presumptively immaterial unless the financial performance is revised downward by more than 5%."). Although the Court must consider "both qualitative and quantitative factors" in determining whether a misstatement is material and cannot rely on the size of the misstatement alone, *Litwin*, 634 F.3d at 717 (internal quotation marks omitted), Plaintiff provides no argument at all for why these particular line items would be important for investors to consider. And, in any event, the qualitative factors, including "(1) whether the misstatement masks a change in earnings or other trends; (2) whether the misstatement involves concealment of an unlawful transaction; and (3) whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability," *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 35 (E.D.N.Y. 2021) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 152 (Aug. 19, 1999) (cleaned up), do not tip the scales towards materiality.

- The fourth bullet point (also erroneously reported in the second bullet point) is perhaps Plaintiff's most compelling.  He alleges that "for the year ended December 31, 2017," Pintec restated the "net cash provided by operating activities from ¥197,438 to ¥164,8[5]2."  Pl.'s Opp'n 22; *see also* Compl. ¶ 159.  The restatement represents a 16% misstatement, which, standing alone, appears to be presumptively material.  But the overall cash position of the Company did not change upon restatement, remaining at ¥375,891, *see* 2019 Report, F-77, and, once again, Plaintiff provides no argument as to why an investor would find this particular line item on the Company's balance sheet important, *see e.g., Peifa Xu*, 2020 WL 1508748, at *9 (declining to find a material misstatement where "some of the figures swing quite dramatically between the original statement and the 2019 restatement," but "when placed into the context of [the company's] operations, the magnitude of these changes greatly diminishes"); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013) (summary order) ("Plaintiffs have failed to plead any reason why a reasonable investor would consider revenue from this one region standing alone material when making an investment decision.").  Without more, the Court cannot conclude that Pintec's misstatement of the company's net cash provided by operating activities would "significantly alter[] the 'total mix' of information made available."  *Litwin*, 634 F.3d at 717.

- Bullet points six through ten demonstrate no more than Plaintiff's misunderstanding of Pintec's financial statements.  As he correctly explains in the Complaint, the table reproduced in Paragraph 161 compares the Company's financial position for the six months ended June 30, 2017, with the six months ended June 30, 2018.  In his Opposition, however, Plaintiff misrepresents his own allegations, arguing that the table in the Complaint compares figures for the six months ended June 30, 2018, before and after a restatement.  *See* Pl.'s Opp'n 22.  That is not the case — the figures that he cites are not restatements of the same line item; instead, they show the year-over-year change in these line items.  Making matters worse, despite columns in the financial statements clearly reporting each line item for 2018 in both Chinese Yuan (¥) and United States Dollars ($), the Opposition misleadingly reports the dollar figures as yuan.  *Compare* Pl.'s Opp'n 22 *with* Compl. ¶ 161.

- Finally, in point eleven, Plaintiff alleges that "Pintec restated its net cash from operating activities and investing activities for year-ended December 31, 2018, from ¥108,309 to ¥231,908, and ¥250,56 to ¥280,595, respectively."  Pl.'s Opp'n 22; Compl. ¶162.  But this is a *positive* restatement, suggesting *negative* causation.  More fundamentally, the financial statement that Pintec restated, for the year-ended December 31, 2018, was first released on July 30, 2019, Compl ¶ 176, months after the Registration Statement upon which Plaintiffs' Section 11 claim is based, Compl. ¶ 2.  Restating financials that were originally issued *after* the Registration Statement plainly cannot make the Registration Statement materially misleading.

In short, for one reason or another, none of Plaintiff's claims with respect to Pintec's restated financial results survives scrutiny.

**CONCLUSION**

In short, Plaintiff fails to plausibly allege a material misstatement or omission that is not time barred.  Accordingly, his Section 11 claims fail.  In addition, because a Section 15 claim against a "control person" requires that a plaintiff first demonstrate a "primary violation of the relevant statute," these claims fail as well.  *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *11 (E.D.N.Y. Aug. 12, 2021); *see also Rombach*, 355 F.3d at 177-78.  The Court need not and does not consider Defendants' other arguments for dismissal.

Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks omitted).  Here, the problems with Plaintiff's claims are substantive, so amendment would be futile.  *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).  Moreover, Plaintiff "has not requested permission to file a[n] Amended Complaint, nor has he given any indication that he is in possession of facts that would cure the problems identified in the instant motion to dismiss." *Gayle v. Home Box Off., Inc.*, No. 17-CV-5867 (JMF), 2018 WL 2059657, at *4 (S.D.N.Y. May 1, 2018); *see also Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014).  Finally, the Court granted Plaintiff leave to amend his complaint for a second time in response to Defendants' motion to dismiss and explicitly warned that he would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  ECF No. 35; s*ee, e.g.*, *Transeo S.A.R.L. v.*

*Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) ("Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*." (collecting cases)).  Accordingly, the Court denies leave to amend the Complaint.

The Clerk of Court is directed to terminate ECF No. 32, to enter judgment in favor of Defendants, and to close this case.

SO ORDERED.

Dated:  April 25, 2022
      New York, New York

                    JESSE M. FURMAN
                 United States District Judge